## UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF MASSACHUSETTS

OLIVER SHIH, Individually and on Behalf of All Others Similarly Situated,

        Plaintiff,

  v.

AMYLYX PHARMACEUTICALS, INC., JOSHUA B. COHEN, JUSTIN B. KLEE, JAMES M. FRATES, and MARGARET OLINGER,

        Defendants.

Civil Action No. 1:24-CV-12068-NMG

**ORAL ARGUMENT REQUESTED**

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE AMENDED CLASS ACTION COMPLAINT

**TABLE OF CONTENTS**

INTRODUCTION ...................................................................................................................1

BACKGROUND .....................................................................................................................2

    I.      Amylyx Developed RELYVRIO® To Address a Devastating and Fatal Disease. ........................2

    II.    Amylyx Informed Investors of Potential Risks in Launching a New Treatment. ........................3

    III.   Amylyx Was Transparent Regarding the Progress of the Commercial Launch. ..........................3

        A.     Amylyx Described "Initial Bolus" of Demand in Q4 2022 Earnings Call. ........................4

        B.     Amylyx Previewed Moderating Growth During Q1 2023 Earnings Call. ..........................4

        C.     Amylyx Reported Steady Interest and Demand in Q2 2023. ...............................................5

        D.     Amylyx Reported a "Slowdown in Net Adds" in Q3 2023. .................................................5

    IV.   Disappointing Phase III Trial Results and RELYVRIO® Ceases to be Marketed. .......................6

LEGAL STANDARD ..............................................................................................................6

ARGUMENT ...........................................................................................................................7

    I.      Plaintiff Fails to Plead Any Actionable Misstatements or Omissions. ..........................................7

        A.     Interest and Demand Statements Are Non-Actionable. ........................................................7

        B.     Plaintiff's "Hidden Discontinuations" Theory Fails. ...........................................................11

        C.     Statements Regarding Corporate Growth Strategies Are Non-Actionable. .........................12

        D.     The AC Fails To Allege Any Duty To Disclose Under Item 303. ......................................14

    II.    The AC Fails To Raise a Strong Inference of Scienter. ...................................................................15

        A.     FE Statements Do Not Give Rise to a Strong Inference of Scienter. .................................15

        B.     The AC Does Not Allege That Defendants' Trades Were Unusual. ...................................18

        C.     Plaintiff's Invocation of the Core Operations Doctrine Fails. ............................................19

        D.     Non-Fraudulent Inferences Far Outweigh Any Inference of Scienter. ...............................19

    III.   The AC Does Not Adequately Allege Loss Causation ....................................................................20

CONCLUSION .......................................................................................................................20

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*In re A123 Sys., Inc. Sec. Litig.*,
930 F. Supp. 2d 278 (D. Mass. 2013)..................................................................................18

*ACA Fin. Guar. Corp. v. Advest, Inc.*,
512 F.3d 46 (1st Cir. 2008)................................................................................... 6, 12

*In re Biogen Inc. Sec. Litig.*,
857 F.3d 34 (1st Cir. 2017)................................................................................... 17, 19

*In re Biogen Sec. Litig.*,
193 F. Supp. 3d 5 (D. Mass. 2016).........................................................................10, 13, 18

*In re Bos. Sci. Corp. Sec. Litig.*,
490 F. Supp. 2d 142 (D. Mass. 2007).....................................................................20

*In re Bos. Sci. Corp. Sec. Litig.*,
Civ. No. 10-10593-DPW, 2011 WL 4381889 (D. Mass. Sept. 19, 2011).........................................14

*In re Bos. Sci. Corp. Sec. Litig.*,
646 F. Supp. 3d 249 (D. Mass. 2022).....................................................................10, 16, 20

*In re Bos. Tech., Inc. Sec. Litig.*,
8 F. Supp. 2d 43 (D. Mass. 1998)..........................................................................16

*Brennan v. Zafgen*, *Inc.*
853 F.3d 606, 616 (1st Cir. 2017) .........................................................................19

*In re Citigroup, Inc. Sec. Litig.*,
330 F. Supp. 2d 367 (S.D.N.Y. 2004).....................................................................13

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Waters Corp.*,
632 F.3d 751 (1st Cir. 2011)................................................................................... 15, 18

*Cody v. Conformis, Inc.*,
199 F. Supp. 3d 409 (D. Mass. 2016)....................................................................17

*Corban v. Sarepta Theraps., Inc.*,
Civ. No. 14-cv-10201-IT, 2015 WL 1505693 (D. Mass. Mar. 31, 2015).........................................11

*Coyne v. Metabolix, Inc.*,
943 F. Supp. 2d 259 (D. Mass. 2013).................................................................... 15, 20

*In re First Marblehead Corp. Sec. Litig.*,
639 F. Supp. 2d 145 (D. Mass. 2009)....................................................................11

*Ganem v. InVivo Therap. Holdings Corp.*,
Civ. No. 09-11267-GAO, 845 F.3d 447 (1st Cir. 2017).........................................................6, 20

*In re Genzyme Corp.*,
  2012 WL 1076124 (D. Mass. Mar. 30, 2012).................................................................20

*Glassman v. Computervision Corp.*,
  90 F.3d 617 (1st Cir. 1996)...............................................................................14

*Harrington v. Tetraphase Pharms. Inc.*,
  Civ. No. 16-10133-LTS, 2017 WL 1946305 (D. Mass. May 9, 2017).......................... 11, 19

*Hensley v. Imprivata, Inc.*,
  260 F. Supp. 3d 101 (D. Mass. 2017).....................................................................17

*In re iRobot Corp. Sec. Litig.*,
  527 F. Supp. 3d 124 (D. Mass. 2021).....................................................................17

*Isham v. Perini Corp.*,
  665 F. Supp. 2d 28 (D. Mass. 2009)........................................................................9

*Leavitt v. Alnylam Pharms., Inc.*,
  451 F. Supp. 3d 176 (D. Mass. 2020).....................................................................19

*Lenartz v. Am. Superconductor Corp.*,
  879 F. Supp. 2d 167 (D. Mass. 2012).....................................................................18

*Metzler Asset Mgmt. GmbH v. Kingsley*,
  305 F. Supp. 3d 181 (D. Mass. 2018)....................................................... 10, 15, 16, 18

*Miss. Pub. Emps.' Ret. Sys. v. Bos. Sci. Corp.*,
  523 F.3d 75 (1st Cir. 2008)..................................................................................6

*NJ Carpenters Pension & Annuity Funds v. Biogen IDEC Inc.*,
  537 F.3d 35 (1st Cir. 2008)................................................................................18

*In re Praecis Pharm., Inc. Sec. Litig.*,
  Civ. No. 04-12581-GAO, 2007 WL 951695 (D. Mass. Mar. 28, 2007)..........................10

*Quinones v. Frequency Therap., Inc.*,
  665 F. Supp. 3d 156 (D. Mass. 2023)......................................................................6

*Ressler v. Liz Claiborne Inc.*,
  75 F. Supp. 2d 43 (S.D.N.Y. 1999)........................................................................19

*Shaw v. Digital Equip. Corp.*,
  82 F.3d 1194 (1st Cir. 1996)............................................................................. 11, 16

*Sousa v. Sonus Networks, Inc.*,
  261 F. Supp. 3d 112 (D. Mass. 2017).....................................................................17

*In re Stone & Webster, Inc., Sec. Litig.*,
  253 F. Supp. 2d 102 (D. Mass. 2003).....................................................................13

*In re Stone & Webster, Inc. Sec. Litig.*,
  414 F.3d 187 (1st Cir. 2005)..................................................................................9

iii

*Tellabs, Inc. v. Makor Issues & Rts, Ltd.*,
    551 U.S. 308 (2007)...............................................................................................................15

*Washtenaw Cty. Emps.' Ret. Sys. v. Princeton Rev., Inc.*,
    Civ. No. 11-11359-RGS, 2012 WL 727125 (D. Mass. Mar. 6, 2012)................................14

*Washtenaw Cty. Emps.' Ret. Sys. v. Talbots, Inc.*,
    Civ. No. 11-10186-NMG, 2013 WL 5348569 (D. Mass. Sept. 23, 2013)..........................16

*In re Wayfair, Inc.*,
    471 F. Supp. 3d 332 (D. Mass. 2020)..............................................................................10

**Statutes**

15 U.S.C. § 78u-4(b).......................................................................................................6, 9, 15

**Other Authorities**

17 C.F.R. § 229.303............................................................................................................14

Fed. R. Civ. P. 9(b).............................................................................................................6

Defendants Amylyx Pharmaceuticals, Inc. ("Amylyx" or the "Company"), Joshua B. Cohen, Justin B. Klee, James M. Frates, and Margaret Olinger ("Individual Defendants," together with Amylyx, "Defendants") respectfully move pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure and the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u (the "PSLRA"), to dismiss the Amended Class Action Complaint (the "AC") with prejudice.

**INTRODUCTION**

Amylyx is a biotechnology company that is dedicated to advancing treatment for patients suffering from devastating rare diseases, including amyotrophic lateral sclerosis, or ALS, with its first-in-kind treatment, RELYVRIO®. Upon FDA approval in September 2022, patients rushed to be among the first to enroll in treatment due to the enormous unmet patient need for this fatal disease. Given the Company's commitment to this patient population, Amylyx worked exceptionally hard to deliver a smooth commercial rollout, but consistently warned investors of the risks inherent in launching a novel treatment. Amylyx cautioned that there would be an "initial bolus" of early demand for RELYVRIO®—which is to be expected for any new drug launch, but particularly here given significant pent-up demand from the ALS community—and that patient data was developing in real time throughout an evolving commercial launch.

The Company considered the unique and aggressive nature of ALS, as well as other companies' disclosures in the rare disease space, in determining what metric would best and most transparently inform the market in tracking the launch. Amylyx determined that disclosing "net patients" taking RELYVRIO® each quarter, in combination with other metrics like revenue and expenses, would provide a holistic view of the launch's progress, as well as how Amylyx was tracking to its business objectives. "Net patients," representing the total number of patients taking RELYVRIO® at any point in time, necessarily reflected changes in new patients and discontinuations.

Despite Amylyx's candor, when the Company narrowly missed analysts' consensus revenue estimates for Q3 2023 (expectations that analysts continued to raise during the course of the commercial rollout), Plaintiff filed this lawsuit alleging that Amylyx misrepresented the progress of the launch. Plaintiff, however, ignores the context of an actively unfolding commercial launch (which is why the Company did

1

not itself provide revenue guidance) and cherry-picks from Amylyx's disclosures to paint a picture in stark contrast to reality. Not only does Plaintiff overlook the growth Amylyx actually achieved, any purported failure to predict the future does not state a claim for securities fraud. The AC should be dismissed for three independently sufficient reasons:

- **No actionable misstatements or omissions**. Plaintiff does not adequately plead that any of Defendants' statements were false or misleading, ignoring or distorting Amylyx's consistent, transparent disclosures throughout the launch, including information that Plaintiff claims Defendants omitted. Plaintiff also ignores the context and chronology of the launch, insisting that Amylyx should have known information that did not yet exist, such as trends in patient data. Moreover, many of the challenged statements are forward-looking and protected by the PSLRA's safe harbor or amount to immaterial puffery.

- **No strong inference of scienter**. The AC should also be dismissed because it is devoid of any allegations that support a strong inference of scienter. The vague and conclusory allegations from three former sales employees ("FEs") are plainly insufficient, particularly when these FEs acknowledge that they did not have access to data that they speculate was misrepresented. Plaintiff's attempt to derive motive from Defendants' stock sales similarly fails: the omitted context demonstrates that these were non-discretionary sales and that Defendants *increased* their holdings during the Class Period. Finally, Plaintiff's generic allegation that Amylyx was motivated to conceal the truth related to the progress of the launch is outweighed by the non-fraudulent inference—which tracks Amylyx's disclosures—that the Company unexpectedly and narrowly missed consensus revenue estimates in Q3 2023 due to a slight uptick in discontinuations.

- **No loss causation**. The AC fails to plead loss causation, as the alleged corrective disclosures merely revealed some marginally bad news, and not fraud.

Further, because the AC fails to allege primary liability under § 10(b), the § 20(a) claim must also be dismissed. Therefore, the AC should be dismissed in its entirety with prejudice.

## BACKGROUND

I.    **Amylyx Developed RELYVRIO® To Address a Devastating and Fatal Disease.**

Since the Company's founding in 2013, its goal has been to improve the quality of, and extend, life for patients suffering from neurodegenerative diseases, including ALS. AC ¶¶ 2, 15, 23; Ex. G.[1] ALS is

---

[1] The factual background is drawn from the AC's allegations, as well as (i) documents and transcripts incorporated by reference in the AC, and (ii) Amylyx's judicially noticeable SEC filings, all of which are submitted as exhibits ("Ex.") to the Declaration of Morgan Mordecai dated September 6, 2024. For the Court's convenience, Exhibit A is a chart containing the AC's alleged misrepresentations and omissions that summarizes the reasons for dismissal outlined in this brief, Exhibit B is a chart containing relevant context surrounding those alleged statements, and Exhibit C contains excerpts from Amylyx's SEC filings with the cited risk and warning disclosures. Unless otherwise noted, all emphasis is added, and all abbreviations are defined in the AC.

relentlessly progressive: all diagnoses are fatal, and the average life expectancy after diagnosis is only 2 to 5 years. AC ¶ 25. ALS is also rare, affecting approximately 30,000 people in the U.S. and more than 200,000 people worldwide. *Id.* ¶ 26.

Due to the needs of these patients with few options and no time to spare, Amylyx poured its efforts and resources into developing RELYVRIO® (formerly known as AMX0035 in the U.S.). *See id.* ¶¶ 24-25, 32. In September 2022, the FDA approved RELYVRIO® based on Phase II trial results (the CENTAUR trial) as Amylyx's confirmatory Phase III (PHOENIX) trial was ongoing. *Id.* ¶¶ 28-29. On October 24, 2022, Amylyx commercially launched RELYVRIO®. *Id.* ¶ 33.

## II.    Amylyx Informed Investors of Potential Risks in Launching a New Treatment.

Amylyx informed investors of the risks inherent in launching a novel drug to treat a rare disease. Amylyx's SEC filings were replete with warnings about the potential inability to achieve market acceptance by physicians and patients, potential obstacles to prescribing and patient uptake, and potential market and treatable patient population limitations. *See* Ex. C. For example:

- "We have a limited operating history and our only product, [RELYVRIO®], has only recently been approved by the FDA in the U.S. . . . which may make it difficult to evaluate the prospects for our future viability." Ex. G at 49; *see also* Ex. M at 31.

- "[RELYVRIO®] may fail to achieve the degree of market acceptance by physicians, patients, third-party payors and others in the medical community necessary for commercial success, in which case we may not generate significant revenues or become profitable" Ex. M at 31.

- "We base our market opportunity estimates on a variety of factors. . . . These estimates are based on many assumptions and may prove incorrect. . . . Estimating market opportunities can be particularly challenging for ultra-rate indications, such as the ones we currently address, as epidemiological data is often more limited than for more prevalent indications and can require additional assumptions to assess potential patient populations." Ex. G at 54-55.

## III.    Amylyx Was Transparent Regarding the Progress of the Commercial Launch.

On February 14, 2023, the Company proactively and transparently filed a Form 8-K previewing that the Company "observed higher demand for RELYVRIO® in the U.S. than initially anticipated pre-launch and, as a result, expect[ed] to meaningfully exceed fourth quarter and full-year 2022 Wall Street research analyst consensus estimates for revenue." AC ¶ 33; Ex. F. Amylyx also explained that it had

3

"recently learned that certain prescriptions were being reported to third-party data vendors" and that such data would no longer be flowing as of February 19, 2023 to prevent selective and unrepresentative data reaching the market "consistent with the closed pharmacy network model."[2] AC ¶ 45; Ex. F.

### A.   Amylyx Described "Initial Bolus" of Demand in Q4 2022 Earnings Call.

To provide investors with real-time data regarding the progress of the launch, Amylyx reported "net patients on therapy," representing patients to start on RELYVRIO® minus patients who discontinued the drug for any reason. *See* AC ¶ 37. During the first post-commercial launch earnings call on March 13, 2023, Amylyx disclosed that 1,300 net patients were on RELYVRIO® in the U.S. as of the end of Q4 2022. Ex. I at 6. Amylyx also previewed that it anticipated that net patients would roughly double by the end of March (as the call took place two weeks before the end of Q1 2023). *Id.* at 10. However, from the outset, Amylyx cautioned that this was an "initial bolus in demand" given pent-up patient need and that the Company did not know "how big this bolus will be or how long it will last." *Id.*; AC ¶ 34.

### B.   Amylyx Previewed Moderating Growth During Q1 2023 Earnings Call.

On May 11, 2023, less than two full quarters into the commercial launch, Amylyx reported that "[a]s of March 31, there were roughly 3,000 people on RELYVRIO® in the U.S., more than double the number of people on RELYVRIO® at the start of the quarter." AC ¶ 35; Ex. L at 5, 9. While Amylyx reported that there was "significant" demand for RELYVRIO®, the Company cautioned that "[t]he rate of net patient adds has begun to moderate as expected," and "our net patient adds can't double forever. So in Q2, we are expecting the number will be lower than what we delivered in Q4 and Q1." Ex. L at 9.

Amylyx also gave preliminary feedback on patient discontinuations. Cautioning that at this early stage of the commercial launch the first patients to take RELYVRIO® "ha[dn't] been on therapy long enough for [Amylyx] to give any clarification" on the duration of treatment or discontinuation rates, the Company stated that "the general trends [are] in line with . . . CENTAUR," the Company's prior Phase II

---

[2] Drug manufacturers of medications that treat rare or complicated diseases often dispense drugs through select specialty pharmacies using this model, also known as limited distribution networks. *See* Ex. BB at 1-2. This ensures the ability to "contain[] costs in the supply chain and provid[e] an enhanced and consistent experience to patients not seen as frequently at the pharmacy." *Id.* at 2.

trial.[3] Ex. L at 11.

> **C.      Amylyx Reported Steady Interest and Demand in Q2 2023.**

As Amylyx previewed in Q1 2023, the number of net patients on RELYVRIO® in the U.S. only increased 27% from Q1 to Q2 2023, growing from 3,000 to 3,800 due, in part, to steady interest and demand for the drug. Ex. O at 4, 9. Amylyx also updated investors on discontinuations during the Q2 2023 Earnings Call, again sharing that discontinuations were tracking the CENTAUR trial, where 70% of patients remained on RELYVRIO® after six months. *Id.* at 8. The Company reminded investors that many of "the first cohort of patients who started on therapy at launch" were those who had fairly advanced ALS, and so "we're going to see the dynamic of the patients change over time" and thus "it's a little too early to really give any trends there." *Id.* at 10.

> **D.      Amylyx Reported a "Slowdown in Net Adds" in Q3 2023.**

On November 9, 2023, during the Company's Q3 2023 earnings call, Amylyx reported roughly 3,900 net patients on RELYVRIO® in the U.S. as of September 30, 2023. Ex. R at 4, 5, 10. Even with the net addition of 100 patients from Q2 to Q3, the Company accurately conveyed that there was a "steady cadence of new prescriptions written in the third quarter" but explained that the "slowdown in net adds this quarter was primarily driven by increased discontinuations for a variety of reasons." AC ¶¶ 138-39; Ex. R at 5. Moreover, with the benefit of three full quarters of data, Amylyx could provide more detail regarding the discontinuation data stating: "60% of people taking RELYVRIO® remain on therapy 6 months after initiation in the U.S." AC ¶ 138; Ex. R at 6, 9. The Company explained that it had been "tracking the CENTAUR data through last quarter," but that it had "gotten a little higher than that discontinuation rate over the last couple of months." Ex. R at 12. Amylyx had always cautioned that it would be difficult to accurately model "6 month or 9 months discontinuations until [the Company] get[s] there." *Id.* The Company stated that it believed that certain discontinuations appeared to be addressable as the persistence rate in Canada was approximately 80% of insured patients six months after starting treatment. *Id.* at 6.

---

[3] Amylyx also cautioned that the results of CENTAUR may not be replicable beyond that trial. *See* Ex. G at 73.

The Company reported a modest, 4.6%, miss in revenue expectations for Q3 2023—sales of $103 million versus consensus estimates of $108 million. *Id.*; Ex. T at 2; *see also* AC ¶ 5 (reporting earnings per share of $30, missing consensus estimates by $0.12). Amylyx's stock fell, AC ¶ 145, and Plaintiff filed this action on February 9, 2024 and filed the AC on June 24, 2024.

## IV.   Disappointing Phase III Trial Results and RELYVRIO® Ceases to be Marketed.

On March 8, 2024, Amylyx announced disappointing and surprising news for the Company and ALS community: the PHOENIX Phase III Study did not meet its prespecified endpoints. Ex. U; *see also* AC ¶ 148. As a result, on April 4, 2024, Amylyx voluntarily ceased marketing and sales of RELYVRIO®. AC ¶¶ 8, 152.

Even though RELYVRIO® is no longer marketed, Plaintiff nevertheless reaches back to the very start of the commercial launch, when patient data was dynamically unfolding, and alleges that Amylyx misrepresented the launch's progress. Notably, Plaintiff does not (and cannot) make a single allegation that Defendants made any misrepresentations or omissions in connection with the CENTAUR Phase II trial results or the PHOENIX Phase III trial.

## LEGAL STANDARD

To state a claim for securities fraud under Section 10(b) and Rule 10b-5, Plaintiffs must adequately plead (i) a material misrepresentation or omission of fact, (ii) scienter, (iii) a connection with the purchase or sale of a security, (iv) reliance, (v) economic loss, and (vi) loss causation. *See ACA Fin. Guar. Corp. v. Advest, Inc.*, 512 F.3d 46, 58 (1st Cir. 2008). Such claims must meet the standard under Fed. R. Civ. P. 9(b) and the "heightened pleading requirements" imposed by the Private Securities Litigation Reform Act of 1995 (the "PSLRA"). *Miss. Pub. Emps.' Ret. Sys. v. Bos. Sci. Corp.*, 523 F.3d 75, 85 (1st Cir. 2008). Under the PSLRA, a complaint for securities fraud must "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading[]" and "state with particularity facts giving rise to a strong inference that the defendant" acted with scienter. 15 U.S.C. § 78u-4(b)(1)(B), (2)(A). Rule 9(b) requires Plaintiffs to "state with particularity the circumstances constituting fraud," *Ganem v. InVivo Therap. Holdings Corp.*, 845 F.3d 447, 454-55 (1st Cir. 2017), including facts demonstrating "how and

why these specific statements were misleading *at the time* they were made." *Quinones v. Frequency Therap., Inc.*, 665 F. Supp. 3d 156, 170 (D. Mass. 2023).

ARGUMENT

## I.   Plaintiff Fails to Plead Any Actionable Misstatements or Omissions.

Plaintiff challenges 64 statements that fall into three overlapping categories: (i) 39 statements regarding interest in and demand for RELYVRIO®; (ii) 6 statements regarding the future commercial potential for RELYVRIO® given the Company's purported obfuscation of patient discontinuation data; and (iii) 18 statements regarding general corporate growth strategies, including strategies to pursue newly diagnosed ALS patients as well as patients receiving treatment outside of ALS treatment centers. *See* AC ¶¶ 4, 81-131; Ex. A. The thrust of the AC is that, across these various categories of alleged misstatements, Amylyx misrepresented the progress of the commercial launch. As set forth below, the AC fails to plead the requisite specific facts demonstrating that any challenged statements were false or misleading, necessitating dismissal.

### A.   Interest and Demand Statements Are Non-Actionable.

Of the 64 statements that Plaintiff challenges, more than half[4] relate to the Company's statements regarding interest in and demand for RELYVRIO®. Plaintiff alleges that the "'initial' demand was due to a temporary 'bolus' of patients that would shortly stabilize," and "had stabilized," as of February 2023, "offering no meaningful opportunity for further 'growth.'" AC ¶¶ 92, 94, 108, 110, 120. Plaintiff also alleges that Defendants' knowledge that the "initial bolus" had already stabilized counteracted any described demand for the drug going forward. *Id.* ¶¶ 94, 108, 120, 131. The Company's disclosures demonstrate that Plaintiff's allegations fail.[5]

The Company accurately described the "initial bolus of demand" and provided updates in real-time

---

[4] *See* Ex. A Nos. 1-39.

[5] Plaintiff broadly copies corporate disclosures concerning Amylyx's commercial launch, including certain language relating to the Company's financial results and profitability. But, Plaintiff does not make a ***single*** allegation that the Company misrepresented ***any*** information pertaining to its profits or financial results. If those statements were included for any substantive purpose, Plaintiff has not met its burden in pleading with specificity why they were false or misleading. *See* AC ¶¶ 97, 99, 113, 123; Ex. A Nos. 9, 14, 23, 24, 34.

7

regarding the "net patients" on RELYVRIO® for each quarter as well as upcoming expected moderation. Amylyx disclosed that it expected an "initial bolus" given pent-up demand for an ALS treatment. *Id.* ¶ 90 ("In regard to interest in RELYVRIO®, we are seeing a ***solid initial bolus***"); Ex. A No. 4. The Company then previewed that it was expecting to exceed analyst consensus for Q4 2022, which is precisely what the Company reported on March 13, 2023 in connection with its first post-commercial launch earnings call. AC ¶ 98; Ex. A No. 10. Amylyx also informed investors that the "initial bolus" was temporary, and it did not know "how big this bolus will be or how long it will last." AC ¶ 101; Ex. A No. 15. In the Q4 2023 Earnings Call, the Company also predicted that by the end of Q1 2023, "we're looking at roughly doubling [the number of net patients] as we get to the end of March, so 2,600 patients, plus or minus." AC ¶ 99; Ex. A No. 14. And this is exactly what the Company ultimately disclosed regarding its Q1 2023 results. AC ¶ 122; Ex. A No. 31. ("As of March 31, there were roughly 3,000 people on RELYVRIO® in the U.S., more than double the number of people on RELYVRIO® at the start of the quarter."). Plaintiff's allegation that the initial demand "had stabilized" by February 2023 (AC ¶ 94) is contradicted by the increase in net patients the Company disclosed through Q1 2023.

Plaintiff also ignores that Amylyx previewed moderating patient additions for Q2 2023 during its Q1 2023 Earnings Call. Specifically, Amylyx disclosed "our net patient adds can't double forever. So in Q2, we are expecting the number will be lower than what we delivered in Q4 and Q1." AC ¶ 115; *see also id.* ¶ 116 ("Regarding the bolus, it's really too early to tell when the bolus will finish. But . . . ***we have begun to see the rate in new patient adds moderate***."). Then, just as previewed, the Company disclosed during its Q2 2023 Earnings Call that "there were roughly 3,800 people on RELYVRIO® in the U.S." as of June 30, 2023, "up from roughly 3,000 people on RELYVRIO® as of March 31, 2023, and just over 1,300 at the end of 2022." AC ¶ 122; Ex. A No. 33. Despite contending that Amylyx misstated growth for RELYVRIO® during the launch, the AC does not contain a single particularized fact disputing the accuracy of the net patient additions disclosed by the Company each quarter.

Instead, Plaintiff attempts to conjure up misstatements regarding a purported lack of demand for RELYVRIO® through vague statements attributed to three FEs. *See* AC ¶¶ 40-57. Critically, however,

8

these FEs acknowledge that they did not have access to the consolidated sales data on which they provided commentary. *Id.* ¶¶ 46, 47, 69 (FEs acknowledging that sales employees "only had sales numbers 'for our own territories'"). Moreover, the FEs' vague references to a "database" that may have been used to track patient information but which, by their own admission, they never had access to (*id.* ¶¶ 55, 82) fail to show why Defendants' statements were purportedly false or misleading when made.

Even if Plaintiff could demonstrate that Defendants' statements were in some way inaccurate (which he cannot), the majority of the alleged misstatements that Plaintiff has identified in this category (24 out of 39)[6] are also forward-looking statements immunized by the PSLRA's statutory safe harbor, including statements about the Company's "***encourage[ment]***" for the future (*id.* ¶¶ 87, 88, 95, 97),[7] "***expected continued growth*** and interest in demand" (*id.* ¶ 101), and anticipated "***long runway . . . ahead of us***" (*id.* ¶¶ 101, 103). Under the safe harbor, a forward-looking statement, whether written or oral, cannot be a basis for liability under Section 10(b) if *either* (i) regardless of intent, it is identified as forward-looking, and is accompanied by meaningful cautionary statement identifying important factors that could cause actual results to differ," *or* (ii) Plaintiff does not plead that the statement was made 'with actual knowledge' that it was false or misleading. *See In re Stone & Webster, Inc. Sec. Litig.*, 414 F.3d 187, 212 (1st Cir. 2005) (quoting 15 U.S.C. § 78u-5(c)(1)). Both prongs apply to the statements here.

All forward-looking statements in the AC were identified as such and accompanied by cautionary language "substantive and tailored to the specific future projections, estimates or opinions." *Isham v. Perini Corp.*, 665 F. Supp. 2d 28, 39 (D. Mass. 2009). Amylyx explicitly identified as forward-looking any "express or implied statements about . . . demand and growth potential for [RELYVRIO®]." Ex. G at 1; *see also* Ex. C. Amylyx also disclosed that there can be no assurance in the Company's "ability to successfully commercialize and market [RELYVRIO]" and that "the initial market opportunity for [RELYVRIO] and any future product candidates may be smaller than the total addressable market opportunity that could be achieved over time." Ex. G at 1, 54). And the AC fails to allege that Defendants

---

[6] Ex. A Nos. 1, 2, 5, 6, 7, 8, 11-21, 23-24, 27, 29-31, 38.
[7] Ex. A Nos. 1, 2, 6-8, 17, 19, 21, 24, 34.

did not believe that RELYVRIO® had opportunity for growth at the time of making these forward-looking statements.[8]

Many of the challenged statements are also classic statements of corporate "puffery" that courts in this Circuit repeatedly discard as non-actionable. *See Metzler Asset Mgmt. GmbH v. Kingsley*, 305 F. Supp. 3d 181, 209 (D. Mass. 2018), *aff'd*, 928 F.3d 151 (1st Cir. 2019); *In re Biogen*, 193 F. Supp. 3d 5, 41 (D. Mass. 2016) (statements of "loose optimism about both a company's current state of affairs and its future prospects" are non-actionable). Specifically, 10 of the 39 "interest and demand" statements[9] Plaintiff identifies as misleading are quintessential "loose optimism." For example: "We are ***thrilled*** that RELYVRIO® . . . [is] now available to people living with ALS in the U.S. . . . ***and we are encouraged by*** . . . the rate of new prescriptions for this important new therapeutic option" (AC ¶ 87); and "[o]ur commercial launch is off to a ***strong start***, and ***we are encouraged*** by the engagement we have seen from physicians, people living with ALS, and payors" (*id.* ¶ 95). Courts routinely find statements with nearly identical language inactionable. *In re Bos. Sci. Corp. Sec. Litig.*, 646 F. Supp. 3d 249, 275 (D. Mass. 2022) (finding that statements that executives were "really pleased" by the pace of the launch, that the product was "doing very well on the market," that the device was being used and ordered "quite consistently," and that results were "encouraging," were immaterial and inactionable).[10]

Moreover, several of the alleged misstatements[11] are non-actionable statements of opinion prefaced by "I think" or "we believe" such as: "So ***we really believe*** that at this point in time RELYVRIO® is really starting to become a foundational therapy in ALS and meeting a really high unmet need for this patient community" (AC ¶ 126); "***We believe we have a large untapped opportunity for additional growth*** as we

---

[8] Even if Defendants' statements had not been accompanied by tailored cautionary language, "recklessness" is not enough to overcome the safe harbor; rather "the facts pled . . . must be sufficient to raise a strong inference [of] actual knowledge of the statement's falsity." *In re Praecis Pharm., Inc. Sec. Litig.*, 2007 WL 951695, at *9 (D. Mass. Mar. 28, 2007). Plaintiff fails to allege any such particularized facts of actual knowledge here. *See infra* Section II.

[9] Ex. A Nos. 1, 2, 6-8, 17, 19, 21, 24, 34. Similar statements including the word "encouraged" appear in other categories: Discontinuations – 42; Corporate Growth Strategies – 46, 47, 56, 59-60.

[10] *See also In re Wayfair, Inc.*, 471 F. Supp. 3d 332, 339 (D. Mass. 2020) (executives' reports that they were "delighted" with progress and that the market-share would grow were not actionable).

[11] Ex. A Nos. 11, 12, 14, 27, 29, 31, 36, 37, 38.

10

conduct ongoing research outreach" (*id.* ¶ 98); ***I think more importantly, we continue to see significant interest in demand for RELYVRIO®*** both from patients and HCP (*id.* ¶ 115). Such "opinions of the speaker" are non-actionable. *Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1217 (1st Cir. 1996); *Harrington v. Tetraphase Pharms. Inc.*, 2017 WL 1946305, at *11 (D. Mass. May 9, 2017) ("The use of '[w]e believe' and 'I think' further bolsters that the statement is a[] [non-actionable] opinion.").[12]

### B.      Plaintiff's "Hidden Discontinuations" Theory Fails.

Next, Plaintiff alleges that every single statement Defendants made from February 2023 forward (60 in total)[13] was false and misleading because "Defendants already were aware that high, undisclosed discontinuation rates were occurring." AC ¶ 4. But Plaintiff's theory is premised on a fundamental distortion of the key net patients metric reported by Amylyx each quarter. The AC makes repeated references to a purported "subscriber" metric,[14] and alleges that "hidden discontinuations inflated the 'ramp' for the stated net patient subscribers." *Id.* ¶ 120. In actuality, however, each quarter Amylyx reported "***net patients*** on therapy." This "net patient" number was not the number of "subscribers" as alleged but, rather, the number "of people living with ALS ***on*** RELYVRIO® in the United States at the end of [each quarter]." Ex. I at 6; AC ¶ 125. Amylyx repeatedly reminded investors that the net patient metric included patients who started on treatment ***less*** any patients who discontinued treatment. AC ¶ 125 ("[A]s a reminder, we report on net patients on therapy. ***So this is inclusive of any discontinuation***."). Plaintiff's repeated assertion that Amylyx did not disclose discontinuation information is simply wrong. *Id.* ¶¶ 80-86. *In re First Marblehead Corp. Sec. Litig.*, 639 F. Supp. 2d 145, 155 (D. Mass. 2009) (no "actionable §10(b) claim predicated on the

---

[12] Statements of opinion or belief are non-actionable "unless Plaintiff[] can allege that (i) the company's opinions were both objectively and subjectively false, i.e., that the person holding the opinion did not subjectively believe in it, (ii) self-embedded facts within the opinion are untrue, or (iii) material facts about the [opinion holder's] inquiry into or knowledge concerning a statement of opinion were omitted." *Corban v. Sarepta Theraps., Inc.*, 2015 WL 1505693, at *6 (D. Mass. Mar. 31, 2015), *aff'd*, 868 F.3d 31 (1st Cir. 2017). Here, the AC does not allege any such facts.
[13] Ex. A Nos. 5-64.
[14] AC ¶¶ 4, 9, 34-35, 39-40, 43, 46, 49-50, 55, 69, 79, 86, 98, 103, 108, 110, 120, 131, 137, 158- 59, 162.

concealment of information if that information was, in fact, disclosed.").[15]

The AC also misleadingly omits the additional context disclosed in Q1 2023 and Q2 2023 regarding discontinuations. During the Q1 2023 earnings call, the Company stated that patients have not been on therapy long enough to discern a particular "discontinuation rate[]" but that "general trends" appear to be "in line with what [the Company] saw with CENTAUR [the 6-month Phase II trial]." Ex. L at 11-12. In Q2, the Company disclosed: "I would say it's really too early to see any long-term trends at this point in our launch. *But maybe a reference point i[s] the CENTAUR trial, which again as a reminder was a 6-month trial, approximately 70% of participants remained on drug*. *And we're tracking close to that in terms of the commercial setting*." Ex. O at 8. Plaintiff has not alleged any facts challenging the accuracy of these Q1 and Q2 statements regarding discontinuations.

The AC then mischaracterizes the Company's Q3 2023 statements regarding discontinuation rates. Plaintiff alleges that it "was not until November 2023 that Defendants revealed discontinuation problems, purportedly that patients were 'discontinuing' after being on treatment 'after six months.'" AC ¶ 80. Plaintiff then tries to rely on anecdotes from FEs that certain patients "discontinu[ed] treatment within the first month or two" and "that people were discontinuing the drug before six months." *Id.* ¶ 81. But Amylyx never claimed that there were *zero* patient discontinuations early in treatment. Rather, in Q3 2023, Amylyx provided data related to *the percentage* of U.S.-based patients that *remained on* RELYVRIO® six months after starting treatment. Ex. R at 6 ("Circling back to discontinuations. *60% of people taking RELYVRIO® remain on therapy 6 months after initiation* in the U.S.").[16] Again, Plaintiff's allegations are contradicted by Amylyx's disclosures.

**C.    Statements Regarding Corporate Growth Strategies Are Non-Actionable.**

Lastly, Plaintiff challenges 18 statements related to the Company's opportunity to reach new ALS

---

[15] That the information is not presented in the exact way that Plaintiff would prefer is not a basis for securities fraud. *See Advest, Inc.*, 512 F.3d at 61 (no duty to disclose a precise attrition rate when that information could be derived from information presented, even if the rate itself was not specifically calculable, and other information such as enrollment data and trends were disclosed).

[16] Plaintiff does not identify any facts (because he cannot) suggesting that the shift from the preliminary 70% rate described in Q2 2023 to the 60% rate described in Q3 2023 was a result of anything other than an actively unfolding commercial launch with trends developing in real time.

patients—patients both being treated at ALS centers and those being seen by neurologists outside of those centers.[17] Plaintiff alleges that Amylyx overstated its growth opportunity because these corporate growth strategies were purportedly "dead-end[s]." AC ¶ 62. Nowhere in the AC, however, does Plaintiff allege that Defendants did not believe that these were opportunities for growth or that the Company did not actually pursue them.[18] That one FE disagreed with the likelihood of success of a company's strategy (*id.* ¶¶ 58-63)—which Plaintiff admits was disclosed and actually pursued by Amylyx—does not amount to a claim for securities fraud. *In re Stone & Webster, Inc., Sec. Litig.,* 253 F. Supp. 2d 102, 123 (D. Mass. 2003) (finding even a "misguided corporate strategy" is "inactionable under securities laws"); *In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d 367, 375 (S.D.N.Y. 2004) (dismissing allegations where plaintiff merely second-guesses defendants' business decisions). Further, the FE's opinion that these were "dead-end" strategies is plainly contradicted by the growth actually achieved. Ex. L at 4.

Moreover, these statements regarding "opportunity for growth," (AC ¶ 98), the Company's work on "expansion moving forward" (*id.* ¶ 128), and description of using these strategies as the "next runway . . . to continue to penetrate this market" (*id.* ¶ 48) are clearly forward-looking.[19] As Amylyx accompanied these statements regarding its patient population and market opportunity with tailored cautionary language (Ex. G at 54), they are non-actionable.

Lastly, many of these statements reflect opinions of what Defendants "believe[d]" (AC ¶¶ 109, 124, 126) regarding the potential addressable patient population and "loose optimism about the Company's current state of affairs and future prospects"[20] (*Biogen*, 193 F. Supp. 3d at 41), e.g.:

- "***We believe*** we have a large untapped opportunity for additional growth," (AC ¶ 98);
- "We have a lot of breadth and depth to continue to look forward to, ***I think*** as we expand this product" (*id.* ¶ 102);
- "***We are encouraged*** by the level of interest among this group ***and believe that we have an opportunity for growth***" (*id* ¶ 124); and
- "***I think*** the way that we've thought about our business . . . is to focus on the ALS specialists,

---

[17] Ex. A Nos. 46-64.
[18] Plaintiff has no explanation for why Amylyx would knowingly expend resources on a doomed strategy. *See* AC ¶ 63.
[19] Ex. A Nos. 46, 48, 50, 51, 52, 54, 55, 56, 57, 58, 59, 60, 64.
[20] Ex. A Nos. 44 & 45, 47 & 48, 53-56, and 58-63.

and then continuing to look to broaden out" (*id* ¶ 128).

As this Court has held, such statements "fall on their face within the penumbra of non-actionable puffing" and are immaterial as a matter of law. *In re Bos. Sci. Corp. Sec. Litig.*, 2011 WL 4381889, at *11 (D. Mass. Sept. 19, 2011).

> **D.     The AC Fails To Allege Any Duty To Disclose Under Item 303.**

The AC also asserts that Defendants failed to disclose trends or uncertainties, as required under Item 303(a) of Regulation S-K, 17 C.F.R. § 229.303. AC ¶¶ 106, 133, 137. Item 303(a) requires disclosure of "**known** trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. § 229.303(a)(3)(ii). And the First Circuit requires that Item 303 "trends and uncertainties" be "discernible from **hard information alone**." *Glassman v. Computervision Corp.*, 90 F.3d 617, 631 (1st Cir. 1996).

Plaintiff ignores the critical background—Amylyx was providing real-time updates to the market in the context of an actively unfolding new commercial launch. The Class Period spans the "very early months of the launch," (AC ¶ 103) where the Company was still collecting and analyzing data to determine any "long-term trends" (AC ¶ 125). It did not have the "hard information" to discern any trends necessitating disclosure under Item 303 at such an early juncture. *See Washtenaw Cty. Emps.' Ret. Sys. v. Princeton Rev., Inc.*, 2012 WL 727125, at *6 (D. Mass. Mar. 6, 2012) ("That [defendants'] third quarter . . . results disappointed does not support the inference that [they] had hard information . . . – seven months prior – that would have predicted a material departure from a result based on known trends and risks."). That said, despite Plaintiff's allegations to the contrary, and as explained *supra*, the Company provided materially accurate and complete disclosures regarding the early progress of the commercial launch.[21]

---

[21] On interest and demand, Amylyx disclosed that it expected an initial patient bolus given pent-up need in the ALS community and then previewed moderating growth for Q2 2023 during its Q1 2023 Earnings Call, (*see supra* Section I.A.); for discontinuations, it disclosed that the data was tracking the CENTAUR trial through Q2 but cautioned that it was too early to provide information about long-term trends at that juncture, (*see supra* Section I.B.); with respect to corporate growth strategies, Amylyx detailed the basis for pursuing patient growth both inside and beyond ALS centers.

14

## II.       The AC Fails To Raise a Strong Inference of Scienter.

Independently, the AC should also be dismissed because Plaintiff fails to plead particularized facts giving rise to a strong inference of scienter. *See* 15 U.S.C. § 78u-4(b)(2). "Under the PSLRA, . . . plaintiffs must state with ***particularity*** facts giving rise to a ***strong*** inference that the defendant[s] acted with scienter," which is "defined as either the intentional or willful conduct designed to deceive or defraud investors or a high degree of recklessness." *Metzler*, 928 F.3d at 158. To meet this burden, Plaintiffs must allege particularized facts showing Defendants (i) had a conscious intent "to deceive or defraud investors" or (ii) "acted with a high degree of recklessness." *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Waters Corp.,* 632 F.3d 751, 757 (1st Cir. 2011). The inference of fraud must be "cogent and at least as compelling as any opposing inference," requiring the Court to consider "plausible, nonculpable explanations for the defendant's conduct." *Tellabs, Inc. v. Makor Issues & Rts, Ltd.*, 551 U.S. 308, 314 (2007). The AC's scienter allegations fail to support any inference of fraudulent intent or extreme recklessness by the Defendants, much less the strong inference required.

### A.       FE Statements Do Not Give Rise to a Strong Inference of Scienter.

Plaintiff's theory of fraud, that Defendants purportedly misstated the progress of the RELYVRIO® commercial launch, rests principally on general grumblings and musings from three former sales employees. FE1 is described as a former sales representative covering New York City (AC ¶ 41), FE2 is described as a former Regional Sales Director overseeing the West Coast (*id.* ¶ 42), and FE3 is described as a former sales training coordinator training salespeople on the RELYVRIO® product (*id.* ¶ 69). But these FE statements lack the "specific facts capable of demonstrating that Defendants ***knew*** the information that [plaintiff] alleges contradicted their public statements." *Coyne v. Metabolix, Inc.*, 943 F. Supp. 2d 259, 267, 271 (D. Mass. 2013).

First, the FEs admit they did not have insight and access to the very data about Amylyx's prescribing rates or trends that they allege was misrepresented. FE1 acknowledges that they "only had sales numbers 'for our own territories,'" (AC ¶ 46), FE2 only got "data on FE2's region," (*id.* ¶ 47), and FE3 "did not have direct 'insight' into the selling data on new subscribers and discontinuations," (*id.* ¶ 69).

15

Absent direct knowledge of the prescription data disclosed by Amylyx, the FEs make conclusory allegations based on mere speculation: FE1 "'***wouldn't be surprised***' if the Company deliberately 'blocked analysts from seeing prescription data.'" *Id.* ¶ 46).[22] Such speculation is insufficient to state a claim. *See Washtenaw Cty. Emps.' Ret. Sys. v. Talbots, Inc.*, 2013 WL 5348569, at *24 (D. Mass. Sept. 23, 2013) ("general allusions to unspecified internal corporate information" fails to show scienter); *In re Bos. Sci. Corp. Sec. Litig.*, 646 F. Supp. 3d at 285 (insufficient to establish scienter where former employees "provide only their own opinions as to what the senior leadership knew").

Second, the FEs' statements about the existence of an internal database purportedly tracking "new patient subscribers" (AC ¶¶ 55, 82, 158) also fails to provide any inference of scienter as there are no allegations that the FEs ever viewed the database, understood the metrics being tracked, understood the results of any tracking, or spoke to Defendants about the data purportedly being tracked. Conclusory allegations about the mere "existence of," and Defendants' "access to," various "corporate information system[s] do[] not plead scienter" because such allegations "may speak to the question of ***how*** defendants might have known what they allegedly knew," but they do not provide any "indication of the specific factual ***content*** of any single report generated by the alleged reporting system." *Shaw*, 82 F.3d at 1224 n.38. Indeed, the AC lacks a specific allegation that any data that was supposedly being tracked contradicted Amylyx's disclosures. *In re Bos. Tech., Inc. Sec. Litig.*, 8 F. Supp. 2d 43, 58 (D. Mass. 1998) ("Not a single report, memorandum, meeting minute, or like item is referred to or specified in the Complaint.").[23]

Third, the FEs' perception that internal sales goals were aggressive, (AC ¶¶ 64-71, 160), does not

---

[22] Plaintiff's suggestion that there is anything nefarious about the use of a closed pharmacy network/limited distribution model, AC ¶¶ 45, 159, is entirely unfounded. Plaintiff cannot point to a single case that has held that limited distribution networks are a basis for fraud. And the AC even acknowledges that "a limited distribution model where the drug was only going through a few specialty pharmacies" is "not a horrible thing." *Id.* ¶ 45. Plaintiff is also wrong that Amylyx "stopped reporting new patient subscriber data to market research services, IQVIA and Symphony, in the summer of 2023." *Id.* ¶ 159. Information stopped flowing in February 2023 when Amylyx learned (and publicly disclosed) that certain prescriptions were mistakenly being reported to third-party data vendors despite the closed pharmacy network model. *See* Ex. F.

[23] *See also Metzler*, 928 F.3d at 162 (defendant's monitoring of "reporting metrics" does not support an inference of scienter because "one would need to know what [he] learned from such monitoring, and whether what he learned was at odds with any of his [] statements.").

form a strong inference of scienter as it does not undermine or contradict the publicly disclosed sales data. *See Hensley v. Imprivata, Inc.*, 260 F. Supp. 3d 101, 122 (D. Mass. 2017) (finding FE allegations that "sales staff rarely achieved their sales quotas" and that "it was readily apparent" sales "in the Company overall were declining" insufficient).

Fourth, the FEs are three lower level former employees so far removed from Amylyx's senior management that the allegations attributed to them cannot plausibly support scienter. *In re Biogen Inc. Sec. Litig.*, 857 F.3d 34, 43 (1st Cir. 2017); *In re iRobot Corp. Sec. Litig.*, 527 F. Supp. 3d 124, 141–43 (D. Mass. 2021) (confidential witnesses with little or no ongoing contact with senior management "undercut[ ] the Plaintiffs' reliance upon them in the pleadings"). The *single* conversation alleged to have taken place between the FEs and any Defendant was a call that purportedly took place between FE1 and Cohen and Klee one quarter *after* the "truth" allegedly "emerged" regarding the discontinuation metrics. But the AC does not even allege that issues about patient data were raised during the call (AC ¶ 62). The FEs fail to provide any "facts bearing on the mindset of the top executives of the company" at the time of the alleged misstatements, as required by the PSLRA. *Cody v. Conformis, Inc.*, 199 F. Supp. 3d 409, 421 (D. Mass. 2016).

Given the lack of contact between the FEs and Defendants, the AC contends that Defendants must have known this information simply because Defendants ranked higher than the FEs in the organization. AC ¶ 158 ("Surely if Amylyx's sales representatives knew of these realities, management did also."). However, "[a] vague assertion that defendants must have known something by virtue of their position of authority does not suffice to adequately allege a strong inference of scienter." *Sousa v. Sonus Networks, Inc.*, 261 F. Supp. 3d 112, 120 (D. Mass. 2017).

Plaintiff tries to muddy the record with unsupported allegations about "unethical and toxic tactics" related to a purported "quid pro quo" arrangement floated by FE2's boss to potentially allow institutions to participate in the distribution of RELYVRIO®. AC ¶¶ 72-77. Without any detail about if, when, or how this program was implemented, a low-level employee's recitation of how this program "sound[ed]" (AC ¶ 76), particularly given that FE2 had been told they "misunderstood" (*id.*), does not provide the requisite

17

particularized facts supporting a strong inference of scienter. *In re A123 Sys., Inc. Sec. Litig.*, 930 F. Supp. 2d 278, 286 (D. Mass. 2013) ("[A] statement that an unnamed person in no specified position of authority 'made suggestions' . . . that [managers] may or may not have heard (or paid attention to) is a meager fount for even a whiff of a fraudulent scheme, much less a particularization of its details."). Despite Plaintiff's vague allegations of fighting among the commercial team, conspicuously absent from the AC are any details suggesting that concerns related to prescribing and discontinuations metrics were ever communicated to Defendants.[24] Absent those requisite facts, the FE allegations cannot give rise to a strong inference of scienter. *See Metzler*, 928 F.3d at 161-62.

### B.   The AC Does Not Allege That Defendants' Trades Were Unusual.

The AC then reverts to listing Class Period stock sales by certain Defendants, contending that they support an inference of scienter. AC ¶¶ 16-18, 157.[25] Plaintiff, however, fails to meet his burden to show that the "insider sales were in fact unusual or suspicious in timing or amount." *Lenartz v. Am. Superconductor Corp.*, 879 F. Supp. 2d 167, 186 (D. Mass. 2012). To raise an inference of scienter, Plaintiff must "provide information on the defendant's trading both before and after the class period, so the court can assess the sales in context." *Id.* Here, the AC's "bare facts about the shares sold," do not provide any basis for finding that the trades were "unusual" or provide a strong inference of scienter. *Waters Corp.*, 632 F.3d at 762 n.5.

Plaintiff likely omitted this context, which can be drawn from Defendants SEC Forms 4 on which the AC relies, because the facts negate any inference of scienter:

- **Defendants increased their vested holdings during the Class Period**. Far from "liquidating" their shares, as the AC misleadingly suggests, (AC ¶ 157), Defendants Cohen, Klee, and Frates each *increased* their overall holdings throughout the Class Period (*see* Exs. V, X, Z), negating any "inference that defendants had a motive to artificially inflate [Amylyx's] stock price." *See In re*

---

[24] AC ¶ 66 ("FE2 theorizes that superiors were lead[ing] by fear"); *id.* ("senior leadership [was] arguing with each other"); *id.* ¶ 70 ("I got the sentiment from [Defendant Olinger], through [Tim Lee] that we need to . . . really make sure the team was trying to drive home the numbers").

[25] Courts have refused to infer scienter from higher proceeds and sales of larger portions of a defendant's overall holdings. *See, e.g., NJ Carpenters Pension & Annuity Funds v. Biogen IDEC Inc.*, 537 F.3d 35, 42, 57 (1st Cir. 2008) (no scienter where insiders sold $84 million in stock and "virtually all" of their shares). Further, as detailed in Exhibit Z, Plaintiff's calculations regarding Mr. Frates's stock sales are incorrect, overstating Frates' proceeds by approximately 50%.

*Biogen Inc. Sec. Litig.*, 193 F. Supp. 3d at 35.

- **Every single Class Period sale by each Defendant was non-discretionary**. Each of the trades during the Class Period was made pursuant to preexisting Rule 10b5-1 trading plans (*see* Exs. W, Y, AA), which "supports the reasonable inference that stock sales were prescheduled and not suspicious" and eliminates the inference of scienter. *Harrington*, 2017 WL 1946305, at \*7; *Leavitt v. Alnylam Pharms., Inc.*, 451 F. Supp. 3d 176, 188 (D. Mass. 2020). And certain of the sales were automatically made to satisfy tax obligations, (*see* Exs. W, Y, AA), which likewise negates an inference of scienter. *See Ressler v. Liz Claiborne Inc.*, 75 F. Supp. 2d 43, 59–60 (S.D.N.Y. 1999).

### C.    Plaintiff's Invocation of the Core Operations Doctrine Fails.

Plaintiff's allegation that the success of RELYVRIO® was "was essential to Amylyx's core operations," AC ¶ 162, likewise fails. "[C]atch-all allegations" that a drug company and its executives had a motive to commit fraud because "all of the company's hopes . . . hinged on [a drug's] success" are insufficient under the PSLRA. *Brennan v. Zafgen, Inc.*, 853 F.3d 606, 616 (1st Cir. 2017) (refusing to infer scienter where company was a "one-drug company").[26]

### D.    Non-Fraudulent Inferences Far Outweigh Any Inference of Scienter.

Plaintiff's reference to post-class period developments highlights how illogical any theory of fraud is here. AC ¶ 147-155. In Plaintiff's distorted view, Amylyx's voluntary withdrawal of RELYVRIO® from the market in April 2024, after the Phase III PHOENIX trial failed to meet its primary endpoints, somehow suggests that Defendants *knew months earlier* during the commercial launch that the drug's growth potential was overstated.[27] Far more compelling than any inference of fraud is that Amylyx believed in RELYVRIO®'s potential to address a serious and unmet medical need for the ALS community. Despite its optimism for RELYVRIO®'s commercial prospects, certain unanticipated but disclosed risks came to fruition during the commercial roll-out, and, ultimately, RELYVRIO® had disappointing Phase III trial results leading the Company to withdraw the drug from the market. But failing to accurately predict future

---

[26] Amylyx disclosed the risk of concentrating the business's operations on one drug: "We currently depend on the success of [RELYVRIO®]. If we are unable to maintain, or obtain additional, regulatory approvals for, and successfully commercialize, [RELYVRIO®], or experience significant delays in doing so, our business may be materially harmed." Ex. M at 32.

[27] The AC does not allege that Defendants were able to predict the outcome of the PHOENIX Phase III Trial. With allegations focused solely on statements about the progress of the commercial launch while the Phase III Trial was ongoing, these post-Class Period references amount to textbook "fraud by hindsight" that courts routinely reject. *See In re Biogen Inc.*, 857 F.3d at 44.

commercial setbacks or clinical trial results is not securities fraud. *In re Genzyme Corp.*, 2012 WL 1076124, at *12 (D. Mass. Mar. 30, 2012), *aff'd*, 754 F.3d 31 (1st Cir. 2014) ("nonculpable explanation" that defendants "did not expect . . . the setbacks the company experienced" was "stronger" than culpable inference plaintiff alleged).[28]

### III.    The AC Does Not Adequately Allege Loss Causation

The AC should also be dismissed for the independent reason that it fails to plead loss causation. "It is not enough to allege that Defendants made false statements on the one hand and that some announcement caused a stock drop on the other. The announcement must have been a 'corrective disclosure,' meaning that the announcement must connect the current, present, negative information to the earlier false or misleading statement." *Coyne*, 943 F. Supp. 2d at 273. The AC points to Amylyx's earnings release for Q3 2023, the Q3 2023 earnings call, and an article from Investor's Business Daily, which Plaintiff claims revealed the alleged prior misrepresentations. AC ¶¶ 138-146. However, these disclosures revealed nothing more than the disappointing news that there was a narrow miss in analysts' forecasts for sales for Q3 2023, primarily driven by a slowdown in net patient additions due to a slight uptick in discontinuations. *Id.* ¶ 5. Moreover, Amylyx repeatedly warned of these very risks, and "loss resulting from the materialization of a disclosed risk does not support a claim of securities fraud." *In re Bos. Sci. Corp. Sec. Litig.*, 490 F. Supp. 2d 142, 154 (D. Mass. 2007), *rev'd on other grounds*, 523 F.3d 75 (1st Cir. 2008).[29]

### CONCLUSION

Defendants respectfully request that the Court dismiss the AC with prejudice.

---

[28] Plaintiff's only other post-class period allegation is the departure of Ms. Olinger on December 31, 2023, AC ¶¶ 19, 147, 161. The resignation of executive defendants, without more, does not give rise to inference of scienter. *See In re Bos. Sci. Corp. Sec. Litig.*, 646 F. Supp. 3d at 287.

[29] Plaintiff's § 20(a) claim fails because Plaintiff fails to plead a primary Exchange Act violation. *See, e.g.*, *Ganem*, 845 F.3d at 450.

Dated:  September 6, 2024

Respectfully submitted,

/s/ *Caroline Bullerjahn*

Caroline Bullerjahn (BBO# 657241)
Morgan Mordecai (BBO# 679390)
GOODWIN PROCTER LLP
100 Northern Avenue
Boston, MA 02210
Tel.:   (617) 570-1000
Fax:   (617) 523-1231
cbullerjahn@goodwinlaw.com
mmordecai@goodwinlaw.com

*Attorneys for Defendants*

21

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that this document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing ("NEF") and by email to those indicated as non-registered participants on this 6th day of September 2024.

*/s/ Caroline Bullerjahn*
Caroline Bullerjahn

22