# UNITED STATES DISTRICT COURT

## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| OLIVER SHIH, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff<br><br>v.<br><br>AMYLYX PHARMACEUTICALS, INC., JOSHUA B. COHEN, JUSTIN B. KLEE, JAMES M. FRATES, and MARGARET OLINGER<br><br>Defendants | Case No. 1:24-cv-12068<br><br><br>**ORAL ARGUMENT REQUESTED** |

## PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENED CLASS ACTION COMPLAINT

**TABLE OF CONTENTS**

I. INTRODUCTION ........................................................................................................... 1

II. STATEMENT OF FACTS ............................................................................................ 1

    A. The Success Of The Relyvrio Commercial Launch Is Critical To The Company's Operations.................................................................................... 1

    B. Publicly, Defendants Tout The Relyvrio Commercial Launch As A Success. ...... 2

    C. Behind The Scenes, Within Months of the Launch, Defendants Knew The Number Of New Subscribers Had Stalled And That Patients Were Discontinuing Treatment. ..................................................................................... 5

        1. Unknown To Investors, New Patient Subscribers Flatlined In February 2023................................................................................................... 5

        2. Unknown To Investors, Patients Were Discontinuing Relyvrio Early, Mere Weeks Into The Launch........................................................................ 6

        3. Throughout The Launch, Defendants Hid The True Numbers Of Patient Additions And Discontinuations From The Market. ................................. 6

    D. The Truth Is Revealed........................................................................................... 7

III. ARGUMENT.................................................................................................................. 9

    A. Legal Standards..................................................................................................... 9

    B. The AC Pleads Actionable False And Misleading Statements About The Success Of The Relyvrio Commercial Launch.......................................................... 9

        1. Statements About The Net Patients On Therapy Were False When Made And Omitted Material Information............................................... 10

        2. Statements About Discontinuations Were False When Made And Omitted Material Information.................................................................. 14

        3. The AC Pleads A Duty To Disclose Under Item 303.............................. 17

    C. The AC Pleads Scienter. ..................................................................................... 18

        1. Defendants Had Access To Information Or Failed To Check Information Core To The Company's Business. ...................................... 18

        2. Defendants Had Motive To Conceal The Fraud. .................................... 22

    D. The AC Pleads Loss Causation........................................................................... 24

IV. CONCLUSION............................................................................................................. 25

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Abramson v. Newlink Genetics Corp.*,
  965 F.3d 165 (2d Cir. 2020)............................................................................14

*ACA Fin. Guar. Corp. v. Advest, Inc.*,
  512 F.3d 46 (1st Cir. 2008)............................................................................16

*Aldridge v. A.T. Cross Corp.*,
  284 F.3d 72 (1st Cir. 2002)........................................................................19, 23

*Brennan v. Zafgen, Inc.*,
  853 F.3d 606 (1st Cir. 2017)......................................................................19, 21

*City of Miami Fire Fighters' and Police Officers' Ret. Tr. v. Cerence Inc.*,
  2024 WL 1258149 (D. Mass. Mar. 25, 2024)....................................................19

*Constr. Indus. & Laborers Joint Pension Tr. v. Carbonite, Inc.*,
  22 F.4th 1 (1st Cir. 2021)....................................................................18, 20, 21

*Crowell v. Ionics, Inc.*,
  343 F. Supp. 2d 1 (D. Mass. 2004) ..........................................................12, 21, 22

*Dahhan v. OvaScience, Inc.*,
  321 F. Supp. 3d 247 (D. Mass. 2018) ....................................................14, 18, 21, 22

*Dura Pharms., Inc. v. Broudo*,
  544 U.S. 336 (2005)......................................................................................24

*Gerneth v. Chiasma, Inc.*,
  2018 WL 935418 (D. Mass. Feb. 15, 2018) ......................................................12

*Goldthwaite v. Sensear, Inc.*,
  2016 WL 5329635 (D. Mass. Aug. 25, 2016) ....................................................14

*Greebel v. FTP Software, Inc.*,
  194 F.3d 185 (1st Cir. 1999)......................................................................22, 23

*Griswold v. Driscoll*,
  625 F. Supp. 2d 49 (D. Mass. 2009) .................................................................9

*Gross v. Summa Four, Inc.*,
  93 F.3d 987 (1st Cir. 1996)...........................................................................10

*In re Allaire Corp. Sec. Litig.*,
224 F. Supp. 2d 319 (D. Mass. 2002) ..................................................................12, 20

*In re Ariad Pharms., Inc. Sec. Litig.*,
842 F.3d 744 (1st Cir. 2016) ...............................................................................16, 24

*In re Biogen*,
193 F. Supp. 3d 5 (D. Mass. 2016) .............................................................................13

*In re Bos. Sci. Corp. Sec. Litig.*,
646 F. Supp. 3d 249 (D. Mass. 2022) ........................................................................20

*In re Cabletron Sys., Inc.*,
311 F.3d 11 (1st Cir. 2002) ...........................................................................9, 18, 23

*In re Cardinal Health Inc. Sec. Litigs.*,
426 F. Supp. 2d 688 (S.D. Ohio 2006) .......................................................................24

*In re Delcath Sys., Inc. Sec. Litig.*,
36 F. Supp. 3d 320 (S.D.N.Y. 2014) ..........................................................................12

*In re Evergreen Ultra Short Opportunities Fund Sec. Litig.*,
705 F. Supp. 2d 86 (D. Mass. 2010) ..........................................................................25

*In re First Marblehead Corp. Sec. Litig.*,
639 F. Supp. 2d 145 (D. Mass. 2009) ..................................................................13, 16

*In re Immune Response Sec. Litig.*,
375 F. Supp. 2d 983 (S.D. Cal. 2005) ........................................................................17

*In re Infosonics Corp. Derivative Litig.*,
2007 WL 2572276 (S.D. Cal. Sept. 4, 2007) .............................................................24

*In re Innocoll Holdings Pub. Ltd. Sec. Litig.*,
2020 WL 1479128 (E.D. Pa. Mar. 25, 2020) ......................................................20, 23

*In re Insys Therapeutics, Inc. Sec. Litig.*,
2018 WL 2943746 (S.D.N.Y. June 12, 2018) ...........................................................23

*In re Nature's Sunshine Prods. Sec. Litig.*,
486 F. Supp. 2d 1301 (D. Utah 2007) ........................................................................22

*In re PTC Therapeutics, Inc. Sec. Litig.*,
2017 WL 3705801 (D.N.J. Aug. 28, 2017) .........................................................12, 22

*In re Sepracor, Inc. Sec. Litig.*,
308 F. Supp. 2d 20 (D. Mass. 2004) ....................................................................12, 23

*In re Stone & Webster, Inc., Sec. Litig.*,
  414 F.3d 187 (1st Cir. 2005) ...................................................................................12

*In re Transkaryotic Therapies, Inc. Sec. Litig.*,
  319 F. Supp. 2d 152 (D. Mass. 2004) ...............................................................12, 19

*Kafenbaum v. GTECH Holdings Corp.*,
  217 F. Supp. 2d 238 (D.R.I. 2002)..........................................................................23

*Karth v. Keryx Biopharmaceuticals, Inc.*,
  2018 WL 3518497 (D. Mass. July 19, 2018)..........................................................12

*Kendall v. Odonate Therapeutics, Inc.*,
  2021 WL 3406271 (S.D. Cal. Aug. 4, 2021) ...........................................................16

*Levy v. Gutierrez*,
  2017 WL 2191592 (D.N.H. May 4, 2017).................................................................13

*Loc. No. 8 IBEW Ret. Plan & Tr. v. Vertex Pharms., Inc.*,
  838 F.3d 76 (1st Cir. 2016)......................................................................................21

*Mahoney v. Found. Med., Inc.*,
  342 F. Supp. 3d 206 (D. Mass. 2018) ......................................................................24

*Makor Issues & Rts., Ltd. v. Tellabs Inc.*,
  513 F.3d 702 (7th Cir. 2008) ...................................................................................21

*Mass. Ret. Sys. v. CVS Caremark Corp.*,
  716 F.3d 229 (1st Cir. 2013).....................................................................................24

*Matrixx Initiatives, Inc. v. Siracusano*,
  563 U.S. 27 (2011)......................................................................................................9

*Mehta v. Ocular Therapeutix, Inc.*,
  955 F.3d 194 (1st Cir. 2020)....................................................................................18

*Metzler Asset Mgmt. GmbH v. Kingsley*,
  305 F. Supp. 3d 181 (D. Mass. 2018) ......................................................................13

*Miss. Pub. Emps.' Ret. Sys. v. Bos. Sci. Corp.*,
  523 F.3d 75 (1st Cir. 2008)................................................................................23, 24

*Murphy v. Precision Castparts Corp.*,
  2017 WL 3084274 (D. Or. June 27, 2017) .......................................................16, 17

*N.J Carpenters Health Fund v. DLJ, Mortg. Capital, Inc.*,
  2010 WL 1473288 (S.D.N.Y. Mar. 29, 2010) .........................................................25

*N.J. Carpenters Pension & Annuity Funds v. Biogen IDEC Inc.*,
    537 F.3d 35 (1st Cir. 2008)................................................................................20

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
    575 U.S. 175 (2015)...........................................................................................14

*Plumbers & Pipefitters Loc. Union No. 630 Pension-Annuity Tr. Fund v. Arbitron
    Inc.*,
    741 F. Supp. 2d 474 (S.D.N.Y. 2010)...............................................................13

*Ret. Sys. v. Bos. Sci. Corp.*,
    523 F.3d 75 (1st Cir. 2008).......................................................................9, 22, 24

*Ret. Sys. v. Princeton Rev., Inc.*,
    2012 WL 727125 (D. Mass. Mar. 6, 2012)........................................................18

*Rocker Mgmt., L.L.C. v. Lernout & Hauspie Speech Prods. N.V.*,
    2005 WL 1365465 (D.N.J. June 7, 2005)...........................................................22

*Rosenbaum Cap. LLC v. Bos. Commc'ns Grp., Inc.*,
    445 F.Supp.2d 170 (D. Mass. 2006) .............................................................9, 13

*SEC v. Lemelson*,
    57 F.4th 17 (1st Cir.), *cert. denied*, 144 S. Ct. 486 (2023) ...............................9

*SEC v. Liberty*,
    2021 WL 664834 (D. Me. Feb. 19, 2021) .....................................................18, 20

*Simon v. Am. Power Conversion Corp.*,
    945 F. Supp. 416 (D.R.I. 1996)..........................................................................17

*Skiadas v. Acer Therapeutics Inc.*,
    2020 WL 3268495 (S.D.N.Y. June 16, 2020) ....................................................23

*Special Situations Fund III, L.P. v. Am. Dental Partners, Inc.*,
    775 F. Supp. 2d 227 (D. Mass. 2011) ................................................................20

*State St. Bank & Tr. Co. v. Denman Tire Corp.*,
    240 F.3d 83 (1st Cir. 2001)...................................................................................9

*Tellabs, Inc. v. Makor Issues & Rts.*,
    Ltd., 551 U.S. 308 (2007) .....................................................................................9

*Yanek v. Staar Surgical Co.*,
    388 F. Supp. 2d 1110 (C.D. Cal. 2005) ..............................................................11

**Rules and Regulations**

17 C.F.R. § 229.303 .............................................................................................................17

17 C.R.F. § 240.10b-5 ........................................................................................................24

## I.        INTRODUCTION

In October 2022, Amylyx commercially launched its flagship drug agent, Relyvrio, offering unprecedented hope for those suffering from ALS.  Publicly, Defendants appeared to make good on that promise:  Throughout the launch from October 2022 to over a year later, in November 2023, Defendants lauded the launch's success and the near- and long-term ability for Relyvrio's growth.  But behind the scenes, Defendants failed to warn of an early, sharp decline in both new subscribers and patient discontinuations that would tank that hope—rendering those rosy statements materially misleading in light of this contemporaneous knowledge to the contrary. Defendants' main rebuttal, that the statements from former employees ("FE"s) do not adequately allege "that Defendants *knew* the information that [Plaintiff] alleges contradicted their public statements," *e.g*., MTD 15, cannot be squared by Defendants' *admissions* that they were tracking these metrics "in real time," MTD 1, 4, 7, 12 n.15, 14.  This Court should not indulge the fiction that the Defendants were blind to this data about a product so core to the Company's operations particularly where, as here, Defendants represented that hard metrics about the launch were strong and improving on the one hand, while they repeatedly rebuffed inquiries from analysts on the other, even as late as ten months after this negative launch data was obvious.

## II.        STATEMENT OF FACTS

### A.    The Success Of The Relyvrio Commercial Launch Is Critical To The Company's Operations.

Amylyx is a commercial-stage biotechnology company developing treatment for amyotrophic lateral sclerosis ("ALS"), or Lou Gehrig's disease. AC¶23.  The Company's "main asset" is AMX0035, sold under the commercial name "Relyvrio."  AC¶¶23, 28-31.  Defendants tout that "[Relyvrio] is the first drug candidate to show both a functional and survival benefit in a large-scale clinical trial."  AC¶32.  And as "Amylyx is a one product company without clear opportunities beyond ALS," Relyvrio's success is critical to Amylyx's overall success.  AC¶¶24.

1

Amylyx launched the much-hyped Relyvrio on October 24, 2022. AC¶33. Given the devasting nature of ALS—and the lack of any viable treatment options—when Relyvrio was first launched, it was understood there would be an initial rush (or "bolus") in demand and new patient subscriptions because "you had all these patients anticipating this treatment" and "patients wanted to get on it" immediately. AC¶¶25-29, 51. And given the fact that patients are desperate for any relief from certain, imminent death, and under pressure from ALS advocacy groups and Congress, the FDA approved Relyvrio for early commercial use even though Relyvrio had not passed a Phase III clinical trial. AC¶¶23, 28-31. In that ongoing Phase III trial—which Amylyx dubbed the "Phoenix" study—the Company was conducting "a 48-week, randomized, placebo-controlled, global clinical trial further evaluating the safety and efficacy of [Relyvrio] … for the treatment of ALS." AC¶¶29-30. Defendants and the market thus understood that tracking discontinuations would be a critical metric to measure the success of this unique launch.

**B.    Publicly, Defendants Tout The Relyvrio Commercial Launch As A Success.**

To the public, the Relyvrio launch appeared to be a success: Throughout the launch, Defendants lauded the strength of the launch in numbers of new patient subscribers, the persistent demand for new subscriptions, and the long runway for growth in new subscriptions. AC¶¶33-39.

On the Q4 earnings call on March 13, 2023, nearly five months into the launch, Defendants conveyed that "1300 people … [were] on RELYVRIO … at the end of 2022," and "shar[ed] some of the important early metrics that we're tracking, which should help [investors] model our near-term opportunity and the total addressable market for the longer term" success of the launch, AC¶¶34, 97-98, and assured investors that the "uptake [in demand] has continued," and that "there is still significant opportunity for growth" for new patient "prescriptions." AC¶¶34, 98, 100.

Defendants specifically assured the market that the "initial bolus" of demand persisted. AC¶¶34, 97-98. In response to an analyst question regarding the pace of patients starting treatment

2

with Relyvrio and "a sense for how we think about the pace of starts after" the first quarter ("Q1") of 2023, Defendant Olinger described this as "seeing an initial bolus in demand" and while "we just don't know how big this bolus will be or how long it will last," Defendant Olinger reiterated that "we expect continued growth and interest in demand" and "[w]e really see that we have a lot of runway ahead of us" as far as getting more new subscribers.  AC¶¶38, 101.  Defendant Klee bolstered that assurance, stating that for this bolus, demand was "very concentrated so far so we have a lot of breadth and depth to continue to look forward to, I think as we expand this product." AC¶¶34, 102.  Similarly, in response to an analyst question regarding "what the launch curve might look like with an initial bolus and then steadying out until we get to steady state" and "[h]ow [Defendants] are … thinking about it now that [they]'re in the market and seeing kind of the demand that [they]'ve had thus far," Defendant Olinger answered "while we do have that initial bolus of demand, … we … are very confident in the long runway we have ahead of us."  AC¶103.

These assurances continued nearly seven months into the launch.  On the 2023 Q1 May 11, 2023 earnings call, Defendants conveyed that "the strong demand for RELYVRIO [was] driving near term profitability ahead of our expectations" setting the Company up to be "well-positioned to build a profitable financially strong organization for the long term."  AC¶113.  As for net patients on therapy and demand, "[a]s of March 31, there were roughly 3000 people on RELYVRIO in the US," and "we still have plenty of room for growth [in net patient subscribers], both at the top ALS centers, and the broader neurology community," and "we see an opportunity for broader and deeper uptake of key ALS centers, and the opportunity to continue to penetrate the group of top prescribers," and  "[w]e continue to see a wide range of people living with ALS in terms of time sense initial diagnosis, interested in and gaining access to RELYVRIO."  AC¶114.

3

In response to several analyst questions regarding "how long the bolus will last," Defendants reassured the market that "we continue to see significant interest in demand for" the drug and "have a tremendous opportunity for us to grow [new patient subscriptions] both in depth and breadth at all the key ALS centers" and with general neurologists. AC¶115. Specifically, in response to an analyst question regarding whether Defendants "can talk about the trend you're seeing there [with the bolus]," Defendants responded, "it's really too early to tell when the bolus will finish," "[b]ut again … we have a tremendous opportunity for growth." AC¶116. Indeed, as Defendants framed it, "just two quarters into launch over 10% of the approximately 29,000 people living with ALS in the US are now on RELYVRIO," and "[t]here remain many more 1000s of people living with ALS in the US and at least 200,000 people living with ALS globally. We are still in the early stages of our journey." AC¶112.

Defendants also conveyed that they could not see any concerning trends in patient discontinuations. In response to a question about whether Defendants could provide "any color on duration of therapy so far, or any dropouts that you're seeing," they answered "it's really too early in the launch to give that … the first patients who started on therapy, we're basically at the end of October, beginning of November … [s]o they really haven't been on therapy long enough for us to give, any, any clarification there." AC¶117.

This narrative of success continued nearly ten months into the launch. On August 10, 2023, during the Q2 2023 earnings call, Defendants conveyed that "[a]s of June 30, 2023, there were roughly 3,800 people on RELYVRIO in the US," and again touted the "strong and steady demand" "we continue to see" for the drug. AC¶122. "[N]ow three quarters under our belt, we're all starting to get a chance to see what our business is like moving forward," and "run[ning] through a few key metrics that demonstrate our progress and growth opportunities ahead of us," "[p]rescribing

4

remains fairly concentrated" and "[w]e are encouraged by the level of interest … and believe that we have an opportunity for growth as we bring our message to more prescribers."  AC¶¶124, 127. In response to several analysts' questions regarding whether Defendants "have any better sense of the size of the patient bolus at this point," Defendants only stated that "[w]e continue to be pleased that the interest in and demand for RELYVRIO, continues to be as at a very strong pace" and "we have a large opportunity for growth ahead of us."  AC¶126.

Defendants again conveyed that they could not see any concerning trends in patient discontinuations.  In response to an analyst question regarding "what are you seeing with respect to … discontinuation rates" and whether Defendants "[a]re … seeing any emerging trends … for discontinuation," Defendants said only that "we report on net patients on therapy," which is "inclusive of any discontinuation," but it is  "really too early to see any long-term trends at this point in our launch."  AC¶¶37, 125.  Analysts again pressed about discontinuation rates particularly "among the early patients t[hat] have received [the] commercial drug in 4Q of last year [2022] [who are] presumably some of the[] patients [that] … would have been on drug for at least six months now," and whether Defendants could "provide any color as to what percent of them are still on therapy at this point again just among the patients who started in 4Q."  AC¶¶38, 126.  But Defendants would only say that "again, we're only going to be reporting on net patient numbers for a quarter" and that "it's a little too early to really give any trends there."  AC¶¶38, 126.

**C.** **Behind The Scenes, Within Months of the Launch, Defendants Knew The Number Of New Subscribers Had Stalled And That Patients Were Discontinuing Treatment.**

**1.** **Unknown To Investors, New Patient Subscribers Flatlined In February 2023.**

Throughout the launch, Defendants maintained that the bolus of demand continued and that the drug had strong opportunity for growth.  AC¶¶33-39.  But in reality, new patient subscriptions were flat after the initial bolus ended mere months after the launch.  AC¶¶50-67.  As one former employee related, that initial demand only lasted in the "first three or four months"

5

after the commercial launch—around February 2023—but once the prescriptions stabilized after the bolus after that, there was "no chance for growth." AC¶50. After February 2023, prescriptions "might have grown 1% or 2% [monthly] because there were newly diagnosed patients, but generally it was flat throughout the country." AC¶¶52-54.

As another former employee related, while senior executives were portraying to the world how well they were doing with sales, "that wasn't true." AC¶¶68-71. Rather, after the initial bolus, no one could meet the internal sales quotas. AC¶¶64-67. As a result, Amylyx resorted to increasingly desperate and futile attempts to increase patient subscriptions at any cost. AC¶¶78-79. This created a toxic culture of confusion among employees where "[o]ur boss was basically pinning us against each other and telling us that we're all doing s**t"—"yet what [Defendants] were telling Wall Street was that we were blowing out our goals." AC¶¶66-68.

### 2. Unknown To Investors, Patients Were Discontinuing Relyvrio Early, Mere Weeks Into The Launch.

Throughout the launch, Defendants repeatedly stated they could not see trends in patient discontinuation rates or how long patients would remain on Relyvrio as therapy. AC¶¶36-38, 117, 126-28. But patient discontinuations were occurring mere "weeks" after starting the drug—and certainly soon enough for Defendants to be aware of this trend months into the commercial launch. AC¶¶80-84. Indeed, patients discontinued because they did not see any positive results from the drugs, but instead experienced debilitating GI side effects. AC¶¶83-84. If they continued to progress with their disease and still had horrible symptoms, "it wasn't worth it." AC¶84.

### 3. Throughout The Launch, Defendants Hid The True Numbers Of Patient Additions And Discontinuations From The Market.

Defendants strategically obscured data on subscription counts and discontinuations from the market—and even internally. AC¶¶44-49. Early into that launch, Amylyx "established a limited distribution model," "to "control[] costs and data and everything else, and "internally," to

6

"try to hide the data [on patient subscribes and discontinuations] as much as they could" from outsiders. AC¶45. And, contrary to standard practice, Defendants refused to provide company-wide metrics on this data internally, attempting to conceal from its own employees the true nature of the discontinuations, subscriber rates, and the ability for growth. AC¶¶46-47. And mid-launch, Amylyx stopped reporting new patient subscriber data to market research services, further obscuring the true numbers from outsiders. AC¶¶49, 140-143. The market thus had to rely exclusively on Defendants' representations about the launch's success.

**D.     The Truth Is Revealed.**

On November 9, 2023, Amylyx issued a press release announcing disappointing Q3 2023 financial results, "meaningfully miss[ing] Wall Street's expectations" due to a "slowdown in net adds [for Relyvrio] … [and] increased discontinuations." AC¶¶138-39. In an article ("Amylyx Crashes 27% As New ALS Drug Faces A Barrage Of Troubles") discussing these results, analysts questioned the Company's timing of these disclosures as well as the veracity of the claim that the Company had a "steady" cadence of new additions: "Amylyx noted patients are dropping off Relyvrio treatment after six months … But Amylyx said the number of new patients starting treatment was 'steady.' [Analysts] says [the] math suggests otherwise." This analyst also noted how Amylyx blocked analysts from seeing Relyvrio prescription data, and "[k]nowing that stock had underperformed in 2023 already, management could have communicated the discontinuations dynamic much earlier." AC¶140. In response, the stock plummeted 31.89%, prompting analysts to report that market views in "2024 will 'need to come down meaningfully.'" AC¶145.

Two days later, on the November 11, 2023 earnings call, investors understandably were "puzzl[ed]" by the Company's "math" not adding up on the reported numbers of new patient subscribers and discontinuations. AC¶¶141-44. As one investor queried, "[i]f I just look at the fact pattern on how you implemented the data restriction … it looks like you may have had a sense

7

for discontinuations really picking up" much earlier.  AC¶¶141-42.  Another pressed, "it's not just the discontinuation …. It's also the new starts might have dropped" earlier as well."  AC¶¶143-44.  Defendants again did not respond to these accusations, but only stated that "[m]aybe we haven't commented on any of those metrics, but maybe just to circle back. There are roughly 30,000 people living with ALS in the United States. We have 3,900 on therapy. So we certainly see an opportunity to continue to grow." AC¶¶143-44.

A few months later, on March 8, 2024, the death knell for Relyvrio's commercial prospects began.  Amylyx issued a press release revealing that the Relyvrio "failed to slow the progression of the disease," and "made no significant difference versus a placebo in terms of helping patients perform daily living tasks such as walking and breathing."  AC¶148.  "Importantly, the topline data fall into the worst-case scenario with p=0.667, suggesting there's no trend observed from the data," an outcome "worse than [analysts] expected."  AC¶149.

As one article put it:  "Investors didn't take the news [of the Phoenix failure] well"— Amylyx stock "closed 82% lower" after this announcement, and "[t]he decline signals that investors now think the drug is worth something close to zero, or perhaps less than that if one factors in continued expenses associated with it" and will be a "death blow" to Relyvrio.  AC¶151. This failure also "rais[ed] questions about the future of the drug and the company itself."  AC¶151.

Shortly after, on April 4, 2024, the Company confirmed it would "withdraw" Relyvrio from the market, forcing a "reduction [in] its workforce by approximately 70% and [a] decrease [in] external financial commitments outside of its priority areas."  AC¶¶152-54.  While the Company also stated "Amylyx will continue to evaluate and share learnings from PHOENIX to help inform future ALS research" and that "[t]opline data from PHOENIX will be presented at the American Academy of Neurology (AAN) Annual Meeting … taking place April 13-18, 2024," to date,

8

Amylyx has not provided any public information about why the Phoenix trial failed, and, contrary to its representations on April 4, 2024, Amylyx did not "present[]" any "topline [Phoenix] data …[at the] AAN" conference.  AC¶¶154-55.

### III.   ARGUMENT

**A.   Legal Standards.**

When ruling on a "[Rule] 12(b)(6) motion to dismiss a §10(b) action, courts must . . . accept all factual allegations in the complaint as true," *Tellabs, Inc. v. Makor Issues & Rts., Ltd.,* 551 U.S. 308, 322 (2007), and should grant a motion to dismiss "only if it appears to a certainty that the plaintiff would be unable to recover under any set of facts," *State St. Bank & Tr. Co. v. Denman Tire Corp.*, 240 F.3d 83, 87 (1st Cir. 2001).  It is premature to "hold plaintiffs to a standard that would effectively require them, pre-discovery, to plead evidence."  *Miss. Pub. Emps.' Ret. Sys. v. Bos. Sci. Corp.*, 523 F.3d 75, 90 (1st Cir. 2008).  Rather, "courts will allow … securities fraud complaints to advance … when some questions remained unanswered, provided the complaint as a whole is sufficiently particular."  *In re Cabletron Sys., Inc.*, 311 F.3d 11, 32 (1st Cir. 2002).  The issue "is not whether the plaintiffs will ultimately prevail, but whether they are entitled to offer evidence to support their claims."  *Griswold v. Driscoll*, 625 F. Supp. 2d 49, 55 (D. Mass. 2009).

**B.   The AC Pleads Actionable False And Misleading Statements About The Success Of The Relyvrio Commercial Launch.**

To satisfy falsity, Plaintiff must demonstrate "a defendant made a statement that was *misleading* as to a *material* fact."  *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 38 (2011).  "[T]hat a statement is literally accurate does not preclude liability."  *SEC v. Lemelson*, 57 F.4th 17, 24 (1st Cir.), *cert. denied*, 144 S. Ct. 486 (2023).  "When a corporation does make a disclosure—whether it be voluntary or required—there is a duty to make it complete and accurate."  *Rosenbaum Cap. LLC v. Bos. Commc'ns Grp., Inc.,* 445 F. Supp. 2d 170, 175–76 (D. Mass. 2006).  A duty to disclose also arises when a company "has previously made a statement of material fact

9

that is either false, inaccurate, incomplete, or misleading in light of the undisclosed information."

*Gross v. Summa Four, Inc.*, 93 F.3d 987, 992 (1st Cir. 1996).

### 1. Statements About The Net Patients On Therapy Were False When Made And Omitted Material Information.

Defendants admit that they were tracking the number of new patient additions "in real-time" (MTD 7-8), yet, as the AC alleges, Defendants made false and misleading statements about the drug's strong number of net patient additions and the long runway for new patient additions ahead despite knowing that demand and the initial bolus had tapered off by February 2023, a few months into the launch. AC¶¶50-77. Defendants critically did *not* "accurately describ[e] the 'initial bolus of demand' … as well as upcoming expected moderation" of that bolus (MTD 7-8) but maintained well *after* February 2023 that the bolus had a long runway ahead. AC¶¶95-102, 109, 111-17, 121-24, 126, 128.

Defendants' contention that the "AC does not … contain … particularized fact[s] disputing the accuracy of the net patient additions disclosed by the Company each quarter" (MTD 8) ignores the host of allegations confirming this subterfuge. Starting in February 2023, major markets for the drug witnessed growth of only "1 or 2 %" in the months after, AC¶¶50-52—and any new growth was nearly "flat" and had "stabilized." AC¶54 (showcasing, with references to specific accounts and numbers, the sharp decline and flattening of demand). Moreover, in the Company's public statements, that the same number of doctors accounted for half of all prescriptions in Q1 2023 and in Q3 2023 shows that the prescriber base did not expand meaningfully during the launch. AC¶56. Former employees also reveal that the Company could not meet internal sales quotas—an unusual posture for a new drug rollout in the ALS industry, AC¶¶64-67—and that management's rosy statements to the market about the success of the launch did not match the panicked reality over failed quota marks internally, AC¶¶68-79. Yet, far from acknowledging

10

these negative trends, Defendants continued to peddle the false narrative that Relyvrio subscriber count was strong, steady, and had ample room to expand after February 2023 (*e.g*., AC¶¶95-102, 109, 111-117, 121-124, 126, 128) while at the same time actively hiding data on these numbers internally and from the market at large (AC¶¶44-49).  *Yanek v. Staar Surgical Co.*, 388 F. Supp. 2d 1110, 1132 (C.D. Cal. 2005) (statements on a conference call that were "assuring investors" while concealing adverse facts about FDA approval were actionable).  And the AC also notes how—after the truth came out about net patient additions declining—analysts expressed skepticism about the Company's "math" in conveying those additions.  AC¶¶140-44.

Defendants' claim that "Plaintiff's allegation that the initial demand 'had stabilized' by February 2023 … is contradicted by the increase in net patients the Company disclosed through Q1 2023" (MTD 8) ignores the allegations that the "net patients" disclosures were materially misleading because Defendants omitted the high, early amount of ALS patients discontinuing the drug within weeks of treatment (AC¶¶85-86).  One former relates that during the bolus, the Company "already had 9,000 patients on the drug," yet Defendants "kept saying there were 30,000 patients in the United States that should be treated with Relyvrio," misleadingly implying there was ample room for growth from the reported net patient numbers between 1,000 and 3,800. AC¶¶85-86.  For instance, on the Q1 call on May 11, 2023, Defendants reiterated "just two quarters into launch over 10% of the approximately 29,000 people living with ALS in the US are now on RELYVRIO," and "[t]here remain many more 1000s of people living with ALS in the US and at least 200,000 people living with ALS globally" and "[w]e are still in the early stages of our journey," but the failure to consider discontinuations in this reporting data rendered the current numbers and future projections of patient subscribers "way off" from reality.  AC¶¶85-86.  Thus, even assuming *arguendo* that the numbers of net additions were literally accurate, Defendants

11

nonetheless materially misled the market by omitting the high number of discontinuations that artificially inflated the runway for growth. *See, e.g.*, *Gerneth v. Chiasma, Inc.*, 2018 WL 935418, at \*5 (D. Mass. Feb. 15, 2018) ("[A] reasonable investor could have been misled by the failure to include details … regarding warnings by the FDA … which Chiasma failed to heed .…").[1]

In any event, by claiming that the net additions dispelled any investor confusion, Defendants are "offer[ing] facts that they assert contradict the Plaintiff['s] assertions"; but on "a motion to dismiss, the Court assumes that all of the pled facts are true." *In re Allaire Corp. Sec. Litig.*, 224 F. Supp. 2d 319, 327 (D. Mass. 2002). Asking Plaintiff to affirmatively disprove these numbers is really a demand to plead *evidence*, but in the First Circuit, "not every question regarding relevant transactions must be answered at the pleading stage" and "the rigorous standards for pleading securities fraud do not require a plaintiff to plead evidence." *Crowell v. Ionics, Inc.*, 343 F. Supp. 2d 1, 21 (D. Mass. 2004); *In re Stone & Webster, Inc., Sec. Litig.*, 414 F.3d 187, 199 (1st Cir. 2005); *Gerneth*, 2018 WL 935418, at \*5 ("[T]he Court cannot consider that disputed issue of fact on a motion to dismiss."). That is particularly true where the reason Plaintiff cannot make these allegations is because Defendants concealed from the market the true numbers of patient additions and discontinuations; Defendants now cannot defeat a motion to dismiss by arguing that *their own fraud* prevents Plaintiff from alleging falsity with sufficient particularity.

---

[1] *Karth v. Keryx Biopharmaceuticals, Inc.*, 2018 WL 3518497, at \*4 (D. Mass. July 19, 2018) ("[As] a reasonable investor could have concluded from the removal of the disclosure … [and] ambiguous language in the subsequent filings … that Keryx had engaged multiple contract manufacturers … when in fact Keryx had not .…"); *In re PTC Therapeutics, Inc. Sec. Litig.*, 2017 WL 3705801, at \*13-14 (D.N.J. Aug. 28, 2017) (statement that "totality of the data" supported approval is a false statement of fact when only 25% of patients saw clinical benefit); *In re Delcath Sys., Inc. Sec. Litig.*, 36 F. Supp. 3d 320, 331-33 (S.D.N.Y. 2014) (defendants misled investors by providing data from "Drug Group" while omitting negative data from "Control Group"). Once Defendants chose to laud the existing demand and the vast runway for new subscribers, they had a duty to do so that would not mislead investors. *In re Transkaryotic Therapies, Inc. Sec. Litig.*, 319 F. Supp. 2d 152, 160-62 (D. Mass. 2004) (failure to disclose adverse clinical trial data and negative FDA review letter were material omissions directly affecting the drug's marketability); *In re Sepracor, Inc. Sec. Litig.*, 308 F. Supp. 2d 20, 28, 34 (D. Mass. 2004) (omitted information regarding a drug's adverse side effects was material, given the potential risk to the drug's marketability).

12

Nor can the PSLRA's safe harbor shield these statements. *Contra* MTD 9. *First*, none of the alleged misleading statements challenged by Defendants are "forward looking," as the statements about the success of the launch via observed, high numbers of current demand and current avenues for growth are present facts. *Levy v. Gutierrez*, 2017 WL 2191592, at *15 (D.N.H. May 4, 2017) (statement that "arrangement … is progressing well" was "non-forward-looking"). For the same reason, they cannot be dismissed as mere vague "corporate optimism" or inactionable "growth strategies," *contra* MTD 10, 12, as "[D]efendants' statements that the [the launch] was then performing well" "were statements of specific, present-day fact, not optimistic predictions of the future," *Plumbers & Pipefitters Loc. Union No. 630 Pension-Annuity Tr. Fund v. Arbitron Inc.*, 741 F. Supp. 2d 474, 485 (S.D.N.Y. 2010).[2]

*Second*, even if deemed forward looking, none of the purported "cautionary language" cited by Defendants (MTD 9) address the specific risks Defendants concealed: that prescriber rates and demand had flattened after February 2023, and that known, high discontinuations inflated the runway for new subscribers. AC¶¶50-71, 80-86.

*Third*, the safe harbor provides no protection where, as here, Defendants identify *possible* future risks while failing to disclose such existing facts suggesting that those risks have already come to pass. Rather, forward-looking statements can be the basis of a fraud claim when "the first amended complaint adequately alleges facts which, if true, establish that the defendant knew at the time it shared them with the plaintiff that its projections and statements of future expectations

---

[2] Defendants' authorities are not to the contrary. MTD 10. Neither case (*Metzler Asset Mgmt. GmbH v. Kingsley*, 305 F. Supp. 3d 181, 209 (D. Mass. 2018), *In re Biogen*, 193 F. Supp. 3d 5, 41 (D. Mass. 2016)) involved such statements about current demand for the drug and specific avenues for growth. And whether a statement amounts to puffery is really a question of materiality, and only if the materiality of the statement is so obvious that reasonable minds could not differ is the issue appropriately resolved as a matter of law. *Rosenbaum*, 445 F. Supp. 2d at 176 ("disputes over the materiality … must be reserved for the trier of fact"). Tellingly, nowhere do Defendants contest the materiality of their representations about the net patient additions or discontinuation rates.

13

could not possibly come to fruition." *Goldthwaite v. Sensear, Inc.*, 2016 WL 5329635, at *3-4 (D. Mass. Aug. 25, 2016). Here, Defendants' "projections and statements of future expectations could not possibly come to fruition," given allegations that early into the commercial launch, they knew of the sharp decline in new subscribers after the initial bolus, the flattened growth, and the high, early, and undisclosed discontinuations. AC¶¶50-67, 80-86. Moreover, such "[o]missions of existing facts are not forward-looking statements, and are not protected by the PSLRA safe harbor." *Dahhan v. OvaScience, Inc.*, 321 F. Supp. 3d 247, 254 (D. Mass. 2018).[3]

### 2.  Statements About Discontinuations Were False When Made And Omitted Material Information.

Throughout the launch from October 2022 to November 2023, Defendants repeatedly stated they could not see trends in patient discontinuation rates or how long patients would remain on Relyvrio as therapy. AC¶¶36-38, 117, 126-28. It was not until November 2023 that Defendants revealed discontinuation problems, *i.e.*, that patients were "discontinuing" purportedly after being on treatment "after six months." AC¶138.

Defendants contend that "Plaintiff has not alleged any facts challenging the accuracy of the … Q1 [May 2023] and Q2 [August 2023] statements regarding discontinuations." MTD 12. That is not true. Defendants do not dispute the Company was tracking discontinuations in real time, nor do they dispute that the "pent up" initial demand bolus frontloaded most new patient additions

---

[3] Nor are "several of the alleged misstatements [about the success of the commercial launch] … non-actionable statements of opinion" because they are "prefaced by 'I think' or 'we believe.'" *Contra* MTD 10-11, 13-14. "[T]hose magic words can preface nearly any conclusion, and the resulting statements, as we have shown, remain perfectly capable of misleading investors." *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 192-93 (2015). Rather, "[w]hen omitted contrary facts substantially undermine the conclusion a reasonable investor would reach from a statement of opinion, that statement is misleading and actionable." *Abramson v. Newlink Genetics Corp.*, 965 F.3d 165, 177 (2d Cir. 2020). That is the case here. For instance, that the "opinion" statement made in May 2023 that "I think more importantly, we continue to see significant interest in demand for RELYVRIO", is contradicted by facts that, after February 2023, defendants knew demand had declined and that rates had remained flat in each month following. AC¶¶95-102, 109, 111-17, 121-24, 126, 128.

in the early months of the launch, meaning defendants had many, early data points to observe these patient dropouts. AC¶¶114-17. But by the time Defendants issued those Q1 and Q2 statements—*seven* and *ten* months into the launch, respectively—Defendants maintained they could not observe any trends. *E.g.*, AC¶117 (Q1: "the first patients who started on therapy … at the end of October … haven't been on therapy long enough for us to give, any, any clarification"); AC¶125 (Q2: "too early to give any trends" on dropouts). That is flatly contradicted by Defendants' later admission in November 2023 that patients were discontinuing purportedly after "six months," AC¶138, although, as the AC alleges, Company insiders knew that patients were discontinuing treatment "much sooner than six months," *mere weeks* after starting treatment, AC¶81, and that Defendants were aware of this high number of dropouts by early 2023, AC¶¶80-84. The AC also recounts how the Defendants knew that these early dropouts were driven by severe gastrointestinal side effects and a lack of a corresponding clinical benefit. AC¶¶83-84.

Defendants contend that "that Amylyx did not disclose discontinuation information is simply wrong" because Amylyx disclosed "***net patients*** on therapy," which purportedly "included patients who started on treatment ***less*** any patients who discontinued treatment." MTD 11. But this is *not* the same as disclosing the number of discontinuations, a fact made obvious by analysts' repeated inquiries during the launch to weigh this omitted information. AC¶¶36-38, 117, 126-28, 141-44. And as discussed, *supra* 11-12, reporting the net patients on therapy is a misleading half-truth because it inflates the runway for potential growth. AC¶¶85-86. Rather, reporting only "net patients on therapy" prevented the market from determining the true number of patients stopping treatment early into the launch. AC¶¶85-86, 141-44.

Contrary to Defendants' contention, comparing the discontinuation rates to the prior, successful "Centaur" trial (*e.g.*, MTD 4-5) heightens this fraud because it suggests that the launch

15

was proceeding according to expectations.  But "[w]hile management may have held out hope of achieving this result, the expression of that hope without disclosure of recent troubling developments created an impermissible risk of misleading investors."  *In re Ariad Pharms., Inc. Sec. Litig.,* 842 F.3d 744, 753 (1st Cir. 2016); *Murphy v. Precision Castparts Corp.*, 2017 WL 3084274, at *12-13 (D. Or. June 27, 2017) ("[Defendants'] assertion … there is no change to the [2016 EPS] framework … is a representation of [Defendants'] current market status, *i.e.*, hitting benchmarks along the way to achieving the 2016 goal.").

Unlike in *In re First Marblehead Corp. Sec. Litig*., 639 F. Supp. 2d 145, 155 (D. Mass. 2009) and *ACA Fin. Guar. Corp. v. Advest, Inc*., 512 F.3d 46, 61 (1st Cir. 2008) (cited at MTD 12, n. 15), here such "trends" in dropouts were never "disclosed" to the market—a reality confirmed by the analysts' confusion and surprise at the news.  AC¶¶140-45.  This case is more akin to *Kendall v. Odonate Therapeutics, Inc*., where the plaintiff "alleg[ed] that"—despite "learn[ing] that patients were experiencing" adverse events and thus "higher-than expected" "patient" "discontinuations"—"Defendants failed to disclose these events, continued to make positive statements about [the drug's] potential" which "created an impression that [the drug] was proceeding as expected, with no significant setbacks—especially none that would potentially undermine the central rationale behind the trial."  2021 WL 3406271 at *5 (S.D. Cal. Aug. 4, 2021).  The court concluded these "allegations are sufficient to state a claim" given "that a reasonable investor would have considered the omitted information … material, given that the unexpectedly high rates of [adverse events] and patient withdrawals were at odds with the value proposition and hypothesis" behind the drug. *Id*. at *6, *14.  Here, Defendants' statements about the launch likewise were misleading given the knowledge of "unexpectedly high rates of … patient withdrawals." *Id*.  And at the same time, Defendants exacerbated the misimpressions by

16

concealing these discontinuations; in other words, as the markets' understanding of the discontinuation rate was *by design* entirely dependent on Defendants' disclosures, Defendants had a duty to disclose it completely and accurately—particularly in light of the many (rebuffed) analyst questions directly on this point.  AC¶¶36-38, 117, 126-28, 141-144; *In re Immune Response Sec. Litig.*, 375 F. Supp. 2d 983, 1021 (S.D. Cal. 2005) (undisclosed "negative clinical study results … would have been viewed" as material).

### 3.     The AC Pleads A Duty To Disclose Under Item 303.

Defendants agree that an issuer has "independent duties" under Item 303 of SEC Regulation S-K, 17 C.F.R. § 229.303, which imposes an affirmative duty to disclose "any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." *See Simon v. Am. Power Conversion Corp.*, 945 F. Supp. 416, 431 (D.R.I. 1996) (failure to disclose defect that would likely "cause a material change in the relationship between costs and revenues" is an actionable omission under Item 303).  Here, the AC alleges that Defendants repeatedly touted the success of the commercial launch, including the strong, continued demand, while failing to inform investors of the whole truth, including the natural and foreseeable implications of: (1) Defendants' knowledge that the demand was due to an initial, temporary bolus of patients that, by this time, had stabilized, offering no meaningful opportunity for further growth, (2) Defendants' awareness that high, undisclosed discontinuation rates were occurring, undermining the commercial potential for the launch, and that (3) hidden discontinuations inflated the runway for the stated net patient subscribers.   AC¶¶50-71, 80-86.   Defendants' counter that they "did not have the 'hard information' to discern any trends necessitating disclosure under Item 303 at such an early juncture" when they made the statements in the Forms 10-K and 10-Q, filed on March 13, 2023, May 11, 2023, and August 10, 2023 (MTD 14), is belied by the AC's allegations that, well before

17

those filings, Defendants *did* possess the "hard information" of the numbers showing the sharp decline in subscriber rates and high dropouts. AC¶¶50-71, 80-86. The complaint in *Washtenaw Cnty. Emps.' Ret. Sys. v. Princeton Rev., Inc.*, 2012 WL 727125, at *6 (D. Mass. Mar. 6, 2012), cited at MTD 14, did not contain such specific allegations challenging the timing of the disclosures and the Defendants' contemporaneous knowledge.

**C.    The AC Pleads Scienter.**

"To establish scienter, plaintiff must show either that the defendants consciously intended to defraud, or that they acted with a high degree of recklessness." *Constr. Indus. & Laborers Joint Pension Tr. v. Carbonite, Inc.*, 22 F.4th 1, 8 (1st Cir. 2021). "[T]his circuit has rejected any rigid formula for pleading scienter, *Cabletron*, 311 F.3d at 38, and "no particular types of indicia" nor evidence "of scienter are required," *OvaScience*, 321 F. Supp. 3d at 256. Importantly, "[w]hen there are equally strong inferences for and against scienter, the draw is awarded to the plaintiff." *Mehta v. Ocular Therapeutix, Inc.*, 955 F.3d 194, 207 (1st Cir. 2020).

**1.    Defendants Had Access To Information Or Failed To Check Information Core To The Company's Business.**

"[C]ourts have found allegations of recklessness sufficient where a defendant [1] had knowledge of facts or access to information that contradicts [his] public statements, *or* [2] failed to review or check information that he had a duty to monitor, *or* [3] ignored obvious signs of fraud." *SEC v. Liberty*, 2021 WL 664834, at *6 (D. Me. Feb. 19, 2021). All are true here.

Defendants "had knowledge of facts or access to information that contradicts [their] public statements." As the AC alleges, Defendants were aware of, and tracking in real time, the numbers of new subscribers, and thus knew that the initial bolus of demand had severely tapered off within a few months of the launch (AC¶¶50-71) and that Defendants also were aware of, and tracking, discontinuations in real time, and these dropouts were occurring mere weeks into the commercial launch (AC¶¶80-86). Despite this knowledge, Defendants continued to represent that the drug

18

was in strong demand, had known avenues for growth, and had a long runway of growth to reach all 29,000 patients living with ALS. AC¶¶95-102, 109, 111-17, 121-24, 126, 128. "[T]he fact that the defendants published statements when they knew facts suggesting the statements were inaccurate or misleadingly incomplete is classic evidence of scienter." *Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 83 (1st Cir. 2002); *In re Transkaryotic*, 319 F. Supp. 2d at 162 (strong inference of scienter when defendants made false or misleading statements with knowledge of FDA communications). In addition, in reporting on only "net patient" additions, Defendants could obscure the high, early discontinuations, and when "data [is] used to support a narrative ... that ... is itself misleading ... there is an equally if not more compelling inference that Defendants acted with scienter." *City of Miami Fire Fighters' & Police Officers' Ret. Tr. v. Cerence Inc*., 2024 WL 1258149, at *16 (D. Mass. Mar. 25, 2024); *see also Brennan v. Zafgen, Inc.*, 853 F.3d 606, 617–18 (1st Cir. 2017) ("Fragmentary information may be as misleading … as active misrepresentation."). That is true even when the data is "public[ly] availab[le]," *Cerence*, 2024 WL 1258149, at *16, but the inference is all the more compelling here given Defendants' affirmative efforts to conceal these numbers, AC¶¶44-49.

Defendants' main rebuttal that the AC does not allege "that Defendants *knew* the information that [Plaintiff] alleges contradicted their public statements," *e.g*., MTD 15, is belied by Defendants' admissions that they were tracking these metrics "in real time," MTD 1, 4, 7, 12 n.15, 14; *e.g*., AC¶¶97-98 (stating intent to "share some of the important early metrics that we're tracking, which should help [investors] model our near-term opportunity and the total addressable market for the longer term"). It also ignores the FEs' allegations demonstrating Defendants' actual knowledge of, or access to, those metrics. *See, e.g*., AC¶¶55, 57, 59, 60, 62, 66, 68-71, 77, 79, 82-

19

84, 86.[4]  In addition, Defendants have vast experience with ALS and would know that there was

no opportunity for growth within ALS centers after the bolus, newly diagnosed patients, or patients

being treated by general neurologists; under these circumstances, "it is simply inconceivable that

management could not have known [this information]."  *Allaire Corp.*, 224 F. Supp. 2d at 329.

And given Defendants spoke directly about these numbers, they had a duty to monitor them

and either "failed to review or check information" or "ignored obvious signs of fraud" by failing

to disclose these discrepancies. *Liberty*, 2021 WL 664834, at *6.  At minimum, "[i]f Defendants

did not know that their statements posed a danger of misleading investors in this way, then they

were highly reckless not to know it."  *Special Situations Fund III, L.P. v. Am. Dental Partners,*

*Inc.*, 775 F. Supp. 2d 227, 243 (D. Mass. 2011).[5]

This inference of scienter is more pronounced given that the launch's success was core to

the Company's operations.  "'[T]he importance of a particular item to a defendant can support an

inference that the defendant is paying close attention to that item.'"  *Carbonite*, 22 F.4th at 9.  In

addition, the complaint must allege "particular facts strongly suggesting that that attention exposed

---

[4] Rather than meaningfully grapple with these allegations, Defendants instead attempt to discredit the sources.  MTD 15-18.  FE1 and FE2 are far from "low level"; both have plenary insight into two of the largest country-wide markets for the drug.  AC¶¶41-42.  In any event, there is no requirement under First Circuit law that FEs be of a certain level or stature.  *See N.J. Carpenters Pension & Annuity Funds v. Biogen IDEC Inc.*, 537 F.3d 35, 52 (1st Cir. 2008) ("Scienter involves wrongdoing by high-level company officials; low-level employees or consultants may well know of the wrongdoing and wish to disclose it").  Rather, the inquiry focuses on "the level of detail provided by the confidential sources, the corroborative nature of the other facts alleged (including from other sources), the coherence and plausibility of the allegations, the number of sources, the reliability of the sources, and similar indicia." *Id.* at 51– 52.  Both FEs, grounded in personal knowledge, disclosed detailed and corroborated accounts of the launch's progression, including by referencing specific declining sales numbers, specific conversations with coworkers and clients, and the high rates of early discontinuation impacting that launch.  AC¶¶52-57, 60-63, 64-66, 76-77, 78-86. None of Defendants' authorities (MTD 15-16) involved the outright admissions that the speakers were tracking these metrics in real time, as Defendants concede here, MTD 1, 4, 7, 12 n.15, 14; *e.g.*, AC¶¶97-98; thus, quibbling with issues of who had "access" to the "database" of these metrics (*e.g.*, MTD 16) is beside the point.

[5] *In re Bos. Sci. Corp. Sec. Litig.*, 646 F. Supp. 3d 249, 284 (D. Mass. 2022) ("'classic evidence' of scienter are facts showing that the defendant knew their public statements to be inaccurate or recklessly disregarded the risk that they would be"); *In re Innocoll Holdings Pub. Ltd. Sec. Litig.*, 2020 WL 1479128, at *13 (E.D. Pa. Mar. 25, 2020) ("recklessness is *intended* to encompass 'willful blindness'" and "discourage[es]deliberate ignorance").

them to information that either rendered their public statements false or *necessarily invited further investigation*." *Id.* at 9-10 (emphasis added). That is, "'that close attention'" must reveal "'an incongruity so glaring as to make the need for further inquiry obvious.'" *Id.* at 9.

Plaintiff has alleged the importance of Relyvrio's success to Amylyx: As Amylyx's "flagship product, and the only product approved for commercial use in the U.S., the outcome of this launch would make or break the Company." AC¶¶23-24. Indeed, when the Phoenix trial failed, "Amylyx's stock crashed 82%, forcing the Company to restructure and lay off 70% of its workforce." AC¶¶151-53. Given "the dire stakes involved, it is not plausible that management would not be aware of the negative data about the drug's near and long-term prospects." Such obvious "[f]acts critical to a business's core operations … generally are so apparent that their knowledge may be attributed to the company and its officers." *Crowell*, 343 F. Supp. 2d at 19.[6]

The AC also alleges "incongruit[ies]" "necessarily invit[ing] further investigation" into the actual success of the Relyvrio launch. *Carbonite*, 22 F.4th at 9, 10. Such incongruities include the issues known early into the launch that the number of new subscribers were sharply decreasing after a short, initial bolus and that patients were dropping off the treatment in high numbers due to the inefficacy of the drug and the intolerable side effects. AC¶¶50-71, 80-86. Defendants' statements to the market about steady, strong growth did not match the sentiments that the sales teams received internally. AC¶¶68-71. Behind the closed doors of the Company, Defendants were panicked about the sales quotas not meeting their internal targets—panic that resulted in a toxic

---

[6] *See*, *e.g.*, *Loc. No. 8 IBEW Ret. Plan & Tr. v. Vertex Pharms., Inc.,* 838 F.3d 76, 82 (1st Cir. 2016); *OvaScience*, 321 F. Supp. 3d at 255 ("The importance of [the fertility treatment] supports the inference that [top executives] knew of the Company's sales and inability to sell 1,000 cycles."); *Makor Issues & Rts., Ltd. v. Tellabs Inc*., 513 F.3d 702, 711 (7th Cir. 2008) (finding it "exceedingly unlikely" that CEO was "unaware of the problems of his company's two major products"). In *Brennan v. Zafgen, Inc*., 853 F.3d 606, 617 (1st Cir. 2017) (MTD 19), the court found the alleged omissions about the drug not material, an inquiry intrinsically linked to scienter. Here, Defendants do not even attempt to challenge that the omissions about the number of patient subscribers and discontinuation are material.

culture of unethical and desperate means to increase sales numbers at any cost. AC¶¶72-77. Accordingly, the AC raises a strong inference that Defendants were at minimum extremely reckless in portraying the launch as a source of long-term success for the Company.

"Evidence that a defendant has taken steps to cover-up a misdeed is strong proof of scienter," *In re Nature's Sunshine Prods. Sec. Litig.*, 486 F. Supp. 2d 1301, 1310 (D. Utah 2007), and here, Defendants took great pains to disguise their fraud by undertaking a closed network pharmacy system, hiding data internally, ceasing reporting on new patients subscribers (AC¶¶44-48) and—despite analysts' repeated attempts to gain information—evading questions about discontinuations, all which bolsters a strong inference of scienter, AC¶¶36-38; *Rocker Mgmt., L.L.C. v. Lernout & Hauspie Speech Prods. N.V.*, 2005 WL 1365465, at *13 (D.N.J. June 7, 2005) ("alleged cover-up" supported scienter); *OvaScience*, 321 F. Supp. 3d at 256 (defendants "ceased providing quarterly metrics" supported the inference done "to conceal poor sales figures").[7]

### 2.    Defendants Had Motive To Conceal The Fraud.

While evidence of motive and opportunity to commit fraud can create a strong inference of scienter, *Greebel v. FTP Software, Inc.*, 194 F.3d 185 at *197 (1st Cir. 1999), a plaintiff pleading "recklessness" need not allege "motive," *Crowell*, 343 F. Supp. 2d at 15. Nevertheless, "[a]t the pleading stage, a plaintiff's allegations of motive and opportunity, coupled with some evidence of

---

[7] That Relyvrio was withdrawn from the market shortly after this is not "fraud by hindsight." (MTD 19 p. 27) because the AC contains "factual allegations relating to a combination of developments known to the company … that could have provided a basis for advance knowledge of the information" that was eventually disclosed. *Miss. Pub. Emps*, 523 F.3d at 90 (reversing dismissal for erroneously construing allegations as fraud-by-hindsight). Indeed, "at the pleadings stage, 'a bad outcome truly *is relevant* to the likelihood of fraud.'" *Id.* That Amylyx later had to removed Relyvrio from the market supports an inference of scienter because it reinforces that Defendants knew throughout the commercial launch that the drug did not have long-term potential for growth. In addition, while Amylyx told the market that it would share the failed Phoenix trial data, and present on it at an upcoming conference, to date Amylyx has provided no public information about why the trial failed and did not attend that conference. *PTC Therapeutics,* 2017 WL 3705801, at *16 (finding strong inference of scienter when "viewed holistically" notwithstanding Defendants' argument that it was not plausible company would file NDA it knew would fail).

22

additional misconduct from which a jury can draw a reasonable inference of intentional deception," alleges scienter. *Kafenbaum v. GTECH Holdings Corp.*, 217 F. Supp. 2d 238, 247 (D.R.I. 2002); *In re Insys Therapeutics, Inc. Sec. Litig.*, 2018 WL 2943746, at *6 (S.D.N.Y. June 12, 2018) (weak motive can supports scienter when accompanied by circumstantial evidence of misconduct). That is the case here.

Allegations beyond "the usual concern by executives to improve financial results" founded on a company's future being dependent on a certain product support scienter. *Cabletron*, 311 F.3d at 39. That includes allegations where, as here, a drug company was "burning cash at a high rate and was dependent on [a specific drug] as the most promising drug in its pipeline." *Sepracor*, 308 F. Supp. 2d at 31. As discussed, Relyvrio was Amylyx's main pipeline, and its failure resulted in devastating workforce cuts, calling into question the Company's survival. AC¶¶23-32, 138-45, 147-53. Like here, where "executiv[es] ha[ve] a stronger incentive to bet the farm in a reckless gamble because the alternative is certain failure … supports … scienter." *Skiadas v. Acer Therapeutics Inc.*, 2020 WL 3268495, at *11 (S.D.N.Y. June 16, 2020).[8] Thus, this is a case where the "executives' careers and the very survival of the company were on the line" that strongly supports an inference of scienter. *Cabletron*, 311 F.3d at 39.

Moreover, "[u]nusual trading or trading at suspicious times or in suspicious amounts by corporate insiders has long been recognized as probative of scienter." *Greebel*, 194 F.3d at 197; *see Miss. Pub. Emps.' Ret. Sys. v. Bos. Sci. Corp.*, 523 F.3d 75 at 92. The AC alleges that, during the class period, Defendants Cohen and Klee each sold 105,968 shares of Amylyx common stock

---

[8] *Innocoll*, 2020 WL 1479128, at *10 (fear of losing job because company was on verge of insolvency); *Aldridge*, 284 F.3d at 83–84; *see also In re Insys Therapeutics*, 2018 WL 2943746, at *6 (executives motivated to misstate financials "to maintain the appearance of continued success" and "cover up the economic impact of problems'").

for total proceeds of over $3.4 million,[9] while Defendant Frates sold 100,158 shares of Amylyx common stock for total proceeds of over $3 million, and former employees watched as "mass amounts of stock [were] being liquidated by the CEOs, the CFO, and the COO" while Defendants were disseminating these rosy statements about Relyvrio's success, and thus alleges motive and opportunity. *See Mahoney v. Found. Med., Inc.*, 342 F. Supp. 3d 206, 216 (D. Mass. 2018).[10]

**D.     The AC Pleads Loss Causation.**

Plaintiff must "allege[] a causal connection between the [D]efendants' material misrepresentations and the drop in [Amylyx's] share price." *Mass. Ret. Sys. v. CVS Caremark Corp.*, 716 F.3d 229 at *237 (1st Cir. 2013). Plaintiff need only allege "some indication of the loss and the causal connection that the plaintiff has in mind." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 347 (2005). Defendants mischaracterize Plaintiff's allegations, arguing that the November 9 disclosure "revealed nothing more than … a narrow miss in analysts' forecasts." MTD 20. But Defendants overlook the primary reason for that miss was a "slowdown in net adds … [and] increased discontinuations." AC¶¶138-39. "[I]t is appropriate to look for indications of

---

[9] The purported "increase" in Defendants' overall holdings (MTD 18) does not negate the inference of scienter. Those increases were *not* due to share purchases on the open market, but rather to gifts and options awarded or exercised. *See* Defs.' Exs. V, W, X. Rather than make purchases in the open market, Defendants *sold* shares during the class period. Accordingly, the increase in Defendants' overall holdings is irrelevant to the AC's scienter allegations.

[10] Defendants cannot escape this inference by claiming that their trades were based on so-called Rule 10b5-1 trading plans. MTD 19. As an initial matter Rule 10b5-1 trading plans are no defense on a motion to dismiss when the plans were adopted during the Class Period. *Ariad*, 98 F. Supp. 3d at 165. In addition, Courts frequently refuse to consider 10b5-1 trading plans at the pleading stage. *See In re Cardinal Health Inc. Sec. Litigs.*, 426 F. Supp. 2d 688, 734 (S.D. Ohio 2006); *In re Infosonics Corp. Derivative Litig.*, 2007 WL 2572276, at *9 (S.D. Cal. Sept. 4, 2007). Further, Defendants have not provided sufficient evidence about the plans for the Court to evaluate Defendants' trades. While the SEC Form 4s Defendants attached to their Motion do refer to Rule 10b5-1 plans, the actual plans are not public, nor have Defendants produced them. Indeed, Defendants failure to produce or provide details regarding these plans raises the inference that they were either entered into during the Class Period, or provided Defendants with sufficient discretion regarding the timing and quantity of sales to allow them to profit on the sale of securities while being aware of material undisclosed information. Accordingly, there is no evidence that the trading plans removed from Defendants' discretion the question of when sales would occur and at what amounts, that they were unable to amend these trading plans, or that they were executed during the Class Period. *See Miss. Pub. Emps.' Ret. Sys.*, 523 F.3d at 92 ("It was defendants' choice to move to dismiss the case on the pleadings without presenting evidence."). Consequently, the 10b5-1 plans should be accorded no weight.

the market's contemporaneous response to [defendant's] statements" revealing the truth, including a stock price decline and analysts' reactions, *CVS*, 716 F.3d at 243; here, in response, Amylyx stock plummeted 31.89%.'" AC¶¶145. In addition, "defendants … concealed [a] risk … that materialized and played some part in" that loss. *In re Evergreen Ultra Short Opportunities Fund Sec. Litig.*, 705 F. Supp. 2d 86, 95 (D. Mass. 2010). While Defendants tracked the declining "net adds" and "discontinuations" triggering the loss, they repeatedly touted the strong numbers of net patient additions and the long runway for growth, concealing this known risk. These disclosures "as a whole, plausibly revealed to the market that [the launch] had problems[,]" undermining Defendants' misstatements and omissions concerning the success of that launch. *CVS*, 716 F.3d at 240. That is enough to plead loss causation. *See id.* at 243.[11]

## IV.  CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss should be denied.

Dated: October 21, 2024

*/s/ Samantha Daniels*

Jeremy Lieberman (admitted *pro hac vice*)
Samantha Daniels (admitted pro hac vice)
Emily C. Finestone (BBO # 693684)
POMERANTZ LLP
600 Third Avenue, Floor 20
New York, New York 10016
Phone: 212-661-1100
Email: efinestone@pomlaw.com
          sdaniels@pomlaw.com
          jalieberman@pomlaw.com

*Counsel for Lead Plaintiff Oliver Shih*

---

[11] Defendants also suggest that their "risk warnings" negates loss causation. MTD 20. However, "[t]he disclosures fail[ed] to make clear the magnitude of the risk" which Defendants knew the launch faced and did not warn of the specific risks (declines in net additions and increased dropouts) and that later materialized. Such inadequate warnings cannot defeat loss causation. *N.J Carpenters Health Fund v. DLJ, Mortg. Capital, Inc.*, 2010 WL 1473288, at *6 (S.D.N.Y. Mar. 29, 2010) (rejecting argument that risk disclosures undercut loss causation).

## CERTIFICATE OF SERVICE

I hereby certify that on October 21, 2024, a true and correct copy of the foregoing

**OPPOSITION TO DEFENDANTS' MOTION TO DISMISS** was served by CM/ECF to the

parties registered to the Court's CM/ECF system.

*/s/ Samantha Daniels*

26