**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| OLIVER SHIH, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>AMYLYX PHARMACEUTICALS, INC., JOSHUA B. COHEN, JUSTIN B. KLEE, JAMES M. FRATES, and MARGARET OLINGER,<br><br>Defendants. | Case No. 1:24-cv-12068-NMG |

## DEFENDANTS' ANSWER TO THE AMENDED CLASS ACTION COMPLAINT

Defendants Amylyx Pharmaceuticals, Inc. ("Amylyx" or the "Company"), Joshua B. Cohen, Justin B. Klee, James M. Frates, and Margaret Olinger ("Individual Defendants," together with Amylyx, "Defendants"), by and through their attorneys, state the following in response to Plaintiff Oliver Shih's ("Plaintiff") Amended Class Action Complaint ("Amended Complaint").

## GENERAL DENIAL

Except as otherwise expressly admitted in the paragraphs below, Defendants deny each and every allegation in the Amended Complaint, and specifically deny any and all wrongdoing and/or liability to Plaintiff, or the class members Plaintiff represents. To the extent the Amended Complaint contains allegations dismissed by the Court pursuant to the Court's Order Denying Defendants' Motion to Dismiss dated September 30, 2025, ECF No. 55 (the "Motion to Dismiss Order"), this Answer is not required to address those allegations and does not do so. To the extent any allegation in the Amended Complaint is not specifically and expressly admitted, it is denied. To the extent the Amended Complaint asserts legal conclusions, such legal conclusions require no

response in this Answer, and this Answer contains no response to legal conclusions. The table of

contents and headings in the Amended Complaint are not allegations and, therefore, do not require

a response. To the extent any response is required to the table of contents, headings, or other

unnumbered paragraphs in the Amended Complaint, Defendants deny all allegations of

wrongdoing and/or liability to Plaintiff or the class members Plaintiff represents in the table of

contents, headings, or other unnumbered paragraphs. Defendants reserve the right to seek to amend

or supplement this Answer as may be necessary or appropriate.

<u>**SPECIFIC RESPONSES TO THE PARAGRAPHS**</u>
<u>**IN THE AMENDED COMPLAINT**</u>

## I.   <u>NATURE OF THE ACTION</u>

1.      This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants that purchased or otherwise acquired Amylyx securities between November 11, 2022 and November 8, 2023, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

**ANSWER:** Defendants state that Paragraph 1 is a characterization of the Amended

Complaint to which no response is required. To the extent a response is required, Defendants deny

the allegations in Paragraph 1 and specifically deny that the Class Period is November 11, 2022 to

November 8, 2023 based on the Motion to Dismiss Order, which limited the actionable statements

to only statements about growth potential made between May 11, 2023 and August 10, 2023.

2.      Amylyx is a commercial-stage biotechnology company that engages in the discovery and development of treatments for amyotrophic lateral sclerosis ("ALS"), also known as Lou Gehrig's disease, and other neurodegenerative diseases.  The Company's products include, among others, AMX0035 (commercially referred to as "Relyvrio" in the U.S.), a dual UPR-Bax apoptosis inhibitor composed of sodium phenylbutyrate and taurursodiol, for the treatment of ALS in adults in the U.S.

**ANSWER:** Defendants admit that Amylyx is a biotechnology company, and that

Amylyx previously developed a treatment for amyotrophic lateral sclerosis, or ALS. Defendants admit that Amylyx developed RELYVRIO®, (formerly known as AMX0035), a dual UPR-Bax apoptosis inhibitor composed of sodium phenylbutyrate and taurursodiol, for the treatment of ALS in adults.

3. Following the U.S. Food and Drug Administration's ("FDA") September 2022 approval of Relyvrio for the treatment of ALS in adults in the U.S., Defendants consistently touted the drug's commercial prospects and prescription rate, offering hope to those suffering from this devastating disease.

**ANSWER:** Defendants admit that in September 2022, the FDA approved RELYVRIO®. Defendants deny the remaining allegations in Paragraph 3.

4. Yet throughout the Class Period, Defendants made materially false and misleading statements regarding the success of the Relyvrio commercial launch. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) at the time, Defendants knew that the "significant demand" was due to an initial, temporary bolus of patients that, by this time, had stabilized, offering no meaningful opportunity for further growth, (2) at the time, contrary to their representations, Defendants knew the initial bolus was over within months of the launch, (3) and thus, there was no growth potential for newly diagnosed patients with ALS in ALS centers, (4) that there was no opportunity for growth outside the concentrated ALS centers, in the broader neurology community, (5) at the time, Defendants already were aware that high, undisclosed discontinuation rates were occurring, undermining the commercial potential for the launch, (6) those hidden discontinuations inflated the "runway" left for more, new net patient subscribers, and (7) as a result, Defendants' public statements were materially false and misleading at all relevant times.

**ANSWER:** Defendants deny the allegations in Paragraph 4 and specifically deny that the Class Period is November 11, 2022 to November 8, 2023 based on the Motion to Dismiss Order, which limited the actionable statements to only statements about growth potential made between May 11, 2023 and August 10, 2023. To the extent the allegations in Paragraph 4 address claims about statements of interest or demand, Defendants state that no response is required because the Court found those statements non-actionable in the Motion to Dismiss Order.

5. The truth about the launch's failure was revealed on November 9, 2023, when Amylyx issued a press release announcing its third quarter ("Q3") 2023 financial results, including Q3 GAAP earnings per share ("EPS") of $0.30, missing consensus estimates by $0.12. That same day, on a conference call with investors and analysts to discuss these results, Company

management revealed that, despite "a [purported] steady cadence of new prescriptions written in" Q3 for Relyvrio, Amylyx's "results were impacted by a number of factors" including a "slowdown in net adds" for Relyvrio in Q3, which "was primarily driven by increased discontinuations for a variety of reasons."

**ANSWER:** Defendants admit that on November 9, 2023, Amylyx announced Q3 2023 financial results in a press release and on a conference call with investors and analysts. To the extent that Paragraph 5 characterizes Amylyx's November 9, 2023 press release or call transcript, Defendants state that such press release and call transcript speak for themselves, refer the Court to the press release and call transcript for their content, and deny the allegations in to the extent they are inconsistent with the content of the press release or call transcript referenced in Paragraph 5. Defendants deny the remaining allegations in Paragraph 5.

6.        That same day, on November 9, 2023, *Investor's Business Daily* published an article addressing the Company's disappointing financial results (the "*IBD* Article"). The *IBD* Article cited an Evercore ISI analyst, who questioned Amylyx's assertion that the number of new patients starting treatment with Relyvrio was "steady," noting that his math suggested otherwise and that Amylyx had blocked analysts from viewing Relyvrio's prescription data in the summer of 2023. The analyst also stated that, "[k]nowing that [Amylyx's] stock had underperformed in 2023 already, management could have communicated the discontinuations dynamic much earlier," and that the "[s]tock move today in a bad biotech tape and fund performance doesn't help investor confidence among folks that have held onto the stock."

**ANSWER:** To the extent Paragraph 6 characterizes the November 9, 2023 Investor's Business Daily Article, Defendants state that such article speaks for itself, refer the Court to the article for its content, and deny the allegations in Paragraph 6 to the extent they are inconsistent with the content of the article. To the extent a further response is required, Defendants deny the allegations in Paragraph 6.

7.        Following these disclosures and the publication of the *IBD* Article, Amylyx's stock price fell $5.74 per share, or 31.89%, to close at $12.26 per share on November 9, 2023.

**ANSWER:** Defendants deny the allegations in Paragraph 7, except admit that (1) Amylyx's common stock closed at $18.00 per share on November 8, 2023; and (2) Amylyx's common stock closed at $12.26 per share on November 9, 2023.

8.          Months after this truth about Relyvrio's launch failure was revealed, the death knell for Relyvrio came when the late-stage clinical trial assessing the drug's efficacy (the Phoenix trial) failed spectacularly—revealing the drug was no better than a placebo (a sugar pill) in mitigating any symptoms of ALS. In response to this news, Amylyx's stock dove 82%, and Amylyx withdrew Relyvrio from the market.

**ANSWER:** Defendants deny the allegations in Paragraph 8, except admit that (1) on March 8, 2024, Amylyx announced that the PHOENIX Phase 3 Study did not meet its prespecified endpoints, and (2) on April 4, 2024, Amylyx voluntarily ceased selling RELYVRIO®.

9.          As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

**ANSWER:** Defendants deny the allegations in Paragraph 9.

## II. <u>JURISDICTION AND VENUE</u>

10.         The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

**ANSWER:** The allegations in Paragraph 10 consist of legal conclusions, to which no response is required. To the extent Paragraph 10 contains factual allegations to which a response is required, Defendants deny the allegations in Paragraph 10, except admit that Plaintiff brings this action against Defendants on behalf of a class pursuant to the statutory and regulatory provisions cited in Paragraph 10.

11.         This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

**ANSWER:** The allegations in Paragraph 11 consist of legal conclusions, to which no response is required. To the extent Paragraph 11 contains factual allegations to which a response is required, Defendants deny the allegations in Paragraph 11.

12.         Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b). Amylyx's common stock trades on the Nasdaq Global Select Market ("NASDAQ"), which is located in this Judicial District.

**ANSWER:** The allegations in Paragraph 12 consist of legal conclusions, to which no response is required. To the extent Paragraph 12 contains factual allegations to which a response is required, Defendants deny the allegations in Paragraph 12, except admit that Amylyx's common stock is listed on the Nasdaq Global Select Market.

13.    In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

**ANSWER:** The allegations in Paragraph 13 consist of legal conclusions, to which no response is required. To the extent Paragraph 13 contains factual allegations to which a response is required, Defendants deny the allegations in Paragraph 13.

### III. <u>PARTIES</u>

14.    Lead Plaintiff, as set forth in the attached Certification, acquired Amylyx securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

**ANSWER:** Defendants state that they lack knowledge or information sufficient to form a belief as to the truth of the allegations concerning the timing of Plaintiffs' stock price purchases. Defendants deny the allegations in Paragraph 14 and specifically deny that the Class Period is November 11, 2022 to November 8, 2023 based on the Motion to Dismiss Order, which limited the actionable statements to only statements about growth potential made between May 11, 2023 and August 10, 2023.

15.    Defendant Amylyx is a Delaware corporation with principal executive offices located at 43 Thorndike Street, Cambridge, Massachusetts 02141. The Company's common stock trades in an efficient market on the NASDAQ under the ticker symbol "AMLX."

**ANSWER:** Defendants admit that (1) Amylyx is incorporated in the state of Delaware, and (2) Amylyx's main office is in Cambridge, Massachusetts, and (3) Amylyx common stock trades on the NASDAQ under the ticker symbol "AMLX." Defendants otherwise deny the

remainder of the allegations in Paragraph 15.

16.        Defendant Joshua B. Cohen ("Cohen") has served as Amylyx's Co-Chief Executive Officer ("Co-CEO") at all relevant times.  Defendant Cohen is also a Co-Founder of the Company. During the Class Period, Defendant Cohen sold 105,968 shares of Amylyx common stock for total proceeds of over $3.4 million.

**ANSWER:** Defendants admit that Mr. Cohen co-founded Amylyx and serves as its Co-Chief Executive Officer and that in 2023, Mr. Cohen sold 105,968 shares of Amylyx common stock. Defendants otherwise deny the remaining allegations in Paragraph 16, and specifically deny that the Class Period is November 11, 2022 to November 8, 2023 based on the Motion to Dismiss Order, which limited the actionable statements to only statements about growth potential made between May 11, 2023 and August 10, 2023.

17.        Defendant Justin B. Klee ("Klee") has served as Amylyx's Co-CEO at all relevant times.  Defendant Klee is also a Co-Founder of the Company.  During the Class Period, Defendant Klee sold 105,968 shares of Amylyx common stock for total proceeds of over $3.4 million.

**ANSWER:** Defendants admit that Mr. Klee co-founded Amylyx and serves as its Co-Chief Executive Officer and that in 2023, Mr. Klee sold 105,968 shares of Amylyx common stock. Defendants otherwise deny the remaining allegations in Paragraph 17, and specifically deny that the Class Period is November 11, 2022 to November 8, 2023 based on the Motion to Dismiss Order, which limited the actionable statements to only statements about growth potential made between May 11, 2023 and August 10, 2023.

18.        Defendant James M. Frates ("Frates") has served as Amylyx's Chief Financial Officer at all relevant times.  During the Class Period, Defendant Frates sold 100,158 shares of Amylyx common stock for total proceeds of over $3 million.

**ANSWER:** Defendants admit that Mr. Frates serves as Amylyx's Chief Financial Officer. Defendants deny the remaining allegations in Paragraph 18, and specifically deny that the Class Period is November 11, 2022 to November 8, 2023 based on the Motion to Dismiss Order, which limited the actionable statements to only statements about growth potential made between May

11, 2023 and August 10, 2023.

19.  Defendant Margaret Olinger ("Olinger") served as Amylyx's Chief Commercial Officer ("CCO") at all relevant times.  Defendant Olinger left the Company effective December 31, 2023.

**ANSWER:** Defendants admit that Ms. Olinger served as Amylyx's Chief Commercial Officer until December 31, 2023.

20.  Defendants Cohen, Klee, Frates, and Olinger are collectively referred to herein as the "Individual Defendants."

**ANSWER**: The allegations in Paragraph 20 consist of a defined term, to which no response is required. To the extent Paragraph 20 contains factual allegations to which a response is required, Defendants deny the allegations in Paragraph 20.

21.  The Individual Defendants possessed the power and authority to control the contents of Amylyx's SEC filings, press releases, and other market communications.  The Individual Defendants were provided with copies of Amylyx's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected.  Because of their positions with Amylyx, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading.  The Individual Defendants are liable for the false statements and omissions pleaded herein.

**ANSWER:** The allegations in Paragraph 21 consist of legal conclusions, to which no response is required. To the extent Paragraph 21 contains factual allegations to which a response is required, Defendants deny the allegations in Paragraph 21.

22.  Amylyx and the Individual Defendants are collectively referred to herein as "Defendants."

**ANSWER:** The allegations in Paragraph 22 consist of a defined term, to which no response is required. To the extent Paragraph 22 contains factual allegations to which a response is required, Defendants deny the allegations in Paragraph 22.

## IV. <u>SUBSTANTIVE ALLEGATIONS</u>

23.        Amylyx is a commercial-stage biotechnology company that engages in the discovery and development of treatments for amyotrophic lateral sclerosis ("ALS"), also known as Lou Gehrig's disease, and other neurodegenerative diseases. Founded in 2013 and based in Cambridge, Massachusetts, the Company's "main asset" is AMX0035, sold under the commercial name "Relyvrio," which received FDA approval for the treatment of ALS in September 2022.

**ANSWER:** Defendants admit that: (1) Amylyx is a biotechnology company and that Amylyx previously developed a treatment for amyotrophic lateral sclerosis, or ALS; (2) Amylyx was founded in 2013 and is based in Cambridge, Massachusetts; and (3) Amylyx's product RELYVRIO®, (formerly known as AMX0035), was approved by the FDA for the treatment of ALS in September 2022. To the extent a further response is required, Defendants deny the remaining allegations in Paragraph 23.

24.        As Amylyx's only approved commercial product for sale in the U.S., it is the key product in Amylyx's commercial pipeline. As one analyst report stated, "Amylyx is a one product company without clear opportunities beyond ALS." (Bank of America, "New ALS launch addressing huge unmet need; Initiate at Buy, $50 PO," Jan. 5, 2023) "While Amylyx has other pipeline assets . . . and can potentially expand to other neurological diseases such as Alzheimer's and Wolfram Syndrome," those are in the early stages of development, so "the Company's near-term focus is on Relyvrio's commercial execution." (*Id.*) The success of any such launch thus is critical to Amylyx's overall success.

**ANSWER:** Defendants admit that at the time RELYVRIO® was approved by the FDA, it was Amylyx's only commercial product. To the extent Paragraph 24 characterizes an analyst report, Defendants respectfully refer the Court to the analyst report referenced in Paragraph 24, which speaks for itself. Defendants specifically deny any characterization that is not consistent with the content of the analyst report referenced in Paragraph 24. Defendants deny the remaining allegations in Paragraph 24.

25.        Amylyx developed Relyvrio to treat ALS, a rare, progressive, and fatal neurodegenerative disease characterized by the degeneration of neurons in the brain and spinal cord. The initial manifestation of the disease ranges from muscle weakness of the limbs to difficulty with speech and swallowing—and over time, patients develop muscle paralysis, inability to speak or swallow, and respiratory failure leading to certain death in only 2 to 5 years. While all patients develop motor dysfunction, roughly half also develop cognitive or behavioral impairment and 15% develop frontotemporal dementia.

9

**ANSWER:** Defendants admit that RELYVRIO® was developed to treat ALS, and that ALS is a progressive and fatal neurodegenerative disease. ALS is caused by motor neuron death in the brain and spinal cord, leading to deteriorating muscle function, the inability to move, speak, swallow, and eat, respiratory paralysis, and, eventually, death. Defendants admit that ALS leads to certain death and further states that approximately half of patients pass away less than a median of 3 years from symptom onset.

26.    About 30,000 people in the U.S., and more than 200,000 worldwide, suffer from this devasting disease.  And universally, diagnosis is a shock: more than 90% of people living with ALS have no family history of the disease, and it can strike adults at nearly any age.

**ANSWER:** Defendants admit that at least 200,000 people worldwide are diagnosed with ALS, that there are approximately 30,000 ALS patients in the U.S., and that over 90% of patients have no family history of ALS. Defendants further admit that ALS can strike at any age, but further state that most people who develop ALS are between the ages of 40 and 70.

27.    Even more distressingly—because the current approved drugs to treat ALS at best can extend life mere months—typical treatment is largely focused on supportive care such as symptom management.  In addition, the last approved treatment for ALS was issued 25 years before the FDA approved Relyvrio.  Given the strong unmet needs in treatment, physicians and patients are often willing to try a new agent either as a monotherapy or as an add-on to existing therapy.

**ANSWER:** Defendants state that Paragraph 27 consists of characterizations of facts to which no response is required. To the extent a further response is required, Defendants deny any factual allegations contained in Paragraph 27.

28.    Before seeking FDA approval, drugs typically must clear three increasingly challenging clinical-trial hurdles, called "Phases."  Phase I trials are conducted in a small number of volunteers or patients to assess the early tolerability and safety profile, and the pattern of drug absorption, distribution, and metabolism.  Next, Phase II trials are conducted in a limited patient population afflicted with a specific disease in order to assess appropriate dosages and dose regimens, expand evidence of the safety profile, and evaluate preliminary efficacy. Finally, Phase III involves larger scale, multicenter, well-controlled clinical trials that are conducted on patients with a specific disease to generate enough data to statistically evaluate the efficacy and safety of the product for approval.  Once all are cleared, the company typically submits a "new drug application" to the FDA for commercial assessment.

**ANSWER:** Defendants state that Paragraph 28 consists of characterizations of facts to which no response is required. To the extent a further response is required, Defendants deny any factual allegations contained in Paragraph 28.

29.        However, given the unmet need in the market, and the fact that patients are desperate for any relief from certain, imminent death, and under pressure from ALS advocacy groups and Congress, the FDA approved Relyvrio for early commercial use despite the fact that Relyvrio was currently in Phase III.  In that Phase III trial—which Amylyx dubbed the "Phoenix" study—the Company was conducting "a 48-week, randomized, placebo-controlled, global clinical trial further evaluating the safety and efficacy of [Relyvrio] . . . for the treatment of ALS."

**ANSWER:** Defendants admit that (1) the FDA approved RELYVRIO® while Amylyx's Phase 3 (PHOENIX) trial was ongoing, and (2) the PHOENIX trial was a 48-week, randomized, placebo-controlled, global clinical trial further evaluating the safety and efficacy of RELYVRIO® for the treatment of ALS. To the extent a further response is required, Defendants deny the remaining allegations in Paragraph 29.

30.        "The primary efficacy outcome" of the trial (i.e., the trial's main research question) would assess whether, at the end of the 48 weeks, there was any "change from baseline in ALS Functional Rating Scale-Revised (ALSFRS-R) total score." The ALSFRS-R measures 12 aspects of a patient's physical function robbed by the disease (everyday functions including speech, salivation, swallowing, handwriting, cutting food, climbing stairs, turning in bed, walking, dressing and hygiene, dyspnea (difficulty breathing), orthopnea (shortness of breath while lying down), and breathing insufficiency), and then each function category is scored from 4 (normal) to 0 (no ability), with a maximum total score of 48 and a minimum total score of 0.  The trial's "secondary endpoints" (i.e., additional events of interest, but to which the study is not specifically powered to assess) "include quality of life patient-reported outcome assessments, overall survival, and respiratory function."

**ANSWER:** Defendants state that to the extent Paragraph 30 quotes from an uncited source, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 30. Defendants admit that the primary efficacy outcome of the PHOENIX trial was change from baseline in ALS Functional Rating Scale-Revised (ALSFRS-R) total score at 48 weeks, and that the secondary endpoints include quality of life patient-reported outcome assessments, overall survival, and respiratory function as measured by slow vital capacity (SVC).

31.        Given this early FDA approval, and the need to fully assess Relyvrio efficacy long-term, "[b]efore Relyvrio's approval in September 2022, [Amylyx] executives said they would withdraw the drug [from commercial use] if the late-stage [Phase III Phoenix] data weren't positive." (WSJ, "Wall Street Predicted a Blockbuster, Now the Drug May Be Withdrawn," March 10, 2024).

**ANSWER:** To the extent that Paragraph 31 characterizes the article referred to in Paragraph 31, Defendants state that such article and the sources cited therein speak for themselves, refer the Court to the article and such sources for their content, and deny the allegations in Paragraph 31 to the extent they are inconsistent with the content of the article and such sources. To the extent a further response is required, Defendants deny the allegations in Paragraph 31.

32.        Leading up to the commercial launch following this FDA approval, Amylyx promised this vulnerable population hope from Relyvrio.  Amylyx claimed "our mission is to one day end the suffering caused by" ALS, and since its founding, "[f]rom a dorm room at Brown University in 2013, our Co-CEOs and Co-Founders, Josh Cohen and Justin Klee set out to determine why neurons die, and have ever since been working to develop [Relyvrio], which we believe is the first drug candidate to show function and survival benefits in patients with ALS." (Amylyx, 10-K, March 13, 2023).  "Unlike most other cells in the body that regularly die and are replaced as part of healthy function, mature neurons are normally resistant to cell death and generally cannot regenerate.  We believe [Relyvrio] is the first drug candidate to show both a functional and survival benefit in a large-scale clinical trial of patients with ALS." (*Id.*)

**ANSWER:** To the extent that Paragraph 32 characterizes the Amylyx 10-K dated March 13, 2023, Defendants state that such filing speaks for itself, refer the Court to the filing for its content, and deny the allegations in Paragraph 32 to the extent they are inconsistent with the content of the filing. Defendants deny the remaining allegations in Paragraph 32.

33.        Amylyx commercially launched Relyvrio in the U.S. on October 24, 2022. From the beginning, Defendants touted the strength of that launch in numbers and the potential for growth in new subscriptions.  On February 14, 2023, for instance, Defendants filed an 8-K, lauding that "[t]he Company has observed higher demand for RELYVRIO in the U.S. than initially anticipated pre-launch and, as a result, expects to meaningfully exceed fourth quarter and full-year 2022 Wall Street research analyst consensus estimates for revenue."

**ANSWER:** Defendants admit that on October 24, 2022, Amylyx commercially launched RELYVRIO®. To the extent the allegations in Paragraph 33 predate the May 11, 2023 statements, Defendants state that no response is required because the Court found statements prior to May 11,

2023 non-actionable in its Motion to Dismiss Order. To the extent that Paragraph 33 characterizes

a Form 8-K Amylyx filed on February 14, 2023, Defendants state that the SEC filing speaks for

itself, refer the Court to the filing for its content, and deny the allegations in Paragraph 33 to the

extent they are inconsistent with the content of the filing. Defendants deny the remaining

allegations in Paragraph 33.

34.     Indeed, throughout the launch period, Defendants were reporting steady increases in patient subscribers. On March 13, 2023, during the Q&A portion of the Q4/FY 2022 Earnings Call, in response to an analyst question regarding the pace of patients starting treatment with Relyvrio and "a sense for how we think about the pace of starts after" the first quarter ("Q1") of 2023, Defendant Olinger described this as "seeing an initial bolus in demand" and while they noted "we just don't know how big this bolus will be or how long it will last," Defendant Olinger reiterated that "we expect continued growth and interest in demand" and "[w]e really see that we have a lot of runway ahead of us" as far as getting more new subscribers after the bolus. Defendant Klee bolstered that assurance, stating that for this bolus, demand was "very concentrated so far so we have a lot of breadth and depth to continue to look forward to, I think as we expand this product."

**ANSWER:** To the extent the allegations in Paragraph 34 predate the May 11, 2023

statements, Defendants state that no response is required because the Court found statements prior

to May 11, 2023 non-actionable in its Motion to Dismiss Order. To the extent that Paragraph 34

characterizes the March 13, 2023 earnings call transcript, Defendants state that such call transcript

speaks for itself, refer the Court to the call transcript for its content, and deny the allegations in

Paragraph 34 to the extent they are inconsistent with the content of the call transcript. Defendants

deny the remaining allegations in Paragraph 34.

35.     These assurances continued on May 11, 2023, when Relyvrio announced it more than "doubled" subscribers from 1,300 to 3,000. Analysts again attempted to get information about how long this bolus would last, and Defendants assured them that demand remained fervent and that there were strong "opportunities for growth" to come. And, on August 10, 2023, for the Q2 2023 earnings call, Defendants announced that number had increased to 3,800, touting "[w]e made strong and steady progress on our commercial launches in [Q2]" with "strong and steady demand in Q2." Indeed, on that earnings call, Defendant Olinger stated this was just the beginning, as "we have a really large untapped opportunity for growth outside of" the core prescribing group of ALS centers.

**ANSWER:** To the extent that Paragraph 35 characterizes earnings call transcripts from

13

May 11, 2023 and August 10, 2023, Defendants state that such call transcripts speak for themselves, refer the Court to the call transcripts for their content, and deny the allegations in Paragraph 35 to the extent they are inconsistent with the content of the call transcripts. Defendants deny the remaining allegations in Paragraph 35.

36.    Yet while touting this seemingly "strong and steady growth" throughout the launch, Defendants refused to provide information about patient discontinuations—a key metric that would impact the purported amount of patients currently on Relyvrio. On November, 10, 2022, the Company released its Q3 financial results. During the Q&A earnings call, Defendant Cohen would not answer directly about "how long [Defendants] expect patients to stay on drugs in [Amylyx's] model," stating only that "we haven't given specific guidance as to time on therapy for our product."

**ANSWER:** Defendants state that no response is necessary based on the Motion to Dismiss Order, which limited the actionable statements to only statements about growth potential made between May 11, 2023 and August 10, 2023. To the extent a response is required, Defendants admit that Amylyx released its Q3 2022 financial results on November 10, 2022. To the extent that Paragraph 36 characterizes the November 10, 2022 earnings call transcript, Defendants state that such call transcript speaks for itself, refer the Court to the call transcript for its content, and deny the allegations in Paragraph 36 to the extent they are inconsistent with the content of the call transcript. Defendants deny the remaining allegations in Paragraph 36.

37.    This obfuscation on discontinuation continued well into the launch in 2023. Nearly ten months after the launch, on the August 10, 2023 Q2 earnings call, in response to an analyst question regarding "what are you seeing with respect to . . . discontinuation rates" and whether Defendants "[a]re . . . seeing any emerging trends with respect to the primary reason for discontinuation," Defendant Olinger said only that "we report on net patients on therapy," which is "inclusive of any discontinuation" but it is "really too early to see any long-term trends at this point in our launch."

**ANSWER:** To the extent that Paragraph 37 characterizes the August 10, 2023 earnings call transcript, Defendants state that such call transcript speaks for itself, refer the Court to the call transcript for its content, and deny the allegations in Paragraph 37 to the extent they are inconsistent with the content of the call transcript. Defendants deny the remaining allegations in

14

Paragraph 37.

38.      Analysts again pressed about discontinuation rates particularly "among the early patients t[hat] have received [the] commercial drug in 4Q of last year [2022] [who are] presumably some of the[] patients [that] . . . would have been on drug for at least six months now," and whether Defendants could "provide any color as to what percent of them are still on therapy at this point again just among the patients who started in 4Q."  In response, Defendant Olinger would only say that "again, we're only going to be reporting on net patient numbers for a quarter" and that "it's a little too early to really give any trends there."  Defendants Klee and Olinger also dodged yet another question asking for "any color on . . . new prescription trends versus refill trends?" and thus the retention of patients on Relyvrio, to which Defendant Olinger would only state that the Company was "going to continue to work on . . . expansion" of new subscribers with a "number of General and Community Neurologist."

ANSWER: To the extent that Paragraph 38 characterizes the August 10, 2023 earnings call transcript, Defendants state that such call transcript speaks for itself, refer the Court to the call transcript for its content, and deny the allegations in Paragraph 38 to the extent they are inconsistent with the content of the call transcript. Defendants deny the remaining allegations in Paragraph 38.

39.      Throughout the launch from October 2022 to over a year later, in November 2023, Defendants thus lauded the success of the launch and the near- and long-term ability for Relyvrio's growth while failing to warn of concerning trends in declining new subscribers and patient discontinuations that would temper that growth.

ANSWER: Defendants deny the allegations in Paragraph 39.

40.      Behind the scenes, however, former employees ("FE") tell a different story: how Defendants conspired to hide the sharp decline in new patient subscribers and the high, early discontinuations, from the market.

ANSWER: Defendants deny the allegations in Paragraph 40.

41.      FE1 was a sales representative for Amylyx and covered all main accounts in New York City, including Columbia and Mt. Sinai—a region in the top three largest geographies in the country for distributing and marketing Relyvrio. FE1 started in November 2022 and left the Company in May 2024. Before joining Amylyx, FE1 had decades of experience in the pharmaceutical sales industry.

ANSWER: Defendants deny the allegations in Paragraph 41, except state that they lack knowledge or information sufficient to form a belief as to the truth of the allegations concerning

15

FE1, whose identity has not been disclosed to Defendants.

42.     FE2 worked at Amylyx from September 2021 to December 2023 as the Regional Business Director responsible for overseeing sales. Only five people held this title nationwide, and those five directors split oversight of the business in the U.S. FE2's region amounted to the West Coast, including every state that touches the Pacific Ocean: California, Oregon, Washington, Alaska, Hawaii, Nevada, Utah, Montana, Wyoming, and Idaho. This large market amounted to approximately 25% of Relyvrio's sales. FE2 had eight sales representatives reporting to FE2.

**ANSWER:** Defendants deny the allegations in Paragraph 42, except state that they lack knowledge or information sufficient to form a belief as to the truth of the allegations concerning FE2, whose identity has not been disclosed to Defendants.

43.     These former employees conclude "absolutely" that Defendants misled the market about Relyvrio's "prescription rate," that "the rate at which new patients were starting treatment with Relyvrio was decreasing," as well as "discontinuations" thus "overstating Relyvrio's" success and opportunities for growth. Specifically, as detailed below, Defendants (1) hid the data from the market on these key metrics, (2) knew new patient subscribers were declining rapidly across the launch and that initial demand only rode on an initial bolus of subscriptions, which Defendants knew would not, and could not, continue, thus overstating the potential for Relyvrio's growth, and that (3) unknown to investors, patients were discontinuing after mere weeks treatment, further inflating the ability of Relyvrio to enter untapped patient subscribers.

**ANSWER:** Defendants deny the allegations in Paragraph 43.

44.     Both former employees revealed how during the Relyvrio launch, Amylyx strategically obscured data on subscription counts and discontinuations from the market—and even internally among Amylyx's own employees.

**ANSWER:** Defendants deny the allegations in Paragraph 44.

45.     FE2 related how, "early" in the commercial launch, Amylyx "established a limited distribution model," "where [the drug] was only going through a few specialty pharmacies, and [providers and patients] had to use Amylyx's own patient services." While "not a horrible thing" when viewed in isolation, FE2 related that it was "very well stated all along that the reason management wanted to use the limited distribution model and the specialty pharmacy model is that so [Amylyx] could control all the data." Their distribution model involved "controlling costs and data and everything else, and "internally," to "try to hide the data as much as they could."

**ANSWER:** Defendants admit that RELYVRIO® was launched using specialty pharmacies. Defendants state that they lack knowledge or information sufficient to form a belief as to the truth of the allegations concerning FE2's purported opinions. Defendants deny the

16

remaining allegations in Paragraph 45.

46.        As a sales representative, FE1 confirmed this lack of transparency at Amylyx for data on number of subscribers or discontinuation rates. While FE1 joined Amylyx excited about the promised hopes of helping ALS patients, FE1 soon noticed "a lot of things I have seen with the company [Amylyx] that I have never seen with any other companies" in FE1's 20-year experience. Shortly after joining, FE1 started to "question everything because a couple of things just didn't make sense." For one, FE1 only had sales numbers "for our own territories which never happened with any other pharmaceutical company, and I've been with pharma companies for two decades." "We always had transparency as far as numbers, where you ranked compared to other people in the country, general numbers, discontinuation rates, everything." But here "we had nothing [at Amylyx]; not even my manager had exposure to what was happening with the rest of the country," as "the numbers were not shared" internally. When FE1 asked a manager, Beth Kinsella, the Regional Business Director of the Northeast, about this significant deviation from standard commercial practice, the response was, "this is just how it is; it's strange, but it's just how it is." Given these anomalous data-sharing practices among its own employees, FE1 "wouldn't be surprised" if the Company deliberately "blocked analysts from seeing prescription data in the summer of 2023."

**ANSWER:** Defendants admit that in 2023, Beth Kinsella was a Regional Business Director at Amylyx. Defendants otherwise deny the allegations in Paragraph 46, except state that they lack knowledge or information sufficient to form a belief as to the truth of the allegations concerning FE1's prior employment practices and opinions.

47.        Likewise, in FE2's time as regional director at the Company, Amylyx "didn't share data with them for other parts of the country" "and the reason that they give us, which is bulls**t, is that they don't want it to be easily added up so that somebody outside could find out what's going on." As a result, FE2 would get data on FE2's region but "wouldn't get data on the other four regions."

**ANSWER:** Defendants deny the allegations in Paragraph 47, except state that they lack knowledge or information sufficient to form a belief as to the truth of the allegations concerning FE2's opinion.

48.        FE2 "doesn't know how [Amylyx] got away with hiding data from analysts in the summer of 2023" during the Relyvrio launch, and FE2 believes "[t]hat's why they didn't want to give us the data"—"[t]hey didn't want us giving it to the analysts; they didn't want us to leak it" to the market.

**ANSWER:** Defendants deny the allegations in Paragraph 48, except state that they lack knowledge or information sufficient to form a belief as to the truth of the allegations concerning

17

FE2's opinion.

49.       Amylyx also stopped reporting new patient subscriber data to market research services, IQVIA and Symphony, in the summer of 2023. (Amylyx, Q3 2023 Earnings Call).

**ANSWER:** Defendants deny the allegations in Paragraph 49. To the extent that Paragraph 49 references the Q3 2023 earnings call transcript, Defendants state that such call transcript speaks for itself, refer the Court to the call transcript for its content, and deny the allegations in Paragraph 49 to the extent they are inconsistent with the content of the call transcript.

50.       Defendants also knew that the demand and subscriber count would taper off significantly after the initial bolus. As FE1 found, that initial demand only lasted in the "first three or four months" after the commercial launch, around February 2023. After that, there "no chance for growth."

**ANSWER:** Defendants deny the allegations in Paragraph 50.

51.       As FE1 explained, given the devasting nature of ALS—and the lack of any viable treatment options—when Relyvrio was first launched "you had all these patients anticipating this treatment" and "patients wanted to get on it" immediately. These patients anxiously were waiting for this therapy because they "are going to die in five years" and "if God forbid you have someone that you know that has ALS, and there is potentially this new medication that is coming out, everyone wanted to go on it."

**ANSWER:** Defendants deny the allegations in Paragraph 51, and further state that they lack knowledge or information sufficient to form a belief as to the truth of the allegations concerning FE1's opinion in Paragraph 51.

52.       This reality of ALS led to the initial "bolus of patients" which "was overwhelming even for the company to triage all these prescriptions in the beginning." But as the prescriptions stabilized after the bolus, FE1 saw that "there was no growth. ***It might have grown 1% or 2%*** because there were newly diagnosed patients, but generally it was flat throughout the country." That makes sense because after the bolus, demand would be limited to just newly diagnosed patients, and ALS is an extremely rare disease.

**ANSWER:** Defendants deny the allegations in Paragraph 52.

53.       Even within that small group of potential new patients, "not every single newly diagnosed patient wanted to get on any treatment," FE1 said, "because it's not a cure" and to "endure side effects without sure benefit was not desired by many." Indeed, one of FE1's prominent prescribing doctors at an ALS center said that around 40% of the doctor's patients didn't want to take Relyvrio. FE1 would repeatedly tell FE1's manager, Beth Kinsella, the Regional

Business Director of the Northeast, that "this product has no potential to grow. It's not an antibiotic."

**ANSWER:** Defendants admit that in 2023, Beth Kinsella was a Regional Business Director at Amylyx. Defendants state that they lack knowledge or information sufficient to form a belief as to the truth of the allegations concerning statements purportedly made to or by FE1. To the extent a further response is required, Defendants deny the allegations in Paragraph 53.

54.     FE1's sales numbers showcase this steep decline in new patient adds. In FE1's territory—one of the largest geographically and the most populated—FE1 had only an average of 10 new patients per month. In FE1's number one account (Columbia University), FE1 had 246 prescriptions, comprising about 66% of FE1's business. In Q4 of 2022 FE1 had 122 prescriptions, Q1 of 2023 went down to 44 scripts, Q2 was 27 scripts, Q3 went up to 33 scripts, and Q4 was 21 scripts. FE1 confirms that management knew about this stalled growth "Data is data. They knew everything was flat. I grew my territory 170%. If mine is flat, so is every other territory."

**ANSWER:** Defendants state that they lack knowledge or information sufficient to form a belief as to the truth of the allegations concerning FE1, whose identity has not been disclosed to Defendants. To the extent a further response is required, Defendants deny the allegations in Paragraph 54.

55.     FE1 affirms that management knew about the numbers of new patient adds in real time. FE1 worked with reimbursement managers that "had a database" to track new patient subscribers. Such notification (or lack of notification) means that the Company had real-time information on who was starting and when, ensuring the Company was aware immediately of changes in new patient starts.

**ANSWER:** Defendants state that they lack knowledge or information sufficient to form a belief as to the truth of the allegations concerning FE1, whose identity has not been disclosed to Defendants. To the extent a further response is required, Defendants deny the allegations in Paragraph 55.

56.     Moreover, Amylyx's public statements show that the prescriber base did not expand meaningfully during the launch. For instance, the same amount of doctors (80) accounted for half of all prescriptions in Q1 2023 and in Q3 2023. (Amylyx Conference Call Transcripts). As the FEs relate, this flat growth is unusual for a ("successful") launch-stage drug and conflicts with the Company's oft-stated ability to keep expanding Relyvrio's prescriber base.

**ANSWER:** To the extent that Paragraph 56 characterizes a conference call transcript, Defendants state that the conference call transcript speaks for itself, refer the Court to the conference call transcript for its content, and deny the allegations in Paragraph 56 to the extent they are inconsistent with the content of the conference call transcript. To the extent a further response is required, Defendants deny the allegations in Paragraph 56.

57.     FE2 confirms this knowledge within Amylyx.  In late 2022, after the initial launch, "Jim Frates right hand guy in finance tells us what the [2023 sales] forecast is and what our goals are going to be" and that the forecast was "front loaded for the first quarter," and that he "wanted them to get more than half of the business in the first quarter of 2023."  When FE2 asked if that meant if their goals would go incrementally down through the rest of the year, he said, "Yeah, I guess."

**ANSWER:** Defendants state that they lack knowledge or information sufficient to form a belief as to the truth of the allegations concerning statements purportedly made to FE2. To the extent a further response is required, Defendants deny the allegations in Paragraph 57.

58.     In addition, as Defendant repeatedly stated, the initial bolus and influx of subscribers was "concentrated" with patients from ALS centers, but Defendants assured investors that there were opportunities for growth by targeting patients treated by "general neurologists."

**ANSWER:** To the extent the allegations in Paragraph 58 address claims about statements of interest or demand, Defendants state that no response is required because the Court found those statements non-actionable in its Motion to Dismiss Order. To the extent a further response is required, Defendants deny the allegations in Paragraph 58.

59.     As FE1 related, "that's baloney, there is no patient that has ALS that is maintained by a general neurologist, general neurologists don't even want to touch it.  They diagnose it." Rather, given "the complexity of the disease, the ALS Association will tell a patient that they should be seen by an ALS center because you have access to so many different services there."

**ANSWER:** Defendants deny the allegations in Paragraph 59.

60.     FE1 "attended every single investor call," and "was in awe how [management] could say there is potential for growth with general neurologists."  "It's like saying for a cancer patient there is potential to grow within internal medicine.  There is no cancer patient who is going to be followed by internal medicine.  It's the same thing here.  They were certainly misleading to

20

investors, and they tried to cover it up."

**ANSWER:** Defendants deny the allegations in Paragraph 60 and state that they lack

knowledge or information sufficient to form a belief as to the truth of the allegations concerning

FE1's investor call attendance or opinion.

61.     That the "commercial prospects [for expansion with general neurologists] were definitely overstated" is confirmed by FE1's numbers.  In FE1's entire territory, FE1 only had two general neurologists that ever wrote a prescription for Relyvrio in the duration of the launch.

**ANSWER:** Defendants deny the allegations in Paragraph 61.

62.     FE1 directly warned management about this dead-end promise.  Around Q4 2024, FE1 was asked to get on a call on a Sunday with CEOs Joshua Cohen and Justin Klee.  In FE1's "entire 20-year career in pharma, I had never been asked to join a call on a Sunday."  As FE1 put it: "Basically, we were asked about the potential growth in our geographies with general neurologists and getting our thoughts on the potential."  FE1 was very local about the reality that general neurologists are a "dead end," stating "99% of them said that if we do diagnose it, we will send them to an ALS center because it's too complex of a disease for us to treat it."

**ANSWER:** Defendants deny the allegations in Paragraph 62 and state that they lack

knowledge or information sufficient to form a belief as to the truth of the allegations concerning

FE1's prior employment experience.

63.     Yet after that, around January 2024, Amylyx hired "third-party sales reps" to go after general neurologists and brought in no new leads.  FE1 related how "there was a total coverup when they hired these third-party sales reps.  I wouldn't even call them sales reps; they were just calling general neurologists to generate leads for us."  FE1 believes it was done to "continue the narrative, that the company still believed that this is the way to go and that there is business with general neurologists."  But as FE1 predicted, from when they came on board in January to March, FE1 had "not gotten even one lead from them."

**ANSWER:** Defendants admit that Amylyx hired third-party sales reps in early 2024.

Defendants otherwise deny the allegations in Paragraph 63.

64.     Given this initial bolus and the inability for meaningful growth, FE2 described how the sales teams would be given quotas that "were ridiculous" and "you would never be able to hit these quotas."

**ANSWER:** Defendants deny the allegations in Paragraph 64.

65.     That these quotas were "impossible" is confirmed by FE2's experiences talking

21

with representatives from direct competitor, Mitsubishi Tanabe Pharma America. Those competitor representatives stated that their target "goals were a lot lower than their goals [at Amylyx] and they [MT Pharma] were being told that they were blowing it out of the water."

**ANSWER:** Defendants deny the allegations in Paragraph 65 and state that they lack knowledge or information sufficient to form a belief as to the truth of the allegations concerning FE2's conversations with a competitor.

66.     The reality, FE2 relates, was that management "were overpromising and underdelivering," "so they were trying to motivate us to sell more, and they hoped that the motivation of us selling more would then eventually have us hit our numbers that they were selling to Wall Street." FE2 theorizes that superiors were "lead[ing] by fear." "Nobody was making target and that is not the norm in our industry. People usually make target or better, but we were making under target during a launch. It was ridiculous." "All it was that we saw was all senior leadership arguing with each other, never giving us clear direction, telling us that we were never doing anything right, and anytime we asked questions or came to them with solutions, they would just get angry," FE2 said.

**ANSWER:** Defendants deny the allegations in Paragraph 66.

67.     At bottom, Amylyx, FE2 said, "took advantage of these desperate people and then the sh**show just continued." Every quarter when the sales teams "didn't meet goal," "they [senior leadership] kept on inflating the goal." FE2 said, "I felt like I was talking to a priest; the more questions I asked, the more I was told to just have faith."

**ANSWER:** Defendants deny the allegations in Paragraph 67.

68.     As FE2 related, while senior executives were portraying to the world how well they were doing with sales, "that wasn't true." "Our boss was basically pinning us against each other and telling us that we're all doing s**t, that we need to do better and were underperforming" — "yet what they were telling Wall Street was that we were blowing out our goals."

**ANSWER:** Defendants deny the allegations in Paragraph 68.

69.     Yet another former employee (FE3) confirms this mismatch between the Defendants' rosy public statements and the internal panic to make sales after the initial bolus ended. FE3 was at Amylyx from January 2022 to June 3, 2024 and worked as a sales training coordinator in the Company's commercial department, training salespeople on the Relyvrio product. In this training role, FE3 focused on learning and development for their commercial team by building onboarding content, onboarding the entire field force and any other customer facing commercial colleagues, and maintaining a continuous learning implemented program to keep people up to speed and engaged on the information needed to sell the drug. While FE3 worked closely with the Head of Sales (Tim Lee) and reported to him early on when FE3 started at Amylyx, as FE3 was commercial training role (unlike FE1 and FE2) FE3 did not have direct "insight" into the selling data on new subscribers and discontinuations, but nonetheless witnessed the CEOs'

22

"mixed messages" delivered internally and publicly after the bolus ended.

**ANSWER:** Defendants admit that Tim Lee was the Commercial Head of US Sales and Training at Amylyx during the launch of RELYVRIO®. Defendants otherwise deny the allegations in Paragraph 69 and state that they lack knowledge or information sufficient to form a belief as to the truth of the allegations concerning FE3, whose identity has not been disclosed to Defendants.

70.    FE3 related that around the "middle of 2023, we were getting some mixed messages." "Being in the commercial department and knowing and being on the same team as the Head of Sales, I do recall him [Tim Lee] always trying to get us in the training department to fill gaps and get involved, push numbers up with training and continuous learning and building the field's knowledge to try and fill those gap numbers," and "I got the sentiment from [Defendant Olinger], through him, [Tim Lee] that we needed to work on some stuff and really make sure the team was trying to drive home the numbers." On the other hand, "then we would hear the CEOs during the same period say that we're doing great, everything is great, and all 'rainbows and butterflies' kind of energy." In fact, after a regional meeting in that period, the CEOs spoke about how "well the company was doing" but "[c]oworkers at that meeting were asking if they should be worried," and "there were some rumblings" about this disconnect.

**ANSWER:** Defendants deny the allegations in Paragraph 70 and state that they lack knowledge or information sufficient to form a belief as to the truth of the allegations concerning FE3's impressions.

71.    Shortly after that meeting, when FE3 was in a private meeting with FE3's boss, Laura Jamieson, the Global Head of Training and Development, and Tim Lee, FE3 brought something up: "I asked him, I know [Defendant Olinger] is saying this, but the CEOs are saying that. What is really going on? It was confusing." FE3 said that Lee "gave a very vague answer," and "basically said that there were things that needed to be addressed such as the number of discontinuations and that the CEOs' focus was on many other things. He beat around the bush, and it was confusing."

**ANSWER:** Defendants admit that Laura Jamieson was the Global Head of Training and Development during the launch of RELYVRIO®. Defendants otherwise deny the allegations in Paragraph 71 and state that they lack knowledge or information sufficient to form a belief as to the truth of the allegations concerning FE3's conversations.

72.    After the initial bolus ended around February 2023, the former employees also

23

relate how Amylyx resorted to increasingly desperate, and futile, attempts to increase patient subscriptions at any cost.

**ANSWER:** Defendants deny the allegations in Paragraph 72.

73.     After the bolus, FE2 recalls how Amylyx resorted to an unethical "quid pro quo" tactic in a desperate attempt to raise the prescription levels.

**ANSWER:** Defendants deny the allegations in Paragraph 73.

74.     After the demand from the bolus ended, FE2 described how the sales teams would be given quotas that "were ridiculous" and "you would never be able to hit these quotas." Given that FE2's boss was "on the hook for not meeting these quotas," he started to push Dave MacLeod, Head of Global Patient Services and Commercial Distribution, and Keith White, the Head of Market Access, to open up the distribution model, letting institutions distribute the drug so more people could get it and they could generate more revenue.

**ANSWER:** Defendants admit that Dave MacLeod was the Head of Patient Services and Specialty Pharmacy Operations until early 2023 and that Keith White was the Head of Global Market Access during the launch of RELYVRIO®. Defendants otherwise deny the allegations in Paragraph 74.

75.     FE2 described this quid-pro-quo relationship whereby institutions that should have been focused on solely on patient care could enroll as distributors, thereby receiving fees that would normally go to supply chain intermediaries such as wholesalers and pharmacies. While this scheme appears to operate at a one-step removal from direct payments in exchange for higher prescribing, it nonetheless involves remuneration that is dependent on prescribing frequency. As such, the arrangement could run afoul of the Federal Anti-kickback Statute and the False Claims Act, both of which are intended to maintain the integrity of healthcare decisions.

**ANSWER:** Defendants deny the allegations in Paragraph 75.

76.     FE2 went to Keith White and told him that FE2's boss requested FE2's top ten accounts where they could get more business if they allowed them to distribute the product—an inappropriate quid pro quo arrangement. As FE2 related, FE2's superiors "were specifically asking if they could get more enrollments if they opened up the distribution model," "which is a complete quid pro quo." "I said to Keith that this is how it sounds: you guys are trying to get business by opening up the distribution model and specifically asking people, will you give us more business if we let you distribute the drug?  Will your doctors write more?"  White diminished these ethical concerns, telling FE2 that FE2 simply "misunderstood."

**ANSWER:** Defendants deny the allegations in Paragraph 76.

77.     Undaunted, FE2 knew "there was no misunderstanding" as FE2's superiors "sent a spreadsheet about it" to implement this quid pro quo strategy.  Yet when FE2 tried to raise

24

this ethical quandary to Head of Compliance, attorney Sue Dyer, along with the attached spreadsheet, Amylyx had erased FE2's emails. This left FE2 "befuddled" because FE2 positively had those emails about the unethical practice, but they were missing from FE2's inbox. "I will bet my life on it, and I know these emails existed." Indeed, FE2 also describes a culture where if someone spoke out about Amylyx's practices, they would be fired or ignored. The Human Resources Department "was constantly investigating things and turning a cheek along with Sue Dyer, our Head of Compliance."

**ANSWER:** Defendants admit that Sue Dyer is the Head, Deputy General Counsel and Global Compliance Officer at Amylyx. Defendants otherwise deny the allegations in Paragraph 77.

78. After the bolus, FE2 confirmed that when management "couldn't get enough patients on the drug and generate enough revenue," "they basically just blamed" a scapegoat for "a faulty system and faulty data." Tim Lee, the Director of Sales, and Defendant CFO Frates "were always butting heads." After the initial demand settled, "Frates would give Lee a forecast, and Lee would tell him it wasn't possible." Defendant Frates would then tell him, "do whatever you've got to do" to make the numbers work. In response, Lee would start telling us to do stuff that was completely unethical," FE2 said. "Paying off doctors, paying doctors to be speakers, whatever." "It's the bulls*** of my industry."

**ANSWER:** Defendants deny the allegations in Paragraph 78.

79. FE2 recalled how all Defendant Olinger's five direct reports, Tim Lee, Director of Sales, John Landry, Director of Operations, Keith White, Director of Market Access, Dave MacLeod, Director of Patient Services, and Shauna Horvath, Director of Marketing, "were all in charge of different parts of commercial, and they were constantly arguing with each other." "They were all trying to point fingers between marketing, sales, operations, market access, and pricing," "all saying it was someone else's fault; nobody was working together." After quarters of missed sales results, "they needed to blame somebody, so like what constantly happened, is the people who were hiding information would get together and figure out who to blame" for failing to meet internal sales targets after the initial demand and new subscribers tapered off.

**ANSWER:** Defendants admit that Shauna Horvath was the Head of Global Marketing during the launch of RELYVRIO® and that she and Tim Lee, John Landry (Head of Commercial Strategies and Operations), Keith White, and Dave MacLeod reported to Ms. Olinger. Defendants otherwise deny the allegations in Paragraph 79.

80. Throughout the launch from October 2022 to November 2023, Defendants repeatedly stated they could not see trends in patient discontinuation rates or how long patients would remain on Relyvrio as therapy. It was not until November 2023 that Defendants revealed discontinuation problems, purportedly that patients were "discontinuing" after being on treatment

25

"after six months."

**ANSWER:** No response is required because Paragraph 80 involves allegations prior to May 11, 2023, which the Court found non-actionable in its Motion to Dismiss Order. To the extent Paragraph 80 refers to public statements, Defendants state that the statements speak for themselves, refer the Court to those statements for their content, and deny the allegations in Paragraph 80 to the extent they are inconsistent with the content of the statements. Defendants otherwise deny the allegations in Paragraph 80.

81.    But both former employees reveal that patient discontinuations were occurring mere weeks after starting the drug—and certainly soon enough for Defendants to be aware of these trends. According to FE1, in reality, patients "were discontinuing treatment *within the first month or two*"— "it was much sooner than six months." FE2 likewise reiterated that senior leadership were "absolutely" overstating Relyvrio commercial prospects to the public given "that people were discontinuing the drug before six months."

**ANSWER:** Defendants admit that patients discontinued treatment on varying timelines. Defendants otherwise deny the allegations in Paragraph 81.

82.    FE1 also confirmed that management would track these discontinuations in near real time. For one, FE1 worked with reimbursement managers that "had a database where they could track the last shipment and they would follow up with the patient directly" if they did not refill the prescription to confirm the discontinuation. In addition, FE1 says that management "knew this was an issue [discontinuation rates] because there were a lot of things being done to mitigate the GI side effects" behind many dropouts, including training for medical science liaisons about how to address discontinuations in real time due to negative side effects.

**ANSWER:** Defendants deny the allegations in Paragraph 82. Defendants further state that they lack knowledge or information sufficient to form a belief as to the truth of the allegations concerning FE1's opinions.

83.    This attempted intervention on discontinuations was widely discussed on conference calls in FE1's region. The "number one" such effect was diarrhea and "if you're in a wheelchair you're pretty much dependent on someone caring for you," and "if someone has to wipe you every 30 minutes or hour because of that it becomes very uncomfortable, and patients would discontinue even within that first month." Given that these discontinuations were such an issue, Amylyx created a PDF for providers on what to do and what other medications they could use for the GI side effects.

**ANSWER:** Defendants deny the allegations in Paragraph 83, except admit (1) one reason patients discontinued RELYVRIO® was GI side effects, and (2) educational materials on how to minimize potential side effects while taking RELYVRIO® existed throughout the launch.

84.     Understandably, many patients discontinued because they did not see any positive results from the drugs.  If they continued to progress with their disease and still had horrible symptoms, "it wasn't worth it."  FE2 confirms that "all the sales and medical people all knew why the drug wasn't being used and they [senior leadership] didn't want anything to do with that; all they were telling us was that . . . [the] Phoenix [trial] is going to prove it and there are 30,000 patients who need this drug, so you guys need to figure out a way to get them to use it."

**ANSWER:** Defendants deny the allegations in Paragraph 84.

85.     While consistently lauding the potential for new and growing subscriptions, this hidden discontinuation trend also obscured the truth about the reported subscriptions and likely future patient subscriptions.  In other words, revealing only "net adds" of patients without also including the discontinuation rates obscured the remaining "runway" for growth.

**ANSWER:** Defendants deny the allegations in Paragraph 85.

86.     As FE2 reported, Defendants Klee and Cohen "kept saying there were 30,000 patients in the United States that should be treated with Relyvrio," implying there was ample room for growth from the reported numbers between 1,000 and 3,800.  Yet when the initial bolus of patients was at its peak, "we already had 9,000 patients on the drug" and "we already had a third of the business."  Despite this, Defendants Klee and Cohen "were saying that we were underperforming," so FE2 at the time "didn't know what the disconnect was."  FE2 believes the failure to consider discontinuations in this reporting data rendered the current numbers and future projections of patient subscribers "way off."

**ANSWER:** Defendants deny the allegations in Paragraph 86, except admit that 1,300 net patients were on RELYVRIO® in the U.S. as of the end of Q4 2022, the first post-commercial quarter, which grew to 3,900 net patients at the end of Q3 2023, the last commercial quarter.

87.     The Class Period begins on November 11, 2022.  On November 10, 2022, during after-market hours, Amylyx issued a press release announcing the Company's Q3 2022 financial results.  That press release quoted Defendants Cohen and Klee, who stated, in relevant part:

> We are thrilled that RELYVRIO . . . [is] now available to people living with ALS in the U.S. . . . and *we are encouraged by . . . the rate of new prescriptions for this important new therapeutic option*. We continue to work expeditiously during the early stages of our commercial launch to ensure every eligible person living with ALS will gain access as

quickly and efficiently as possible.

(Emphasis added.)

**ANSWER:** No response is required because the Court found the statements contained in Paragraph 87 non-actionable in its Motion to Dismiss Order. To the extent that Paragraph 87 characterizes a November 10, 2022 press release, Defendants state that such press release speaks for itself, refer the Court to the press release for its content, and deny the allegations in Paragraph 87 to the extent they are inconsistent with the content of the press release. To the extent a further response is required, Defendants deny the allegations in Paragraph 87 and specifically deny that the Class Period is November 11, 2022 to November 8, 2023 based on the Motion to Dismiss Order, which limited the actionable statements to only statements about growth potential made between May 11, 2023 and August 10, 2023.

88.     That same day, also during after-market hours, Defendants hosted a conference call with investors and analysts to discuss Amylyx's Q3 2022 results (the "Q3 2022 Earnings Call"). During his prepared remarks on that call, Defendant Klee stated, in relevant part:

> Given we are only a few weeks into the launch in the U.S., it is too early to discuss specific expectations. ***But we are encouraged by the initial engagement with both physicians and with people living with ALS.***

(Emphasis added.)

**ANSWER:** No response is required because the Court found the statements contained in Paragraph 88 non-actionable in its Motion to Dismiss Order. To the extent that Paragraph 88 characterizes a November 10, 2022 conference call transcript, Defendants state that such call transcript speaks for itself, refer the Court to the call transcript for its content, and deny the allegations in Paragraph 88 to the extent they are inconsistent with the content of the call transcript. To the extent a further response is required, Defendants deny the allegations in Paragraph 88.

89.     Likewise, during his prepared remarks on the Q3 2022 Earnings Call, Defendant Cohen stated, in relevant part, that "[w]e are excited about the strong initial interest that we are seeing only a couple of weeks into launch" of Relyvrio.

**ANSWER:** No response is required because the Court found the statements contained in Paragraph 89 non-actionable in its Motion to Dismiss Order. To the extent that Paragraph 89 characterizes a November 10, 2022 call transcript, Defendants state that the earnings call transcript speaks for itself, refer the Court to the call transcript for its content, and deny the allegations in Paragraph 89 to the extent they are inconsistent with the content of the call transcript. To the extent a further response is required, Defendants deny the allegations in Paragraph 89.

90.        During her prepared remarks on the Q3 2022 Earnings Call, Defendant Olinger represented, in relevant part:

> In the days and weeks following the FDA's approval of RELYVRIO on September 29, ***we immediately started receiving enrollments and prescriptions through the Amylyx Care Team***, and have heard very positive feedback from physicians in the ALS community about the level of support we are providing. Importantly, on October 24, the first shipment of RELYVRIO from one of our specialty pharmacies was sent to a person living with ALS earlier than we had originally anticipated.
>
> ***In regard to interest in RELYVRIO, we are seeing a solid initial bolus***, including an encouraging number of products enrollment forms and prescriptions coming into the Amylyx Care Team. This initial excitement has also been widespread across the country, and not limited to one geography or group of physicians. The field teams have engaged with clinicians throughout the country, and the feedback from those serving the community has been positive.

(Emphases added.)

**ANSWER**: No response is required because the Court found the statements contained in Paragraph 90 non-actionable in its Motion to Dismiss Order. To the extent that Paragraph 90 characterizes a November 10, 2022 call transcript, Defendants state that such call transcript speaks for itself, refer the Court to the call transcript for its content, and deny the allegations in Paragraph 90 to the extent they are inconsistent with the content of the call transcript. To the extent a further response is required, Defendants deny the allegations in Paragraph 90.

91.        During the question-and-answer ("Q&A") portion of the Q3 2022 Earnings Call, in response to an analyst question regarding "how long [Defendants] expect patients to stay on

29

drugs in [Amylyx's] model," Defendant Cohen answered, in relevant part:

> *[W]hen it relates to time on therapy, we haven't given specific guidance as to time on therapy for our product. But I can say we've done some research on past products . . . where we see in the ballpark of a year – on average or median.* That being said, one of our hopes with having a really robust education and patient support function is that *we'll be able to educate about the benefits of staying on therapy as well*.

(Emphases added.)

**ANSWER:** No response is required because the Court found the statements contained in Paragraph 91 non-actionable in its Motion to Dismiss Order. To the extent that Paragraph 91 characterizes a November 10, 2022 call transcript, Defendants state that such call transcript speaks for itself, refer the Court to the call transcript for its content, and deny the allegations in Paragraph 91 to the extent they are inconsistent with the content of the call transcript. To the extent a further response is required, Defendants deny the allegations in Paragraph 91.

92.    This statements in ¶¶ 87-91 from November 11, 2022 were false and misleading and omitted material information given Defendants were aware that the "initial" demand was due to a temporary "bolus" of patients that would shortly stabilize, offering no meaningful opportunity for further "growth."

**ANSWER:** Paragraph 92 consists of legal conclusions to which no response is required. To the extent the allegations in Paragraph 92 address claims about statements of interest or demand or involving corporate puffery and are prior to May 11, 2023, Defendants state that no response is required because the Court found those statements non-actionable in its Motion to Dismiss Order. To the extent a response is required, Defendants deny the allegations in Paragraph 92.

93.    On February 14, 2023, Amylyx filed a current report on Form 8-K with the SEC, stating, in relevant part, that "[t]he Company *has observed higher demand for RELYVRIO in the U.S. than initially anticipated pre-launch and, as a result, expects to meaningfully exceed fourth quarter and full-year 2022 Wall Street research analyst consensus estimates for revenue.*"

**ANSWER:** No response is required because the Court found the statements contained in Paragraph 93 non-actionable in its Motion to Dismiss Order. To the extent that Paragraph 93

30

characterizes a February 14, 2023 SEC filing, Defendants state that such SEC filing speaks for

itself, refer the Court to the SEC filing for its content, and deny the allegations in Paragraph 93 to

the extent they are inconsistent with the content of the SEC filing. To the extent a further response

is required, Defendants deny the allegations in Paragraph 93.

94.     This statement in ¶ 93 was false and misleading and omitted material information given:  (1) the "higher demand" was due to an initial, temporary bolus of patients that, by this time, had stabilized, offering no meaningful opportunity for further growth., and (2) at the time, Defendants already were aware that high, undisclosed discontinuation rates were occurring, undermining the commercial potential for the launch.

**ANSWER:** Paragraph 94 consists of legal conclusions to which no response is required.

To the extent the allegations in Paragraph 94 address claims about statements of interest or demand

and are prior to May 11, 2023, Defendants state that no response is required because the Court

found those statements non-actionable in its Motion to Dismiss Order. To the extent a response is

required, Defendants deny the allegations in Paragraph 94.

95.     On March 13, 2023, Amylyx issued a press release announcing its fourth quarter and full year ("Q4/FY") 2022 financial results.  That press release quoted Defendants Cohen and Klee, who stated, in relevant part:

> 2022 was an exceptionally exciting year for Amylyx, culminating with the approval of RELYVRIO in the U.S     ***Our commercial launch is off to a strong start, and we are encouraged by the engagement we have seen from physicians***, people living with ALS, and payors . . . [W]e remain focused on our efforts to engage stakeholders throughout the ALS community as we work to drive the broadest coverage possible for this important new therapeutic option.

(Emphasis added.)

**ANSWER**: No response is required because the Court found the statements contained in

Paragraph 95 non-actionable in its Motion to Dismiss Order. To the extent that Paragraph 95

characterizes a March 13, 2023 press release, Defendants state that the press release speaks for

itself, refer the court to the press release for its content, and deny the allegations in Paragraph 95

to the extent they are inconsistent with the content of the press release.  To the extent a further

response is required, Defendants deny the allegations in Paragraph 95.

96.　　　That same day, Defendants hosted a conference call with investors and analysts to discuss Amylyx's Q4/FY 2022 results (the "Q4/FY 2022 Earnings Call").  During his prepared remarks on that call, Defendant Klee stated that "[s]ince the approval, *we have seen strong interest in RELYVRIO and we are encouraged by the early success of our commercial launch*."

**ANSWER:** No response is required because the Court found the statements contained in Paragraph 96 non-actionable in its Motion to Dismiss Order. To the extent that Paragraph 96 characterizes a March 13, 2023 earnings call transcript, Defendants state that such call transcript speaks for itself, refer the Court to the call transcript for its content, and deny the allegations in Paragraph 96 to the extent they are inconsistent with the content of the call transcript. To the extent a further response is required, Defendants deny the allegations in Paragraph 96.

97.　　　Likewise, during his prepared remarks on the Q4/FY 2022 Earnings Call, Defendant Frates stated:

> *We're pleased to share that at this point in our launch we're meaningfully ahead of our expectations and encouraged by the interest and demand we've seen from the ALS community*. [Defendant Olinger] will share some of the important early metrics that we're tracking, which should help you model our near-term opportunity and the total addressable market for the longer term, but first I'll summarize Q4.
>
> Net product revenues were $21.9 million for the quarter and $22.2 million for the year with the vast majority of that revenue from the [U.S.] As you'll hear from Margaret in a few minutes, *we're seeing robust demand from the ALS community*. Gross-to-net adjustments were approximately 18% in the quarter and in-line with our expectations. We expect gross-to-net to remain in the 15% to 20% range for the year starting at the higher end of that range in Q1 due to the annual reset of co-pays and deductibles in Medicare Part D reenrollment as of January 1st.

(Emphases added.)

**ANSWER:** No response is required because the Court found the statements contained in Paragraph 97 non-actionable in its Motion to Dismiss Order. To the extent that Paragraph 97 characterizes a March 13, 2023 earnings call transcript, Defendants state that such call transcript

speaks for itself, refer the Court to the call transcript for its content, and deny the allegations in

Paragraph 97 to the extent they are inconsistent with the content of the call transcript. To the extent

a further response is required, Defendants deny the allegations in Paragraph 97.

98.       During her prepared remarks on the Q4/FY 2022 Earnings Call, Defendant
Olinger described the continued "uptake" in patient subscribers and the "significant opportunity
for growth":

> [W]e are seeing our efforts *yield strong results and have observed rapid*
> *uptakes* on the FDA's approval on September 29. There were just over
> 1300 people living with ALS on RELYVRIO in the [U.S.] at the end of
> 2022, *and uptake has continued since then*.
>
> *We remain optimistic about our ability to continue growing from here*
> *as we believe people with ALS and their clinicians are eager to learn*
> *about and try new treatment options. By the end of this quarter we*
> *believe we are on our pace to roughly double the amount of people on*
> *RELYVRIO on a net basis.*
>
> *On the clinician* side*, we are encouraged by the prescriptions coming*
> *from the top ALS doctors and key ALS centers, but there is still*
> *significant opportunity for growth*….
>
> Another notable part of our launch is the interest that we are seeing
> across the spectrum of people living with ALS when we look at the times
> of initial diagnosis. We are encouraged that regardless of the time since
> diagnosis, people with ALS are interested in and gaining access to this
> important new treatment. In other words, we *are seeing people on*
> *RELYVRIO who have been newly diagnosed as well as others who*
> *have been diagnosed for more than three years*.
>
> As we look throughout the rest of the year, our team remains vigilant in
> our efforts to educate ALS centers *and look forward to educating the*
> *general neurologist.*
> *We believe we have a large untapped opportunity for additional*
> *growth as we conduct ongoing research outreach*. We remain
> committed to driving access with and support to every eligible person
> living with ALS who can benefit from treatment.

(Emphases added.)

**ANSWER:** No response is required because the Court found the statements contained in

Paragraph 98 non-actionable in its Motion to Dismiss Order. To the extent that Paragraph 98

33

characterizes a March 13, 2023 earnings call transcript, Defendants state that such call transcript

speaks for itself, refer the Court to the call transcript for its content, and deny the allegations in

Paragraph 98 to the extent they are inconsistent with the content of the call transcript. To the extent

a further response is required, Defendants deny the allegations in Paragraph 98.

99.    During the Q&A portion of the Q4/FY 2022 Earnings Call, in response to an analyst question regarding "whether the patient numbers at the end of December . . . was approaching about 1500 to 2000," Defendant Frates touted:

> *[W]e're seeing the demand increase, right?* And again, [Defendant Olinger] mentioned there were 1300 patients on drug at the end of 12/31 and at the end of Q4, and we're looking at roughly doubling that as we get to the end of March, so 2,600 patients plus or minus.
> * * *
>
> And I think I guess I would just say, *we're off to a really good launch*. I think we're probably going to be able to more than double our revenues in Q1. I'd say we'd be closer to tripling our revenues than we are to doubling our revenues, but wouldn't want to give more guidance than that.

(Emphases added.)

**ANSWER:** No response is required because the Court found the statements contained in

Paragraph 99 non-actionable in its Motion to Dismiss Order. To the extent that Paragraph 99

characterizes a March 13, 2023 earnings call transcript, Defendants state that such call transcript

speaks for itself, refer the Court to the call transcript for its content, and deny the allegations in

Paragraph 99 to the extent they are inconsistent with the content of the call transcript. To the extent

a further response is required, Defendants deny the allegations in Paragraph 99.

100.    During the same Q&A, in response to an analyst question regarding "the centers that are responsible for the book of scripts . . . to get a sense as to the inquiries or the queue of patients across the broader ALS population" and "to get a sense of the breadth of awareness on whatever metric you guys can provide," Defendant Olinger stated:

> [T]here's about 2700 physicians that prescribe for ALS, which is our broad target audience. During the first quarter, we are heavily focused on the top ALS centers and the top 500 prescribers of which 55% of them have written a prescription for RELYVRIO in the fourth quarter. So that

34

continues to be our focus. ***There's a lot of opportunity that remains in those top prescribers, but also a lot of patients are being seen by the general neurologists out in the communities, and that's clearly our next runway that we have to continue to penetrate this market much more broadly than we have to date***.

(Emphases added.)

**ANSWER:** No response is required because the Court found the statements contained in Paragraph 100 non-actionable in its Motion to Dismiss Order. To the extent that Paragraph 100 characterizes a March 13, 2023 earnings call transcript, Defendants state that such call transcript speaks for itself, refer the Court to the call transcript for its content, and deny the allegations in Paragraph 100 to the extent they are inconsistent with the content of the call transcript. To the extent a further response is required, Defendants deny the allegations in Paragraph 100.

101.     On the same call, in response to an analyst question regarding the pace of patients starting treatment with Relyvrio and "a sense for how we think about the pace of starts after" the first quarter ("Q1") of 2023, and whether Defendants "expect this kind of 1300 patients per quarter to be kind of a sustainable rate or should we expect the pace of new starts to kind of start to decline thereafter", Defendant Olinger again assured investors about the "long runway" for growth:

> ***So we just want to reiterate, we are very pleased with the growth we're seeing in the second, in Q4 of 2022 and so far this year. And we are -- and things are going really well. We're seeing an initial bolus in demand. And to be honest with you, we just don't know how big this bolus will be or how long it will last. But we expect continued growth and interest in demand as the initial prescribing has been relatively concentrated as I mentioned. We have a large untapped opportunity to build on in our ongoing outreach and education and efforts. We really see that we have a lot of runway ahead of us.***

(Emphases added.)

**ANSWER:** No response is required because the Court found the statements contained in Paragraph 101 non-actionable in its Motion to Dismiss Order. To the extent that Paragraph 101 characterizes a March 13, 2023 earnings call transcript, Defendants state that such call transcript speaks for itself, refer the Court to the call transcript for its content, and deny the allegations in

35

Paragraph 101 to the extent they are inconsistent with the content of the call transcript. To the extent a further response is required, Defendants deny the allegations in Paragraph 101.

102.     In response to the same analyst question, Defendant Klee reiterated:

> [A]nd just one more point, as [Defendant Olinger] emphasized the demand, I think that's on the plus side, right? ***We're seeing early demand. It's very concentrated so far so we have a lot of breadth and depth to continue to look forward to, I think as we expand this product.***

**ANSWER:** No response is required because the Court found the statements contained in Paragraph 102 non-actionable in its Motion to Dismiss Order. To the extent that Paragraph 102 characterizes a March 13, 2023 earnings call transcript, Defendants state that such call transcript speaks for itself, refer the Court to the call transcript for its content, and deny the allegations in Paragraph 102 to the extent they are inconsistent with the content of the call transcript. To the extent a further response is required, Defendants deny the allegations in Paragraph 102.

103.     Likewise, in response to an analyst question regarding "what the launch curve might look like with an initial bolus and then steadying out until we get to steady state" and "[h]ow [Defendants] are . . . thinking about it now that [they]'re in the market and seeing kind of the demand that [they]'ve had thus far," Defendant Olinger again lauded the progress of the launch the future ability to grow subscribers:

> [I]n terms of the slope of the ramp, to your point, it is very early months of the launch, ***but we are seeing very encouraged levels of interest from both people living with ALS and clinicians*** and we said that Q4, we ended with 13 [later changed by the Company to "1300"] people on therapy. We expect to double that by the end of Q1. And again, I just want to reiterate to ***everybody that is on a net basis, which should give you a good sense of how the launch is progressing***. And while we do have that initial bolus of demand, we don't know how big and how long that will last, ***we do really are very confident in the long runway we have ahead of us***.
>
> So our focus remains on the 1,300 patients that are on therapy today ***and keeping them on therapy***. And then also, we're very encouraged by the insurance favorability that we're seeing, while it's only a third at this point we have very broad access to date, and we're encouraged at the future.

(Emphases added.)

36

**ANSWER:** No response is required because the Court found the statements contained in Paragraph 103 non-actionable in its Motion to Dismiss Order. To the extent that Paragraph 103 characterizes a March 13, 2023 earnings call transcript, Defendants state that such call transcript speaks for itself, refer the Court to the call transcript for its content, and deny the allegations in Paragraph 103 to the extent they are inconsistent with the content of the call transcript. To the extent a further response is required, Defendants deny the allegations in Paragraph 103.

104.    Also on March 13, 2023, Amylyx filed an annual report on Form 10-K with the SEC, reporting the Company's financial and operational results for the quarter and year ended December 31, 2022 (the "2022 10-K"). In discussing Amylyx's commercialization of AMX0035 (Relyvrio), the 2022 10-K stated, in relevant part:

> Since obtaining regulatory approval, ***we have seen strong interest in AMX0035, and we are encouraged by the early success of our commercial launch***.
> * * *
> ***When shown a target product profile for AMX0035, the majority of ALS specialists and neurologists with whom we spoke are open to utilizing it in early- to-mid-stage patients, with some also stating the potential for use in late-stage patients.***

(Emphases added.)

**ANSWER:** No response is required because the Court found the statements contained in Paragraph 104 non-actionable in its Motion to Dismiss Order. To the extent that Paragraph 104 characterizes a March 13, 2023 SEC filing, Defendants state that such SEC filing speaks for itself, refer the Court to the SEC filing for its content, and deny the allegations in Paragraph 104 to the extent they are inconsistent with the content of the SEC filing. To the extent a further response is required, Defendants deny the allegations in Paragraph 104.

105.    Moreover, in discussing Amylyx's strategy to "[e]ffectively and efficiently commercializ[e] RELYVRIO for ALS in adults in the U.S," the 2022 10-K touted the Company's "***commercial capabilities***, coupled with our understanding of the ALS patient and medical community," as a key element that "***will enable us to successfully commercialize RELYVRIO*** for ALS in the U.S." The 2022 10-K also represented that "***as we begin to commercialize RELYVRIO in the U.S. . . . and learn more about market dynamics . . . our view of our products' initial potential market opportunity will become more refined***."

**ANSWER:** No response is required because the Court found the statements contained in Paragraph 105 non-actionable in its Motion to Dismiss Order. To the extent that Paragraph 105 characterizes a March 13, 2023 SEC filing, Defendants state that such SEC filing speaks for itself, refer the Court to the SEC filing for its content, and deny the allegations in Paragraph 105 to the extent they are inconsistent with the content of the SEC filing. To the extent a further response is required, Defendants deny the allegations in Paragraph 105.

106.    The March 13, 2023 10-K also contained disclosures under Item 7 requiring information called for under Item 303 of Regulation S-K [17 C.F.R. § 229.303], "Management's Discussion and Analysis of Financial Condition and Results of Operations" regarding the Relyvrio launch:

> The successful development and commercialization of AMX0035 [Relyvrio] and any future product candidates is highly uncertain, due to the numerous risks and uncertainties associated with product development and commercialization, including the following:
>
> - the timing and progress of preclinical and clinical development activities;
> - the number and scope of preclinical and clinical trials for separate indications we decide to pursue;
> - raising necessary additional funds;
> - the progress of the development efforts of parties with whom we may enter into collaboration arrangements;
> - our ability to maintain our current development activities and to establish new ones;
> - our ability to establish new licensing or collaboration arrangements;
> - the successful initiation and completion of clinical trials with safety, tolerability and efficacy profiles that are satisfactory to Health Canada, the FDA or the EMA, or any other comparable foreign regulatory authority;
> - the receipt and related terms of regulatory approvals from applicable regulatory authorities, including our marketing authorization with conditions from Health Canada for ALBRIOZA and the post-marketing requirements from the FDA for RELYVRIO;
> - the availability of drug substance and drug product for use in production of AMX0035;
> - establishing and maintaining agreements with third-party manufacturers for clinical supply for our clinical trials and

commercial manufacturing;

- our ability to obtain and maintain patents, trade secret protection and regulatory exclusivity, both in the U.S. and internationally;
- our ability to protect our rights in our intellectual property portfolio;
- the commercialization in Canada and the U.S. of AMX0035 (known as ALBRIOZA in Canada and RELYVRIO in the U.S.) and in other potential jurisdictions, if and when approved
- obtaining and maintaining third-party insurance coverage and adequate reimbursement;
- the acceptance of AMX0035, if approved, by patients, the medical community and third-party payors;
- competition with other product; and
- a continued acceptable safety profile of our therapies in pre-approval market access programs or in commercial access following approval.

A change in the outcome of any of these variables with respect to the development of AMX0035 or any future product candidates could have a significant impact on the cost and timing associated with the development of our product candidates. We may never succeed in obtaining or maintaining regulatory approval for AMX0035 or any future product candidates.

**ANSWER:** To the extent that Paragraph 106 characterizes a March 13, 2023 SEC filing, Defendants state that such SEC filing speaks for itself, refer the Court to the SEC filing for its content, and deny the allegations in Paragraph 106 to the extent they are inconsistent with the content of the SEC filing. To the extent a further response is required, Defendants deny the allegations in Paragraph 106.

107.    Appended as exhibits to the 2022 10-K were signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), wherein Defendants Cohen, Klee, and Frates certified that "th[e 2022 10-K] does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by th[e]" 2022 10-K, and that "the financial statements, and other financial information included in th[e 2022 10-K], fairly present in all material respects the financial condition, results of operations and cash flows of [Amylyx] as of, and for, the periods presented in th[e]" 2022 10-K.

**ANSWER:** To the extent that Paragraph 107 characterizes a March 13, 2023 SEC filing, Defendants state that such SEC filing speaks for itself, refer the Court to the SEC filing for its

content, and deny the allegations in Paragraph 107 to the extent they are inconsistent with the

content of the SEC filing. To the extent a further response is required, Defendants deny the

allegations in Paragraph 107.

108.    This statements in ¶¶ 95-107 delivered on March 13, 2023 were false and misleading and omitted material information given:  (1) at the time, Defendants knew the "robust demand" was due to an initial, temporary bolus of patients that, by this time, had stabilized, offering no meaningful opportunity for further "significant growth," (2) there was no growth potential for "newly diagnosed" patients with ALS, (3) "general neurologists" did not provide an avenues of "untapped growth" for new subscribers, (4) Defendants already were aware that high, undisclosed discontinuation rates were occurring, undermining the commercial potential for the launch, and (5) those hidden discontinuations inflated the "runway" for the stated net patient subscribers.

**ANSWER:** Paragraph 108 consists of legal conclusions to which no response is required.

To the extent the allegations in Paragraph 108 address claims about statements of interest or

demand or involving corporate puffery and are prior to May 11, 2023, Defendants state that no

response is required because the Court found those statements non-actionable in its Motion to

Dismiss Order. To the extent a response is required, Defendants deny the allegations in Paragraph

108.

109.    On April 18, 2023, Defendants attended a virtual conference addressing Relyvrio. In response to a question asking about the "first launch quarter of sales, [of a] very encouraging start" and to "talk[] through some of the metrics that you're looking for in terms of building upon this strong first quarter" and "how you expect these things to kind of evolve and continue to build over the course of 2023?," Defendant Cohen responded:

> *We had roughly 1,300 patients on drug at the end of the year. By the end of this quarter, we expect to roughly double that. And we believe most of that was fairly concentrated prescribing from some of the very specialty centers. We believe there's a lot more to educate to a lot more people to bring onboard those potential prescribers to keep growing that.*
>
> And I'll say it too, it feels like it's been – we've been out there for a while, but launch was only pretty recently. Until there's only been so much time for all these sites to get on board. So*, I think there's even a lot of potential still at some of the sites that have had just started by the time of the fourth quarter or the first quarter, still a lot more patients to get on…*

> Quite interestingly, we've just seen very broad -- at least as of last report, *we've seen very broad prescribing with people, both w*ho *are very recently diagnosed and people who have had the disease more than three years. So, I think, again, we continue to see a pretty broad base for who's taking RELYVRIO and getting prescribed that*.

(Emphases added.)

**ANSWER:** No response is required because the Court found the statements contained in Paragraph 109 non-actionable in its Motion to Dismiss Order. To the extent that Paragraph 109 characterizes an April 18, 2023 conference call transcript, Defendants state that such call transcript speaks for itself, refer the Court to the call transcript for its content, and deny the allegations in Paragraph 109 to the extent they are inconsistent with the content of the call transcript. To the extent a further response is required, Defendants deny the allegations in Paragraph 109.

110.     Defendant Cohen's statements in ¶ 109 from April 18, 2023 were false and misleading and omitted material information given: (1) at the time, Defendants knew the "robust demand" was due to an initial, temporary bolus of patients that, by this time, had stabilized, offering no meaningful opportunity for further "growth" from "concentrated ALS centers," and (2) there was no growth potential for "newly diagnosed" patients with ALS, (3) Defendants already were aware that high, undisclosed discontinuation rates were occurring, undermining the commercial potential for the launch, and (4) those hidden discontinuations inflated the "potential" growth for the stated net patient subscribers.

**ANSWER:** No response is required because the Court found the statements contained in Paragraph 110 non-actionable in its Motion to Dismiss Order. Paragraph 110 consists of legal conclusions to which no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 110.

111.     On May 11, 2023, Amylyx issued a press release announcing its Q1 2023 financial results. That press release quoted Defendant Cohen stating:

> During [Q1], we made significant progress on our commercial launches of RELYVRIO in the U.S.     as we advanced our goal of ensuring efficient access for every eligible person living with ALS. *We continue to see strong engagement and interest from physicians and the ALS community* and are encouraged that the vast majority of payors who have published formal policy decisions are providing broad access to

RELYVRIO.

(Emphasis added.)

**ANSWER:** No response is required because the Court found the statements contained in Paragraph 111 non-actionable in its Motion to Dismiss Order. To the extent that Paragraph 111 characterizes a May 11, 2023 press release, Defendants state that such press release speaks for itself, refer the Court to the press release for its content, and deny the allegations in Paragraph 111 to the extent they are inconsistent with the content of the press release. To the extent a further response is required, Defendants deny the allegations in Paragraph 111.

112.    That same day, Defendants hosted a conference call with investors and analysts to discuss Amylyx's Q1 2023 results (the "Q1 2023 Earnings Call").  During his prepared remarks on that call, Defendant Klee likewise represented:

> *In [Q1], we saw a continued high level of interest from the ALS community* and RELYVRIO broadened insurance coverage, and high levels of engagement with our Amylyx care team, also known as act, just two quarters into launch over 10% of the approximately 29,000 people living with ALS in the US are now on RELYVRIO. *Even with that success in our first six months, we have more to do*. There remain many more 1000s of people living with ALS in the US and at least 200,000 people living with ALS globally. *We are still in the early stages of our journey, and our team remains hard at work.*
> * * *
> Our commercial ramp in the U.S. . . . is proceeding very well      And we achieved our first quarter of profitability in just the second quarter of our commercial launch in the U.S.

(Emphases added.)

**ANSWER:** To the extent that Paragraph 112 characterizes a May 11, 2023 earnings call transcript, Defendants state that such call transcript speaks for itself, refer the Court to the call transcript for its content, and deny the allegations in Paragraph 112 to the extent they are inconsistent with the content of the call transcript. To the extent a further response is required, Defendants deny the allegations in Paragraph 112.

113.    On the same call, Defendant Frates similarly related:

> *We're encouraged by the strong interest in demand we continue to see from the ALS community.* From a financial point of view, our business [is] strong. Net product revenue were $71.4 million for the quarter, compared to net product revenue of $21.9 million for the fourth quarter of 2022 with the vast majority of that revenue from the [U.S.]
> * * *
> I want to pause a moment on our overall financial results *with the strong demand for RELYVRIO driving near term profitability ahead of our expectations. We want to reiterate our long term financial goals driving top line revenues as RELYVRIO become standard of care, growing profitability for our investors, and investing in a pipeline that has the potential to provide much needed treatments for neurodegenerative diseases. We're well-positioned to build a profitable financially strong organization for the long term . . . . We're currently in a position to fund the programs, we discussed it without the need to raise additional capital.*

(Emphases added.)

**ANSWER:** No response is required because the Court found the statements contained in Paragraph 113 non-actionable in its Motion to Dismiss Order. To the extent that Paragraph 113 characterizes a May 11, 2023 earnings call transcript, Defendants state that such call transcript speaks for itself, refer the Court to the call transcript for its content, and deny the allegations in Paragraph 113 to the extent they are inconsistent with the content of the call transcript. To the extent a further response is required, Defendants deny the allegations in Paragraph 113.

114.    During her prepared remarks on the Q1 2023 Earnings Call, Defendant Olinger echoed these sentiments:

> *We are seeing continued interest and demand for RELYVRIO.* As of March 31, there were roughly 3000 people on RELYVRIO in the US more than double the number of people on RELYVRIO at the start of the quarter. We are pleased that this many people have gained access to our important treatment.
>
> I think it's worth spending a minute to provide some additional context on the strength of our launch. While we knew there was pent up demand, *the fourth quarter and first quarter, were still well ahead of our expectations*. The rate of net patient's [indiscernible] has begun to moderate as expected. *However, we still see significant demand for people living with ALS, and physicians alike. Importantly, we still have plenty of room for growth, both at the top ALS centers, and the*

*broader neurology community*.

Now, let me run through a few metrics that show our progress, but also the growth opportunities ahead of us. By the end of the first quarter, approximately 65% of the top 500 US prescribers and approximately 95% of the key ALS centers had prescribed RELYVRIO out to at least one person since launch. ***Prescribing remains fairly concentrated***, with roughly 80 prescribers mostly at major ALS centers, representing approximately half of all RELYVRIO prescriptions during the quarter. While we are encouraged with these data points, ***we see an opportunity for*** *broader and deeper uptake of key ALS centers, and the opportunity to continue* to penetrate the group of top prescribers.

…"***[w]e continue to see a wide range of people living with ALS in terms of time sense initial diagnosis, interested in and gaining access to RELYVRIO.***"

(Emphases added.)

**ANSWER:** To the extent that Paragraph 114 characterizes a May 11, 2023 earnings call transcript, Defendants state that such call transcript speaks for itself, refer the Court to the call transcript for its content, and deny the allegations in Paragraph 114 to the extent they are inconsistent with the content of the call transcript. To the extent a further response is required, Defendants deny the allegations in Paragraph 114.

115.     During the Q&A portion of the Q1 2023 Earnings Call, in response to an analyst question regarding "the [moderated] rate of pace" of new patients for Relyvrio and "expectations going to perhaps the second quarter," Defendant Olinger stated:

[W]e continue to be incredibly pleased with our launch today     [***I]f I could just reiterate a few key points, we ended the quarter with roughly 3000 patients, again, double what we started with at the beginning of the quarter.***

***And that's about 10% of the 29,000 patients living with ALS. So not surprisingly, our net patient ads can't double forever***. So in Q2 we are expecting the number will be lower than what we delivered in Q4 and Q1. ***I think more importantly, we continue to see significant interest in demand for RELYVRIO*** both from patients and HCP. And ***we have a tremendous opportunity for us to grow both in depth and breadth at all the key ALS centers***[.]

(Emphases added.)

**ANSWER:** To the extent that Paragraph 115 characterizes a May 11, 2023 earnings call transcript, Defendants state that such call transcript speaks for itself, refer the Court to the call transcript for its content, and deny the allegations in Paragraph 115 to the extent they are inconsistent with the content of the call transcript. To the extent a further response is required, Defendants deny the allegations in Paragraph 115.

116.    Similarly, in response to another analyst question regarding "the rate of net patient ads . . . beginning to moderate" and whether Defendants "[c]ould   perhaps provide any updated views on how big this initial bolus of patients could be" and "how long it could last before [Defendants] achieve a steady state trajectory of new starts," Defendant Olinger stated:

> *Regarding the bolus, it's really too early to tell when the bolus will finish. But what I can say is that we know in Q4 and in Q1, we did see that high level of demand due to the pent up demand that we had. And they were quite frankly, even ahead of our expectations. So we have begun to see the rate and new patient ads moderate. But again, I want to reiterate, we have a tremendous opportunity for growth, because even within the key accounts that we penetrated*. And just remind you of some of the metrics, we said 95% of all the key ALS centers have prescribed for at least one patient every account, you see one account, you see one account. It's typical rare disease. So some accounts are highly penetrated. *And some accounts have a great deal of room ahead of us to penetrate. And we really have just started to get out into the broader neurology community. So again, we* see tremendous growth ahead of us to serve all the remaining patients that are depending on us.

(Emphases added.)

**ANSWER:** To the extent that Paragraph 116 characterizes a May 11, 2023 earnings call transcript, Defendants state that such call transcript speaks for itself, refer the Court to the call transcript for its content, and deny the allegations in Paragraph 116 to the extent they are inconsistent with the content of the call transcript. To the extent a further response is required, Defendants deny the allegations in Paragraph 116.

117.    In response to yet another analyst question during the Q1 2023 Earnings Call regarding "what you're seeing in terms of start forms versus net ads," whether Defendants "can talk about the trend you're seeing there," and whether Defendants could provide "any color on duration of therapy so far, or any dropouts that you're seeing," Defendant Klee largely deflected the question, answering:

45

> So we're not providing any guidance on the number of patients for the quarter again, I'll just go back to, we think our net patient adds, they can't double forever. So we'll be lower in Q2 than we've been able to deliver in Q4, Q1 because we believe that was the initial pent up demand. ***Again, we don't know, when that bolus will be over. So it's hard for us to really give any guidance on that. In terms of duration of treatment, it's really too early in the launch to give that I mean, the first patients who started on therapy, we're basically at the end of October, beginning of November. So they really haven't been on therapy long enough for us to give, any, any clarification there. In terms of discontinuation rates, that's sort of similar as well. People just haven't been on therapy long enough***…

(Emphasis added.)

**ANSWER:** No response is required because the Court found the statements contained in Paragraph 117 non-actionable in its Motion to Dismiss Order. To the extent that Paragraph 117 characterizes a May 11, 2023 earnings call transcript, Defendants state that such call transcript speaks for itself, refer the Court to the call transcript for its content, and deny the allegations in Paragraph 117 to the extent they are inconsistent with the content of the call transcript. To the extent a further response is required, Defendants deny the allegations in Paragraph 117.

118.    Also on May 11, 2023, Amylyx filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operational results for the quarter ended March 31, 2023 (the "Q1 2023 10-Q"). The Q1 2023 10-Q contained the same statements as referenced in ¶¶ 104-107, *supra*, assuring investors that Defendants' understanding of Relyvrio's commercial prospects, including, presumably, its prescription rate, would become more accurate with time, and that investors could, therefore, trust Defendants' representations concerning Relyvrio's commercial prospects and prescription rate.

**ANSWER:** To the extent that Paragraph 118 characterizes a May 11, 2023 SEC filing, Defendants state that such SEC filing speaks for itself, refer the Court to the SEC filing for its content, and deny the allegations in Paragraph 118 to the extent they are inconsistent with the SEC filing. To the extent a further response is required, Defendants deny the allegations in Paragraph 118.

119.    Appended as exhibits to the Q1 2023 10-Q were substantively the same SOX certifications as referenced in ¶ 107, *supra*, signed by Defendants Cohen, Klee, and Frates.

46

**ANSWER:** To the extent that Paragraph 119 characterizes a May 11, 2023 SEC filing, Defendants state that such SEC filing speaks for itself, refer the Court to the SEC filing for its content, and deny the allegations in Paragraph 119 to the extent they are inconsistent with the SEC filing. To the extent a further response is required, Defendants deny the allegations in Paragraph 119.

120. This statements in ¶¶ 112-119 from May 11, 2023 were false and misleading and omitted material information given: (1) at the time, Defendants knew that the "significant demand" was due to an initial, temporary bolus of patients that, by this time, had stabilized, offering no meaningful opportunity for further "plenty of room for growth," (2) at the time, contrary to their representations, Defendants knew the "initial bolus" was over, (3) there was no growth potential for "newly diagnosed" patients with ALS, (4) outside the "concentrated ALS centers," the "broader neurology community" did not provide opportunity for future growth, (5) Defendants already were aware that high, undisclosed discontinuation rates were occurring, undermining the commercial potential for the launch, and (6) those hidden discontinuations inflated the "ramp" for the stated net patient subscribers.

**ANSWER:** Paragraph 120 consists of legal conclusions to which no response is required. To the extent the allegations in Paragraph 120 address claims about statements of interest or demand or involving corporate puffery, Defendants state that no response is required because the Court found those statements non-actionable in its Motion to Dismiss Order. To the extent a response is required, Defendants deny the allegations in Paragraph 120.

121. On August 10, 2023, Amylyx issued a press release announcing its second quarter ("Q2") 2023 financial results. That press release quoted Defendants Cohen and Klee, who stated, in relevant part, that "***[w]e made strong and steady progress on our commercial launches in [Q2]***, supporting people living with ALS with increased access to RELYVRIO." (Emphasis added.)

**ANSWER:** No response is required because the Court found the statements contained in Paragraph 121 non-actionable in its Motion to Dismiss Order. To the extent that Paragraph 121 characterizes an August 10, 2023 press release, Defendants state that such press release speaks for itself, refer the Court to the press release for its content, and deny the allegations in Paragraph 121 to the extent they are inconsistent with the content of the press release. To the extent a further

response is required, Defendants deny the allegations in Paragraph 121.

122.    That same day, Defendants hosted a conference call with investors and analysts to discuss Amylyx's Q2 2023 results (the "Q2 2023 Earnings Call"). During his prepared remarks on that call, Defendant Klee stated, in relevant part:

> In [Q2], we made significant progress in bringing RELYVRIO . . . to people with ALS in the US[.]
> * * *
> Let me walk you through our progress. ***Our commercial organization is off to a strong start . . . as evidenced by the strong and steady demand we saw in [Q2].*** As of June 30, 2023, there were roughly 3,800 people on RELYVRIO in the US, up from roughly 3,000 people on RELYVRIO as of March 31, 2023 and just over 1,300 at the end of 2022.

(Emphases added.)

**ANSWER:** No response is required because the Court found the statements contained in Paragraph 122 non-actionable in its Motion to Dismiss Order. To the extent that Paragraph 122 characterizes an August 10, 2023 earnings call transcript, Defendants state that such call transcript speaks for itself, refer the Court to the call transcript for its content, and deny the allegations in Paragraph 122 to the extent they are inconsistent with the content of the call transcript. To the extent a further response is required, Defendants deny the allegations in Paragraph 122.

123.    Similarly, during his prepared remarks on the Q2 2023 Earnings Call, Defendant Frates stated, in relevant part:

> ***We're encouraged by the strong interest and demand we continue to see from the ALS community in the second quarter. From a financial point of view, our business remains strong.***
>
> Net product revenues were $98.2 million for the quarter, compared to net product revenue of $71.4 million for the first quarter of 2023, with the vast majority of that revenue coming from the [U.S.]

(Emphasis added.)

**ANSWER:** No response is required because the Court found the statements contained in Paragraph 123 non-actionable in its Motion to Dismiss Order. To the extent that Paragraph 123

48

characterizes an August 10, 2023 earnings call transcript, Defendants state that such call transcript speaks for itself, refer the Court to the call transcript for its content, and deny the allegations in Paragraph 123 to the extent they are inconsistent with the content of the call transcript. To the extent a further response is required, Defendants deny the allegations in Paragraph 123.

124.    Likewise, during her prepared remarks on the Q2 2023 Earnings Call, Defendant Olinger represented:

> During [Q2], interest in and demand for RELYVRIO continued to build at a steady pace from both those that are newly diagnosed and people who have been living with ALS for years.
> * * *
> Now, let me run through a few key metrics that demonstrate our progress and growth opportunities ahead of us. ***Prescribing remains fairly concentrated with just over 80 prescribers mostly at major ALS centers representing approximately half of all RELYVRIO prescriptions at the end of the quarter.***
>
> ***We are encouraged by the level of interest among this group and believe that we have an opportunity for growth as we bring our message to more prescribers and deepen our relationships within these key ALS centers.***

(Emphases added.)

**ANSWER:** No response is required because the Court found the statements contained in Paragraph 124 non-actionable in its Motion to Dismiss Order. To the extent that Paragraph 124 characterizes an August 10, 2023 earnings call transcript, Defendants state that such call transcript speaks for itself, refer the Court to the call transcript for its content, and deny the allegations in Paragraph 124 to the extent they are inconsistent with the content of the call transcript. To the extent a further response is required, Defendants deny the allegations in Paragraph 124.

125.    During the Q&A portion of the Q2 2023 Earnings Call, in response to an analyst question regarding "what are you seeing with respect to . . . discontinuation rates" and whether Defendants "[a]re . . . seeing any emerging trends with respect to the primary reason for discontinuation," Defendant Olinger stated:

> [A]s a reminder, we report on net patients on therapy. So this is inclusive of any discontinuation. We are really pleased with our ability to serve

49

the roughly 3,800 net patients on RELYVRIO at the end of Q2. *I would say it's really too early to see any long-term trends at this point in our launch.*

(Emphasis added.)

**ANSWER:** No response is required because the Court found the statements contained in Paragraph 125 non-actionable in its Motion to Dismiss Order. To the extent that Paragraph 125 characterizes an August 10, 2023 earnings call transcript, Defendants state that such call transcript speaks for itself, refer the Court to the call transcript for its content, and deny the allegations in Paragraph 125 to the extent they are inconsistent with the content of the call transcript. To the extent a further response is required, Defendants deny the allegations in Paragraph 125.

126.     Likewise, in response to an analyst question regarding whether Defendants "have any better sense of the size of the patient bolus at this point" and the discontinuation rates, particularly "among the early patients t[hat] have received [the] commercial drug in 4Q of last year [who are] presumably some of the[] patients . . . would have been on drug for at least six months now," and whether Defendants could "provide any color as to what percent of them are still on therapy at this point again just among the patients who started in 4Q," Defendant Olinger largely deflected the question, stating:

> Maybe I'll just start with your question regarding the bolus. We continue to be pleased that the interest in and demand for RELYVRIO, continues to be as at a very strong pace and I think importantly includes a mix of both newly diagnosed patients and people who have been diagnosed and living with ALS for many years.
>
> Again at the end of Q2, we had roughly 3,800 net patients on therapy up from roughly 3,000 patients in Q1 and just over 1,300 in Q4. *So we really believe that at this point in time RELYVRIO is really starting to become a foundational therapy in ALS and meeting a really high unmet need for this patient community* which is obviously our mission and what we've been focused on for some time.
>
> As far as the growth opportunities which is equally important to us we see several different opportunities ahead of us. First *the prescribing remains really concentrated* with the 80 prescribers mostly at the major ALS centers where our focus was at the beginning of launch representing about half of all RELYVRIO prescriptions this quarter. *We're also encouraged that the level of interest among this group and believe that we have a large opportunity for growth ahead of us.* As

we bring our messaging to more prescribers and deepen our relationships within those key centers. And I think importantly with those prescribers be much more prolific in their prescribing which I think is an important part.

And second *we have a really large untapped opportunity for growth outside of this group*. As I mentioned, we were heavily focused on the key ALS centers at launch. We're continuing to expand our outreach and educational efforts more broadly because we believe it's critically important that everybody is aware that RELYVRIO is the first-and-only product to have both function and survival demonstrated in the clinical trial and we believe we can change the paradigm for treatment moving forward. And maybe *just to answer your second question on discontinuation, again, we're only going to be reporting on net patient numbers* for a quarter. *But indeed, I think it's important to reflect that the first cohort of* patients who started on therapy at launch many of those who have been really fairly progressed early on. So I think we're going to see the dynamic of the patients change over time. So it's a little too early to really give any trends there.

(Emphases added.)

**ANSWER:** No response is required as to all puffery statements quoted in Paragraph 126 because the Court found such statements non-actionable in its Motion to Dismiss Order. To the extent that Paragraph 126 characterizes an August 10, 2023 earnings call transcript, Defendants state that such call transcript speaks for itself, refer the Court to the call transcript for its content, and deny the allegations in Paragraph 126 to the extent they are inconsistent with the content of the call transcript. Defendants otherwise deny the allegations in Paragraph 126.

127.    Similarly, when asked by an analyst on the same call regarding "what kind of trends you're seeing you saw in July," Defendant Frates largely deflected the question, stating:

[I]n terms of July, I think we'll comment on the July trends when we report our quarterly results for Q3. But I think our business is -- with now three quarters under our belt, we're all starting to get a chance to see what our business is like moving forward. But we won't be giving specifics on July at this stage.

(Emphasis added.)

**ANSWER:** No response is required because the Court found the statements contained in

51

Paragraph 127 non-actionable in its Motion to Dismiss Order. To the extent that Paragraph 127

characterizes an August 10, 2023 earnings call transcript, Defendants state that such call transcript

speaks for itself, refer the Court to the call transcript for its content, and deny the allegations in

Paragraph 127 to the extent they are inconsistent with the content of the call transcript. To the

extent a further response is required, Defendants deny the allegations in Paragraph 127.

128.    Presumably dissatisfied with the Individual Defendants' responses regarding what they observed vis-à-vis prescription rate trends for Relyvrio, as well as the retention rate of patients using Relyvrio for ALS treatment, yet another analyst attempted to elicit some color on these issues on the Q2 2023 Earnings Call.  However, in response, Defendants Klee and Olinger again largely deflected the question:

> [Analyst]
>
> Thanks so much. Congrats on the quarter. Just two questions. One maybe another way to ask a question that people seem to be trying to get at. Do you have any color on -- or can you provide any color on kind of new prescription trends versus refill trends? Any metrics you can provide there and how that's evolved?
>
> * * * [Defendant] Klee
> So I'll start and then have [Defendant Olinger] join in too. So again, we're three quarters into launch. We have roughly 3,800 net people on treatment as of the end of Q2 which we're very pleased about. I mean, that's 3,800 people with ALS we're helping. ***But that means that there's many, many more people that we'd like to help as well.***
> But I think we all here are constantly reminded of the mission at hand. And I think the ALS market in many ways is unique. And it's because it's a large rare disease, there's a huge unmet medical need. And historically there have been few treatment options.
>
> And so I think the way that we've thought about our business, as Margaret was sharing, is to focus on the ALS specialists, and then continuing to look to broaden out. And so I think as we look at our prescription numbers, where our people have focused is where we're seeing the prescriptions as well.
>
> And then [Defendant Olinger], I'll invite you to share any more details on that. [Defendant] Olinger
> Yeah. As we've indicated heavily focused at launch which I think was the right strategic decision to focus on the key ALS centers where the majority of ALS patients are actually treated.

52

However, there's also a number of ALS patients that are treated outside of ALS centers for multiple reasons, either they can't transport, they can't get there at a reasonable time and it's -- they typically need to go there every quarter to see the multidisciplinary care.
***There are a number of General and Community Neurologist, that are equally important to be educated and that's where we're expanding our focus. And we are continuing to increase our penetration and reach out to those, what we call our Tier A or B targets***.

And we're just going to continue to work on that expansion moving forward, because it's really important for us that every physician who treats an ALS patient is educated about the significant RELYVRIO benefits that we can bring to be able to serve this patient community optimally.

(Emphases added.)

**ANSWER:** No response is required as to all puffery statements quoted in Paragraph 128 because the Court found such statements non-actionable in its Motion to Dismiss Order. To the extent that Paragraph 128 characterizes an August 10, 2023 earnings call transcript, Defendants state that such call transcript speaks for itself, refer the Court to the call transcript for its content, and deny the allegations in Paragraph 128 to the extent they are inconsistent with the content of the call transcript. Defendants otherwise deny the allegations in Paragraph 128.

129.    Also on August 10, 2023, Amylyx filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operational results for the quarter ended June 30, 2023 (the "Q2 2023 10-Q").  The Q2 2023 10-Q contained the same statements as referenced in ¶¶ 104-107, *supra*, assuring investors that Defendants' understanding of Relyvrio commercial prospects, including, presumably, its prescription rate, would become more accurate with time, and that investors could, therefore, trust Defendants' representations concerning Relyvrio's commercial prospects and prescription rate.

**ANSWER:** To the extent that Paragraph 129 characterizes an August 10, 2023 SEC filing, Defendants state that such SEC filing speaks for itself, refer the Court to the SEC filing for its content, and deny the allegations in Paragraph 129 to the extent they are inconsistent with the content of the SEC filing. To the extent a further response is required, Defendants deny the allegations in Paragraph 129.

130.    Appended as exhibits to the Q2 2023 10-Q were substantively the same SOX certifications as referenced in ¶ 107, *supra*, signed by Defendants Cohen, Klee, and Frates.

**ANSWER:** To the extent that Paragraph 130 characterizes an August 10, 2023 SEC filing, Defendants state that such SEC filing speaks for itself, refer the Court to the SEC filing for its content, and deny the allegations in Paragraph 130 to the extent they are inconsistent with the content of the SEC filing. To the extent a further response is required, Defendants deny the allegations in Paragraph 130.

131.    This statements in ¶¶ 121-130 from August 10, 2023 were false and misleading and omitted material information given: (1) at the time, Defendants knew that the "significant demand" was due to an initial, temporary bolus of patients that, by this time, had stabilized, offering no meaningful opportunity for further growth or a "strong pace" of demand, (2) at the time, contrary to their representations, Defendants knew the "bolus" was over, (3) thus, at the time, there was no remaining potential for growth at the concentrated "ALS centers," (4) there was no growth potential for "newly diagnosed" patients with ALS, (5) the "General and Community Neurologist," did not provide opportunity for future growth, (6) Defendants already were aware that high, undisclosed discontinuation rates were occurring, undermining the commercial potential for the launch, and (7) those hidden discontinuations inflated the chance to grow the stated net patient subscribers.

**ANSWER:** Paragraph 131 consists of legal conclusions to which no response is required. To the extent the allegations in Paragraph 131 address claims about statements of interest or demand or involving corporate puffery, Defendants state that no response is required because the Court found those statements non-actionable in its Motion to Dismiss Order. To the extent a response is required, Defendants deny the allegations in Paragraph 131.

132.    Amylyx's SEC filings identified above also failed to identify and disclose known trends, events, demands, commitments, and uncertainties that were then having and were reasonably likely to have a material effect on Amylyx's operating performance.

**ANSWER:** Paragraph 132 consists of legal conclusions to which no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 132.

133.    Item 7 of Form 10-K and Item 2 of Form 10-Q require SEC registrants to furnish the information called for under Item 303 of Regulation S-K [17 C.F.R. § 229.303], Management's Discussion and Analysis of Financial Condition and Results of Operations ("MD&A"). Among other things, Item 303 of Regulation S-K required that Amylyx's Class Period Forms 10-K and

10-Q disclose known trends or uncertainties that had, or were reasonably likely to have, a material impact on its revenues or income from continuing operations.

**ANSWER:** Defendants state that the allegations in Paragraph 133 consist of legal conclusions, to which no response is required. To the extent a response is required, Defendants state that the regulations cited in Paragraph 133 speak for themselves, direct the Court to the regulations for their content, and deny the allegations in Paragraph 133 to the extent they contradict the content of the regulations. Defendants otherwise deny the allegations in Paragraph 133 and specifically deny that the Class Period is November 11, 2022 to November 8, 2023 based on the Motion to Dismiss Order, which limited the actionable statements to only statements about growth potential made between May 11, 2023 and August 10, 2023.

134.    In 1989, the SEC issued interpretative guidance associated with the requirements of Item 303 of Regulation S-K concerning the disclosure of material trends or uncertainties. As the interpretative guidance states:

> Required disclosure is based on ***currently known trends, events, and uncertainties that are reasonably expected to have material effects***, such as: A reduction in the registrant's product prices; erosion in the registrant's market share; changes in insurance coverage; or the likely non-renewal of a material contract.
> * * *
> A disclosure duty exists where a trend, demand, commitment, event or uncertainty is both presently known to management and reasonably likely to have material effects on the registrant's financial condition or results of operation.

**ANSWER:** To the extent that Paragraph 134 characterizes SEC guidance, Defendants state that such SEC guidance speaks for itself, refer the Court to the SEC guidance for its content, and deny the allegations in Paragraph 134 to the extent they are inconsistent with the content of the SEC guidance. Defendants also state that the allegations in Paragraph 134 consist of legal conclusions, to which no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 134.

135.    The 1989 Interpretive Release sets forth the following test to determine if

disclosure under Item 303(a) is required:

> Where a trend, demand, commitment, event or uncertainty is known, management must make two assessments:
>
> Is the known trend, demand, commitment, event or uncertainty likely to come to fruition? If management determines that it is not reasonably likely to occur, no disclosure is required.
>
> If management cannot make that determination, it must evaluate objectively the consequences of the known trend, demand, commitment, event or uncertainty, on the assumption that it will come to fruition. Disclosure is then required unless management determines that a material effect on the registrant's financial condition or results of operations is not reasonably likely to occur.

**ANSWER:** To the extent that Paragraph 135 characterizes SEC guidance, Defendants state that such SEC guidance speaks for itself, refer the Court to the SEC guidance for its content, and deny the allegations in Paragraph 135 to the extent they are inconsistent with the content of the SEC guidance. Defendants also state that the allegations in Paragraph 135 consist of legal conclusions, to which no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 135.

136. Additionally, the SEC published interpretive guidance, effective December 29, 2003, "regarding the disclosure commonly known as Management's Discussion and Analysis of Financial Condition and Results of Operations, or MD&A, which is required by Item 303 of Regulation S-K, Items 303(b) and (c) of Regulation S-B, Item 5 of Form 20-F and Paragraph 11 of General Instruction B of Form 40-F." In particular, the SEC advised that "companies must identify and disclose known trends, events, demands, commitments and uncertainties that are reasonably likely to have a material effect on financial condition or operating performance," citing the 1989 Interpretive Release as support and quoting, in footnote 6, the following text of the 1989 Interpretive Release:

> MD&A mandates disclosure of specified forward-looking information, and specifies its own standards for disclosure – i.e., reasonably likely to have a material effect. The specific standard governs the circumstances in which Item 303 requires disclosure.
> * * *
> We believe that management's most important responsibilities include communicating with investors in a clear and straightforward manner. MD&A is a critical component of that communication. The Commission has long sought through its rules, enforcement actions and

interpretive processes to elicit MD&A that not only meets technical disclosure requirements but generally is informative and transparent.

**ANSWER:** To the extent that Paragraph 136 characterizes SEC guidance, Defendants state that such SEC guidance speaks for itself, refer the Court to the SEC guidance for its content, and deny the allegations in Paragraph 136 to the extent they are inconsistent with the content of the SEC guidance. Defendants also state that the allegations in Paragraph 136 consist of legal conclusions, to which no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 136.

137.    Thus, the MD&A disclosures in Amylyx's Forms 10-K and 10-Q it filed with the SEC during the Class Period were materially false and misleading because Defendants failed to disclose the known uncertainties associated with: (1) the declining level of new patient subscribers early on in the Relyvrio launch, (2) the high level of early discontinuations from those patients subscribed Relyvrio, (3) the lack of possible opportunities for growth after the initial patient bolus, (4) the accuracy of Amylyx's reported subscriber numbers given the discontinuations inflated the amount of potential growth, and (5) the fact that Amylyx would not provide accurate, new patient additions or report on discontinuations, obscuring visibility into the objective success of the launch. As a result, these were events presenting known trends and uncertainties that were reasonably likely to—and, when they came to fruition during the Class Period, did—adversely affect Amylyx's financial condition and results. The omission of this information violated the disclosure obligation imposed by Item 303.

**ANSWER:** Defendants state that the allegations in Paragraph 137 consist of legal conclusions, to which no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 137 and specifically deny that the Class Period is November 11, 2022 to November 8, 2023 based on the Motion to Dismiss Order, which limited the actionable statements to only statements about growth potential made between May 11, 2023 and August 10, 2023.

138.    On November 9, 2023, during pre-market hours, Amylyx issued a press release announcing its Q3 2023 financial results, including Q3 GAAP EPS of $0.30, missing consensus estimates by $0.12. That same day, on a conference call with investors and analysts to discuss these results (the "Q3 2023 Earnings Call"), Defendant Olinger revealed that, despite "a [purported] steady cadence of new prescriptions written in" Q3 for Relyvrio, patients were discontinuing treatment with Relyvrio after six months, stating, in relevant part:

> [W]e saw a steady cadence of new prescriptions written in the third quarter      As we think about how our growth has evolved this year, **the slowdown in net adds this quarter was primarily driven by increased discontinuations for a variety of reasons**.
> * * *
> 60% of people taking RELYVRIO remain on therapy six months after initiation in the U.S. We believe some discontinuations are addressable[.]

(Emphasis added.)

**ANSWER:** To the extent that Paragraph 138 characterizes a November 9, 2023 press release and earnings call transcript, Defendants state that such press release and call transcript speak for themselves, refer the Court to the press release and call transcript for their content, and deny the allegations in Paragraph 138 to the extent they are inconsistent with the content of the press release and call transcript. To the extent a further response is required, Defendants deny the allegations in Paragraph 138.

139.    Defendant Frates likewise confirmed on the Q3 2023 Earnings Call that "[o]ur results were impacted by a number of factors" including "what [Defendant Olinger] mentioned earlier"—*i.e.*, an increased rate of patients discontinuing treatment with Relyvrio and a slowdown in the net addition of new patients for Relyvrio.

**ANSWER:** To the extent that Paragraph 139 characterizes a November 9, 2023 earnings call transcript, Defendants state that such call transcript speaks for itself, refer the Court to the call transcript for its content, and deny the allegations in Paragraph 139 to the extent they are inconsistent with the content of the call transcript. To the extent a further response is required, Defendants deny the allegations in Paragraph 139.

140.    Later that day, during intraday trading hours, *Investor's Business Daily* published an article addressing the Company's disappointing financial results, entitled "Amylyx Crashes 27% As New ALS Drug Faces A Barrage Of Troubles." The *IBD* Article (as published during intraday trading hours[3]) stated, in relevant part:

> Amylyx . . . meaningfully missed Wall Street's expectations on Thursday amid struggles with its [ALS] drug. AMLX stock crashed in morning trades.
> * * *

58

Amylyx noted patients are dropping off Relyvrio treatment after six months, Evercore ISI analyst Michael DiFiore said in a report. But Amylyx said the number of new patients starting treatment was "steady." DiFiore says his math suggests otherwise.

He also noted Amylyx blocked analysts from seeing Relyvrio prescription data this summer.

"Knowing that stock had underperformed in 2023 already, management could have communicated the discontinuations dynamic much earlier," he said. "Stock move today in a bad biotech tape and fund performance doesn't help investor confidence among folks that have held onto the stock."

In midday trades on today's stock market, AMLX stock plummeted 27.2% near 13.10.
AMLX Stock: Wide Sales, Earnings Misses
Overall, Relyvrio generated $102.7 million in sales. Though sales grew almost 5% sequentially, they missed analysts' forecasts, which ranged from $108.5 million to $113.8 million, Mizuho Securities analyst Graig Suvannavejh said in a report.
* * *
Evercore's DiFiore says AMLX stock analysts' views for 2024 will "need to come down meaningfully." Analysts currently project $591 million in U.S. sales of Relyvrio. But he says $500 million is closer to what the Street should expect.

"I assume discontinuation rate at month six slows a bit — but not majorly," he said. "New adds improves a bit — but not majorly. Net price per patient stays flat."

**ANSWER:** To the extent that Paragraph 140 and footnote 3 characterize a November 9, 2023 *Investor's Business Daily* article, Defendants state that such article speaks for itself, refer the Court to the article for its content, and deny the allegations in Paragraph 140 to the extent they are inconsistent with the content of the article. To the extent a further response is required, Defendants deny the allegations in Paragraph 140.

141.    Similarly, on the November 11, 2023 earnings call, investors understandably were puzzled by the Company's math not adding up. During the Q&A portion, one investor queried:

"If I just look at the fact pattern on how you implemented the data restriction on IMS and Symphony vendors this summer and how that

59

coincided with this massive slowdown, it just really puzzles me because I feel like not only was the Street ready from communication on your end, but also I feel like you limited the channels to which Street could have been ready for today. How do you -- can you expand on that? Because it looks like you may have had a sense for discontinuations really picking up around July timeframe."

**ANSWER:** To the extent that Paragraph 141 characterizes a November 9, 2023 earnings call transcript, Defendants state that such call transcript speaks for itself, refer the Court to the call transcript for its content, and deny the allegations in Paragraph 141 to the extent they are inconsistent with the content of the call transcript. To the extent a further response is required, Defendants deny the allegations in Paragraph 141.

142.     Defendant Cohen evaded responding to this timeline, instead saying "our intention at launch was always to have the limited distribution model" and that "we updated everyone in February that we thought we had identified one of the areas where there is some data coming out, and so we had addressed that." "I think the most important thing here, though, is that we have huge long-term growth opportunities ahead of us."

**ANSWER:** To the extent that Paragraph 142 characterizes a November 9, 2023 earnings call transcript, Defendants state that such call transcript speaks for itself, refer the Court to the call transcript for its content, and deny the allegations in Paragraph 142 to the extent they are inconsistent with the content of the call transcript. To the extent a further response is required, Defendants deny the allegations in Paragraph 142.

143.     During that call, an analyst pressed that:

> [I]f I model out on discontinuations, what I feel is it's not just the discontinuation. It's also the new starts might have dropped about 35%, 40% quarter-over-quarter from 2Q to 3Q. Is that right? Because I feel like you may have had about, I don't know, 750 discontinuations in 3Q. But if that's the case, you might be in for another about 650 to 700 discontinuations in 4Q, which makes it very hard to again put up a very meaningful net add number in 4Q unless your new add picks up very meaningfully versus where it was in 3Q. Am I on the right track there?

**ANSWER:** To the extent that Paragraph 143 characterizes a November 9, 2023 earnings call transcript, Defendants state that such call transcript speaks for itself, refer the Court to the call

60

transcript for its content, and deny the allegations in Paragraph 143 to the extent they are inconsistent with the content of the call transcript. To the extent a further response is required, Defendants deny the allegations in Paragraph 143.

144.    Defendant Cohen again did not respond to these accusations, but only stated that "[m]aybe we haven't commented on any of those metrics, but maybe just to circle back. There are roughly 30,000 people living with ALS in the United States. We have 3,900 on therapy. So we certainly see an opportunity to continue to grow."

**ANSWER:** To the extent that Paragraph 144 characterizes a November 9, 2023 earnings call transcript, Defendants state that such call transcript speaks for itself, refer the Court to the call transcript for its content, and deny the allegations in Paragraph 144 to the extent they are inconsistent with the content of the call transcript. To the extent a further response is required, Defendants deny the allegations in Paragraph 144,

145.    Following these disclosures and the publication of the *IBD* Article, Amylyx's stock price fell $5.74 per share, or 31.89%, to close at $12.26 per share on November 9, 2023.

**ANSWER:** Defendants deny the allegations in Paragraph 145, except admit that Amylyx's common stock closed at $12.26 per share on November 9, 2023.

146.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

**ANSWER:** Defendants deny the allegations in Paragraph 146.

147.    On December 7, 2023—*i.e.*, less than a month after the truth regarding Relyvrio's commercial prospects and prescription rates were revealed—Amylyx announced the departure of Defendant Olinger as the Company's CCO, effective December 31, 2023. Although no explanation was given for her departure, as CCO, Defendant Olinger was primarily responsible for Relyvrio's commercial development throughout the Class Period, and the timing of her departure appears to, at minimum, correlate with the negative revelations regarding Relyvrio's commercial development as alleged herein.

**ANSWER:** Defendants deny the allegations in Paragraph 147, except admit that on December 7, 2023, Amylyx filed a Form 8-K announcing the departure of Defendant Olinger as the Company's CCO, effective December 31, 2023. To the extent that Paragraph 147 characterizes

such SEC filing, Defendants state that such SEC filing speaks for itself, refer the Court to the SEC

filing for its content, and deny the allegations in Paragraph 147 to the extent they are inconsistent

with the content of the SEC filing. To the extent a further response is required, Defendants deny

the allegations in Paragraph 147 and specifically deny that the Class Period is November 11, 2022

to November 8, 2023 based on the Motion to Dismiss Order, which limited the actionable

statements to only statements about growth potential made between May 11, 2023 and August 10,

2023.

148.    On March 8, 2024, Amylyx issues a press release revealing that the Relyvrio Phase III Phoenix trial failed "to meet its primary endpoint of reaching statistical significance (p=0.667) as measured by change from baseline in the Revised Amyotrophic Lateral Sclerosis Functional Rating Scale (ALSFRS-R) total score at Week 48, nor was there statistical significance seen in secondary endpoints." (Amylyx Press Release, March 8, 2024). In other words, Relyvrio "failed to slow the progression of the disease," and "made no significant difference versus a placebo in terms of helping patients perform daily- living tasks such as walking and breathing." (WSJ, "Wall Street Predicted a Blockbuster. Now the Drug May Be Withdrawn," March 10, 2024).

**ANSWER:** To the extent that Paragraph 148 characterizes a March 8, 2024 press release,

Defendants state that such press release speaks for itself, refer the Court to such press release for

its content, and deny the allegations in Paragraph 148 to the extent they are inconsistent with the

content of the press release. To the extent that Paragraph 148 characterizes a March 10, 2024 news

article, Defendants state that such article speaks for itself, refer the Court to such article for its

content, and deny the allegations in Paragraph 148 to the extent they are inconsistent with the

content of the article. To the extent a further response is required, Defendants deny the allegations

in Paragraph 148.

149.    Investors noted that the Phoenix trial did not just fail, it failed *badly*. "Importantly, the topline data fall into the worst-case scenario with p=0.667, suggesting there's no trend observed from the data, including pre-specified subgroup analyses." (Bank of America Global Research, "Amylyx Pharmaceuticals Complete PHOENIX failure," March 8, 2024).  As one report noted, "[w]e admit, we did expect at least a modest trend to efficacy to be detectable on the primary analysis in the absence of statistical significance, and, thus, the p-value, which implies essentially no separation (a <0.1 point/month difference on slope or a ~1 point difference on the ALSFRS-R rate of change from the baseline vs. placebo based on our math, described below), is

worse than we expected." (Deutsche Bank Group, "Increasingly Hard for AMX0035 to Embody a PHOENIX," March 8, 2024.)

**ANSWER:** To the extent that Paragraph 149 characterizes analyst reports, Defendants state that such analyst reports speak for themselves, refer the Court to such analyst reports for their content, and deny the allegations in Paragraph 149 to the extent they are inconsistent with the content of the analyst reports. To the extent a further response is required, Defendants deny the allegations in Paragraph 149.

150.    As a result, Amylyx "voluntarily decided to pause promotion of the medication during this time" and would consider "voluntary withdrawal" from the market. (Amylyx Press Release, March 8, 2024). On a webcast that day, Defendant Cohen stated "[w]e plan to take swift action to understand the significance of this outcome with regulators and members of the ALS community." (Refinitiv StreetEvents, "Amylyx Pharmaceuticals Inc To Provide Pharmaceuticals Phoenix Update," March 8, 2024). When analysts asked for any information driving the Phoenix failure, Defendant Cohen would not respond, saying only that "I think as we're going through this upcoming period, we'll determine what the future of that analysis and everything is as well."

**ANSWER:** To the extent that Paragraph 150 characterizes a press release and webcast transcript, Defendants state that such documents speak for themselves, refer the Court to such documents for their content, and deny the allegations in Paragraph 150 to the extent they are inconsistent with the content of the documents. To the extent a further response is required, Defendants deny the allegations in Paragraph 150.

151.    "Investors didn't take the news [of the Phoenix failure] well"—Amylyx stock "closed 82% lower" after this announcement. (WSJ, "Wall Street Predicted a Blockbuster. Now the Drug May Be Withdrawn," March 10, 2024). "The decline signals that investors now think the drug is worth something close to zero, or perhaps less than that if one factors in continued expenses associated with it" and will be a "death blow" to Relyvrio. (*Id.*). This failure more broadly also "rais[ed] questions about the future of the drug and the company itself." (*Id.*).

**ANSWER:** To the extent that Paragraph 151 characterizes a March 10, 2024 *Wall Street Journal* article, Defendants state that such article speaks for itself, refer the Court to the article for its content, and deny the allegations in Paragraph 151 to the extent they are inconsistent with the content of the article. To the extent a further response is required, Defendants deny the allegations

in Paragraph 151.

152.    On April 4, 2024, speculation about Amylyx's and Relyvrio's future was partially answered when the Company confirmed it would "voluntarily withdraw" Relyvrio from the market. In a press release, the Company revealed it "has started a process with the [FDA] . . . to voluntarily discontinue the marketing authorizations for [Relyvrio] . . . and remove the product from the market in the U.S. and Canada based on topline results from the Phase 3 PHOENIX trial." (Amylyx Press Release, April 4, 2024). Thus, Relyvrio "will no longer be available for new patients as of today." (*Id*.).

**ANSWER:** Defendants admit that Amylyx voluntarily ceased selling RELYVRIO® in April 2024. To the extent that Paragraph 152 characterizes an April 4, 2024 press release, Defendants state that such press release speaks for itself, refer the Court to the press release for its content, and deny the allegations in Paragraph 152 to the extent they are inconsistent with the content of the press release. To the extent a further response is required, Defendants deny the allegations in Paragraph 152.

153.    This forced a "restructuring to focus the Company's financial resources on upcoming clinical milestones" for non-ALS indications, and stated that the "Company will reduce its workforce by approximately 70% and decrease external financial commitments outside of its priority areas." (Amylyx Press Release, April 4, 2024).

**ANSWER:** Defendants admit that in April 2024, Amylyx restructured and reduced its workforce by approximately 70%. To the extent that Paragraph 153 characterizes an April 4, 2024 press release, Defendants state that such press release speaks for itself, refer the Court to the press release for its content, and deny the allegations in Paragraph 153 to the extent they are inconsistent with the content of the press release. To the extent a further response is required, Defendants deny the allegations in Paragraph 153.

154.    In that release, the Company also stated "Amylyx will continue to evaluate and share learnings from PHOENIX to help inform future ALS research" and "[t]opline data from PHOENIX will be presented at the American Academy of Neurology (AAN) Annual Meeting in Denver and online, taking place April 13-18, 2024." (Amylyx Press Release, April 4, 2024). "The presentation is scheduled to occur on April 16, 2024, during the Clinical Trials Plenary Session (9:15 a.m. – 11:30 a.m. MT) and will be made available on the "Publications and Presentations" section of the Company's website following the conclusion of the presentation." (*Id*.).

**ANSWER:** To the extent that Paragraph 154 characterizes an April 4, 2024 press release, Defendants state that such press release speaks for itself, refer the Court to the press release for its content, and deny the allegations in Paragraph 154 to the extent they are inconsistent with the content of the press release. To the extent a further response is required, Defendants deny the allegations in Paragraph 154.

155.	Yet to date, Amylyx has *not* provided any public information about why the Phoenix trial failed. Notably, contrary to its representations on April 4, 2024, Amylyx did *not* "present[]" any "topline [Phoenix] data at the American Academy of Neurology (AAN)" conference.

**ANSWER:** To the extent that Paragraph 155 characterizes an April 4, 2024 press release, Defendants state that such press release speaks for itself, refer the Court to the press release for its content, and deny the allegations in Paragraph 155 to the extent they are inconsistent with the content of the press release. Defendants otherwise deny the allegations in Paragraph 155.

156.	During the Class Period, Defendants had both the motive and opportunity to commit fraud. Moreover, Defendants had actual knowledge of the misleading nature of the statements they made, or acted in reckless disregard of the true information known to them at the time. In so doing, Defendants participated in a scheme to defraud and committed acts, practices, and participated in a course of business that operated as a fraud or deceit on purchasers of the Company's securities during the Class Period.

**ANSWER:** Paragraph 156 consists of legal conclusions to which no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 156 and specifically deny that the Class Period is November 11, 2022 to November 8, 2023 based on the Motion to Dismiss Order, which limited the actionable statements to only statements about growth potential made between May 11, 2023 and August 10, 2023.

157.	***Stock sales***. Indeed, during the Class Period, while disseminating the materially false and misleading statements and omissions alleged herein that artificially inflated the market prices of Amylyx securities, Defendants Cohen and Klee each sold 105,968 shares of Amylyx common stock for total proceeds of over $3.4 million, while Defendant Frates sold 100,158 shares of Amylyx common stock for total proceeds of over $3 million. As FE2 related, FE2 added: "When you see mass amounts of stock being liquidated by the CEOs, the CFO, and the COO, and God knows who else because we didn't get information about [Defendant Olinger's] direct reports, but

65

we knew they were also liquidating, we were like what do they know if they're liquidating? And why are they liquidating if they keep on telling us that the Phoenix trial is looking good?"

**ANSWER:** Defendants deny the allegations in Paragraph 157 and specifically deny that the Class Period is November 11, 2022 to November 8, 2023 based on the Motion to Dismiss Order, which limited the actionable statements to only statements about growth potential made between May 11, 2023 and August 10, 2023, except admit that between January and March 2023, Mr. Cohen and Mr. Klee each sold shares of Amylyx stock representing approximately 3.6% of their equity owned and vested and pursuant to preexisting Rule 10b5-1 trading plans.

158.    ***Defendants were aware of or recklessly disregarded the issues with the declining new subscribers and the high number of discontinuations that inflated the ramp for growth beyond the initial bolus of patients***. As the former employees related, Defendants were tracking rates of new subscribers, and knew that the initial bolus of demand had severely tapered off within a few months of that launch initiated on October 24, 2022. Defendants also were aware of, and tracking, discontinuations in real time, and these dropouts were occurring mere weeks into the commercial launch. Despite this knowledge, Defendants, however, continued to represent that the drug presented opportunities for untapped growth. In addition, Defendants have vast experience with the nature of the ALS disease, and would know that there was no opportunity for growth within ALS centers after the bolus, newly diagnosed patients, or patients being treated by general neurologists. Surely if Amylyx's sales representatives knew of these realities, management did also.

**ANSWER:** Defendants deny the allegations in Paragraph 158.

159.    ***Defendants hid data on new subscribers and discontinuations from analysts throughout the launch***. Defendants stopped reporting new patient subscriber data to market research services, IQVIA and Symphony, in the summer of 2023. (Amylyx, Q3 2023 Earnings Call). And, despite discontinuations being a key metric necessary to evaluate true demand and potential for growth, and despite tracking these discontinuations in real time, Defendants repeatedly stated that they would not share that data, nor could they see any trends. Yet former employees reveal that in the initial bolus of demand, patients were discontinuing mere weeks after starting the treatment. Defendants took deliberate steps to hide this data from the market, notably by evading investor questions on the topic throughout the launch. In addition, Defendants adopted a "closed" pharmacy network, forbidding analysts from making their own informed judgments about the ongoing data. And, contrary to standard practice, Defendants refused to provide company-wide metrics on this data internally, obscuring its own employees from the true nature of the discontinuations, subscriber rates, and the ability for growth.

**ANSWER:** Defendants deny the allegations in Paragraph 159, except admit that Amylyx dispensed RELYVRIO® through a closed pharmacy network.

66

160.    ***While Defendants related internally that sales were not meeting targets, they represented to the market the launch was steady and thriving***.  As former employees relate, Defendants' statements to the market about steady, strong growth did not match the sentiments the sales teams received internally.  Behind the closed doors of the Company, Defendants were panicked about the sales quotas not meeting their internal targets—panic that resulted in a toxic culture of unethical and desperate means to increase sales numbers at any cost.

**ANSWER:** Defendants deny the allegations in Paragraph 160.

161.    ***Post-class period developments support scienter***.  That Amylyx later had to removed Relyvrio from the market supports an inference of scienter because it reinforces that Defendants knew throughout the commercial launch that the drug did not have long-term potential for growth.  In addition, while Amylyx told the market that it would share the failed Phoenix trial data, and present on it at an upcoming conference, to date Amylyx has provided no public information about why the trial failed and did not attend that conference.  Moreover, Defendant Olinger's departure so soon after the truth was revealed raises an inference of misconduct at the executive level with respect to the pharmaceutical launch and development of Relyvrio. Indeed, former employees reveal a culture of "blame game" at Amylyx to avoid the truth about why sales were not growing, contrary to market representations.

**ANSWER:** Paragraph 161 contains legal conclusions to which no response is required.

Defendants otherwise deny the allegations in Paragraph 161.

162.    ***Defendants knew or acted with deliberate recklessness regarding the data on new subscribers and discontinuations given Relyvrio's commercial success was essential to Amylyx's core operations***. As Relyvrio was Amylyx's flagship product, and the only product approved for commercial use in the U.S., the outcome of this launch would make or break the Company. Indeed, when the Phoenix results revealed Relyvrio's failure to achieve any statistical significance, Amylyx's stock crashed 82%, forcing the Company to restructure and lay off 70% of its workforce. Given the dire stakes involved, it is not plausible that management would not be aware of the negative data about the drug's near and long-term prospects.

**ANSWER:** Defendants deny the allegations in Paragraph 162, except admit that (1) at the

time of its launch, RELYVRIO® was Amylyx's only commercial product, and (2) in April 2024,

Amylyx restructured and reduced its workforce by 70%.

163.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Amylyx securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures.  Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

**ANSWER:** The allegations in Paragraph 163 consist of legal conclusions, to which no response is required. To the extent Paragraph 163 contains factual allegations to which a response is required, Defendants deny the allegations in Paragraph 163 and specifically deny that the Class Period is November 11, 2022 to November 8, 2023 based on the Motion to Dismiss Order, which limited the actionable statements to only statements about growth potential made between May 11, 2023 and August 10, 2023, except admit that Plaintiff brings this action against Defendants on behalf of a putative class.

164.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Amylyx securities were actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Amylyx or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

**ANSWER:** The allegations in Paragraph 164 consist of legal conclusions, to which no response is required. To the extent Paragraph 164 contains factual allegations to which a response is required, Defendants deny the allegations in Paragraph 164 and specifically deny that the Class Period is November 11, 2022 to November 8, 2023 based on the Motion to Dismiss Order, which limited the actionable statements to only statements about growth potential made between May 11, 2023 and August 10, 2023, except admit that Amylyx's stock is traded on NASDAQ.

165.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

**ANSWER:** The allegations in Paragraph 165 consist of legal conclusions, to which no response is required. To the extent Paragraph 165 contains factual allegations to which a response is required, Defendants deny the allegations in Paragraph 165.

166.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff

has no interests antagonistic to or in conflict with those of the Class.

**ANSWER:** The allegations in Paragraph 166 consist of legal conclusions, to which no response is required. To the extent Paragraph 166 contains factual allegations to which a response is required, Defendants deny the allegations in Paragraph 166.

167.        Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;
- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Amylyx;
- whether the Individual Defendants caused Amylyx to issue false and misleading financial statements during the Class Period;
- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;
- whether the prices of Amylyx securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and
- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

**ANSWER:** The allegations in Paragraph 167 consist of legal conclusions, to which no response is required. To the extent Paragraph 167 contains factual allegations to which a response is required, Defendants deny the allegations in Paragraph 167 and specifically deny that the Class Period is November 11, 2022 to November 8, 2023 based on the Motion to Dismiss Order, which limited the actionable statements to only statements about growth potential made between May 11, 2023 and August 10, 2023.

168.        A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

**ANSWER:** The allegations in Paragraph 168 consist of legal conclusions, to which no

response is required. To the extent Paragraph 168 contains factual allegations to which a response is required, Defendants deny the allegations in Paragraph 168.

169.    Plaintiff will rely, in part, upon the presumption of reliance established by the fraud- on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;
- the omissions and misrepresentations were material;
- Amylyx securities are traded in an efficient market;
- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;
- the Company traded on the NASDAQ and was covered by multiple analysts;
- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and
- Plaintiff and members of the Class purchased, acquired and/or sold Amylyx securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

**ANSWER:** The allegations in Paragraph 169 consist of legal conclusions, to which no response is required. To the extent Paragraph 169 contains factual allegations to which a response is required, Defendants deny the allegations in Paragraph 169 and specifically deny that the Class Period is November 11, 2022 to November 8, 2023 based on the Motion to Dismiss Order, which limited the actionable statements to only statements about growth potential made between May 11, 2023 and August 10, 2023.

170.    Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

**ANSWER:** The allegations in Paragraph 170 consist of legal conclusions, to which no response is required. To the extent Paragraph 170 contains factual allegations to which a response is required, Defendants deny the allegations in Paragraph 170.

171.    Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as

70

detailed above.

**ANSWER:** The allegations in Paragraph 171 consist of legal conclusions, to which no response is required. To the extent Paragraph 171 contains factual allegations to which a response is required, Defendants deny the allegations in Paragraph 171 and specifically deny that the Class Period is November 11, 2022 to November 8, 2023 based on the Motion to Dismiss Order, which limited the actionable statements to only statements about growth potential made between May 11, 2023 and August 10, 2023.

## COUNT I

### (Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)

172.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

**ANSWER:** In response to Paragraph 172, Defendants repeat and incorporate by reference their responses to each and every allegation contained in the unnumbered paragraph on page 1 of the Amended Complaint and Paragraphs 1 through 171, and footnotes 1 through 3 as if fully set forth herein.

173.     This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

**ANSWER:** The allegations in Paragraph 173 consist of legal conclusions, to which no response is required. To the extent Paragraph 173 contains factual allegations to which a response is required, Defendants deny the allegations in Paragraph 173.

174.     During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members,

as alleged herein; (ii) artificially inflate and maintain the market price of Amylyx securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Amylyx securities and options at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

**ANSWER:** The allegations in Paragraph 174 consist of legal conclusions, to which no response is required. To the extent Paragraph 174 contains factual allegations to which a response is required, Defendants deny the allegations in Paragraph 174 and specifically deny that the Class Period is November 11, 2022 to November 8, 2023 based on the Motion to Dismiss Order, which limited the actionable statements to only statements about growth potential made between May 11, 2023 and August 10, 2023.

175.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Amylyx securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Amylyx's finances and business prospects.

**ANSWER:** The allegations in Paragraph 175 consist of legal conclusions, to which no response is required. To the extent Paragraph 175 contains factual allegations to which a response is required, Defendants deny the allegations in Paragraph 175.

176.     By virtue of their positions at Amylyx, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

**ANSWER:** The allegations in Paragraph 176 consist of legal conclusions, to which no response is required. To the extent Paragraph 176 contains factual allegations to which a response is required, Defendants deny the allegations in Paragraph 176.

177.        Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of Amylyx, the Individual Defendants had knowledge of the details of Amylyx's internal affairs.

**ANSWER:** The allegations in Paragraph 177 consist of legal conclusions, to which no response is required. To the extent Paragraph 177 contains factual allegations to which a response is required, Defendants deny the allegations in Paragraph 177.

178.        The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Amylyx. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Amylyx's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Amylyx securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Amylyx's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Amylyx securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

**ANSWER:** The allegations in Paragraph 178 consist of legal conclusions, to which no response is required. To the extent Paragraph 178 contains factual allegations to which a response is required, Defendants deny the allegations in Paragraph 178 and specifically deny that the Class Period is November 11, 2022 to November 8, 2023 based on the Motion to Dismiss Order, which limited the actionable statements to only statements about growth potential made between May 11, 2023 and August 10, 2023.

179.        During the Class Period, Amylyx securities were traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Amylyx securities at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Amylyx securities was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of Amylyx securities declined sharply upon

public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

**ANSWER:** The allegations in Paragraph 179 consist of legal conclusions, to which no response is required. To the extent Paragraph 179 contains factual allegations to which a response is required, Defendants deny the allegations in Paragraph 179 and specifically deny that the Class Period is November 11, 2022 to November 8, 2023 based on the Motion to Dismiss Order, which limited the actionable statements to only statements about growth potential made between May 11, 2023 and August 10, 2023.

180.    By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

**ANSWER:** The allegations in Paragraph 180 consist of legal conclusions, to which no response is required. To the extent Paragraph 180 contains factual allegations to which a response is required, Defendants deny the allegations in Paragraph 180.

181.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

**ANSWER:** The allegations in Paragraph 181 consist of legal conclusions, to which no response is required. To the extent Paragraph 181 contains factual allegations to which a response is required, Defendants deny the allegations in Paragraph 181 and specifically deny that the Class Period is November 11, 2022 to November 8, 2023 based on the Motion to Dismiss Order, which limited the actionable statements to only statements about growth potential made between May 11, 2023 and August 10, 2023.

**COUNT II**

**(Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)**

182.    Plaintiff repeats and re-alleges each and every allegation contained in the

foregoing paragraphs as if fully set forth herein.

**ANSWER:** In response to Paragraph 182, Defendants repeat and incorporate by reference their responses to each and every allegation contained in the unnumbered paragraph on page 1 of the Amended Complaint and Paragraphs 1 through 182, and footnotes 1 through 3 as if fully set forth herein.

183. During the Class Period, the Individual Defendants participated in the operation and management of Amylyx, and conducted and participated, directly and indirectly, in the conduct of Amylyx's business affairs. Because of their senior positions, they knew the adverse non-public information about Amylyx's misstatement of income and expenses and false financial statements.

**ANSWER:** The allegations in Paragraph 183 consist of legal conclusions, to which no response is required. To the extent Paragraph 183 contains factual allegations to which a response is required, Defendants deny the allegations in Paragraph 183 and specifically deny that the Class Period is November 11, 2022 to November 8, 2023 based on the Motion to Dismiss Order, which limited the actionable statements to only statements about growth potential made between May 11, 2023 and August 10, 2023.

184. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Amylyx's financial condition and results of operations, and to correct promptly any public statements issued by Amylyx which had become materially false or misleading.

**ANSWER:** The allegations in Paragraph 184 consist of legal conclusions, to which no response is required. To the extent Paragraph 184 contains factual allegations to which a response is required, Defendants deny the allegations in Paragraph 184.

185. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Amylyx disseminated in the marketplace during the Class Period concerning Amylyx's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Amylyx to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of Amylyx within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Amylyx securities.

**ANSWER:** The allegations in Paragraph 185 consist of legal conclusions, to which no response is required. To the extent Paragraph 185 contains factual allegations to which a response is required, Defendants deny the allegations in Paragraph 185 and specifically deny that the Class Period is November 11, 2022 to November 8, 2023 based on the Motion to Dismiss Order, which limited the actionable statements to only statements about growth potential made between May 11, 2023 and August 10, 2023.

186.    Each of the Individual Defendants, therefore, acted as a controlling person of Amylyx. By reason of their senior management positions and/or being directors of Amylyx, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Amylyx to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of Amylyx and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

**ANSWER:** The allegations in Paragraph 186 consist of legal conclusions, to which no response is required. To the extent Paragraph 186 contains factual allegations to which a response is required, Defendants deny the allegations in Paragraph 186.

187.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Amylyx.

**ANSWER:** The allegations in Paragraph 187 consist of legal conclusions, to which no response is required. To the extent Paragraph 187 contains factual allegations to which a response is required, Defendants deny the allegations in Paragraph 187.

## V. PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.    Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiff and the other members of the Class prejudgment and post- judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs;

76

and

D.        Awarding such other and further relief as this Court may deem just and proper.

**RESPONSE TO PLAINTIFF'S PRAYER FOR RELIEF**

Defendants deny any wrongdoing and, except as expressly admitted in Paragraphs 1 through 187 above, deny all allegations, and specifically deny that Plaintiff or the putative class members Plaintiff represents are entitled to any relief from Defendants.

**AFFIRMATIVE DEFENSES**

Defendants offer the following defenses in response to the allegations set forth in the Amended Complaint. Defendants reserve the right to amend this answer, to amend, modify and/or supplement their defenses, and to plead and assert additional defenses as they become known and appropriate during the course of the litigation, including without limitation any defenses that may arise as a result of any findings, conclusions, or other action taken. The statement of any defense does not assume the burden of proof on any issue as to which applicable law places the burden on Plaintiff. To the extent that any of the defenses asserted herein or to be asserted in the future is mutually exclusive with another defense asserted herein or to be asserted in the future, such defense is asserted in the alternative to the other.

**FIRST AFFIRMATIVE DEFENSE**

Plaintiff is not entitled to the certification of any class because Plaintiff's claims are not suitable for a class action under Rule 23 of the Federal Rules of Civil Procedure or any other applicable law, and Plaintiff is not a suitable class representative.

**SECOND AFFIRMATIVE DEFENSE**

This action is barred, in whole or in part, because the Amended Complaint fails to state a claim upon which relief can be granted.

**THIRD AFFIRMATIVE DEFENSE**

This action is barred, in whole or in part, because the Amended Complaint fails to meet the requirements of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act, 14 U.S.C. § 78u-5 ("PSLRA").

## FOURTH AFFIRMATIVE DEFENSE

This action is barred, in whole or in part, because Plaintiff has failed to plead his claims against Defendants with particularity.

## FIFTH AFFIRMATIVE DEFENSE

This action is barred, in whole or in part, because it fails to allege any actionable misstatement, misrepresentation or omission by any Defendant.

## SIXTH AFFIRMATIVE DEFENSE

This action is barred, in whole or in part, because none of the alleged misrepresentations or omissions referenced in the Amended Complaint were, in fact, false or misleading in any way.

## SEVENTH AFFIRMATIVE DEFENSE

This action is barred, in whole or in part, because the statements alleged in the Amended Complaint, if any were in fact made, did not contain untrue material facts and all statements alleged to have been made (if any) had a reasonable basis in fact and/or were immaterial as a matter of law.

## EIGHTH AFFIRMATIVE DEFENSE

At all relevant times, Defendants acted without intent to defraud and without recklessness, and Defendants believed, at the time the statements alleged in the Amended Complaint were made, if any were in fact made, that those statements were correct and not misleadingly incomplete.

## NINTH AFFIRMATIVE DEFENSE

This action is barred, in whole or in part, because the allegedly untrue statements of fact

78

and omissions of fact referenced in the Amended Complaint were immaterial as a matter of law.

## TENTH AFFIRMATIVE DEFENSE

This action is barred, in whole or in part, because the statements alleged in the Amended Complaint, if any were in fact made, bespoke caution about the risks of investing in Amylyx, were corporate puffery, opinion or were forward-looking statements.

## ELEVENTH AFFIRMATIVE DEFENSE

This action is barred, in whole or in part, because the facts alleged to have been misrepresented or omitted were forward-looking and are rendered inactionable by the safe harbor provisions of the PSLRA.

## TWELFTH AFFIRMATIVE DEFENSE

This action is barred, in whole or in part, because Plaintiff lacks standing to sue or to pursue any claims against Defendants.

## THIRTEENTH AFFIRMATIVE DEFENSE

This action is barred, in whole or in part, because the fraud on the market theory is not applicable and/or is not a basis of liability with respect to one or more of the claims asserted in this action.

## FOURTEENTH AFFIRMATIVE DEFENSE

This action is barred, in whole or in part, because Defendants did not act with the requisite scienter. Defendants did not make any of the alleged misrepresentations or omissions in the Amended Complaint with the intent to deceive and/or for the purpose of inducing the purchase or sale of Amylyx stock by Plaintiff or the class members Plaintiff represents. Defendants are not liable for Plaintiff's claims because Defendants did not know, and could not have known with the exercise of reasonable care, the untruth of any alleged misrepresentations or the fact of any material

79

omission.

## FIFTEENTH AFFIRMATIVE DEFENSE

The action is barred, in whole or in part, because the actual facts that Plaintiff alleges to have been misrepresented or omitted were in fact known to and entered the securities market through credible sources. Plaintiff is not entitled to any recovery because the substance of the allegedly material information that Plaintiff alleges to have been omitted or misrepresented was in fact disclosed in Amylyx's own public filings and announcements, in the documents and securities referenced in the Amended Complaint, in the public disclosures of other parties and non-parties, and from other sources that were otherwise publicly available and/or widely known to the market and to the investing community.

## SIXTEENTH AFFIRMATIVE DEFENSE

The action is barred, in whole or in part, because Plaintiff and the market were informed of the material information and risks associated with their investments in SEC filings and their amendments, press releases, proxy statements, advertisements, and other materials available to Plaintiff and/or the market.

## SEVENTEENTH AFFIRMATIVE DEFENSE

This action is barred, in whole or in part, because at all relevant times Defendants had no duty to disclose the allegedly omitted information.

## EIGHTEENTH AFFIRMATIVE DEFENSE

This action is barred, in whole or in part, because Defendants were under no duty to revise, update, and/or correct any previously made statements that Plaintiff alleges were not subsequently revised, updated and/or corrected.

## NINETEENTH AFFIRMATIVE DEFENSE

This action is barred, in whole or in part, because the statements alleged in the Amended Complaint to be false or misleading, were not made for the purpose of inducing the purchase or sale of a security.

**TWENTIETH AFFIRMATIVE DEFENSE**

This action is barred, in whole or in part, because Plaintiff has not suffered any legally cognizable injury or damage.

**TWENTY-FIRST AFFIRMATIVE DEFENSE**

This action is barred, in whole or in part, because Defendants deny that they fraudulently, recklessly, negligently or otherwise engaged in any act of deceit, conspiracy, fraud, or any other action, alleged conduct, or alleged omission, which was a proximate cause of any injury to Plaintiff or the class members Plaintiff represents.

**TWENTY-SECOND AFFIRMATIVE DEFENSE**

This action is barred, in whole or in part, due to the absence of loss causation. Specifically, Defendants were not the cause of any alleged injury or loss or damages suffered by Plaintiff or the class members Plaintiff represents. Any injury or loss or damages suffered by Plaintiff the class members Plaintiff represents is the proximate result, either in whole or in part, of actions or omissions of persons or entities other than, or superseding and intervening events unconnected to, Defendants.

**TWENTY-THIRD AFFIRMATIVE DEFENSE**

This action is barred, in whole or in part, because of the absence of actual or justifiable reliance by Plaintiff or the class members Plaintiff represents on the statements, acts, or omissions alleged in the Amended Complaint to have been made. Plaintiff or the class members Plaintiff represents would have purchased Amylyx stock even with full knowledge of the facts that Plaintiff

81

now alleges were misrepresented or omitted.

## TWENTY-FOURTH AFFIRMATIVE DEFENSE

This action is barred, in whole or in part, because any damages or injuries suffered by Plaintiff or the class members Plaintiff purport to represents are the proximate result, either in whole or in part, of actions or omissions of persons or entities other than Defendants.

## TWENTY-FIFTH AFFIRMATIVE DEFENSE

This action is barred, in whole or in part, by the doctrines of contributory negligence, comparative negligence, and/or assumption of risk. Plaintiff either knew or should have known about the matters alleged in the Amended Complaint, and their own negligence or other fault proximately contributed to the injuries allegedly suffered by Plaintiff.

## TWENTY-SIXTH AFFIRMATIVE DEFENSE

This action is barred, in whole or in part, by the applicable statutes of limitations and other applicable periods of repose.

## TWENTY-SEVENTH AFFIRMATIVE DEFENSE

This action is barred, in whole or in part, by the doctrine of laches.

## TWENTY-EIGHTH AFFIRMATIVE DEFENSE

This action is barred, in whole or in part, because Defendants justifiably relied on information provided to them by others.

## TWENTY-NINTH AFFIRMATIVE DEFENSE

This action is barred, in whole or in part, because Defendants are not liable for any portion of Plaintiff's loss or damage caused by factors other than the misrepresentations and omissions alleged in the Amended Complaint.

## THIRTIETH AFFIRMATIVE DEFENSE

This action is barred, in whole or in part, because Plaintiff and the class members Plaintiff represents failed to take reasonable action to mitigate any damages allegedly sustained as a result of the facts alleged in the Amended Complaint.

## THIRTY-FIRST AFFIRMATIVE DEFENSE

This action is barred, in whole or in part, because the alleged damages are speculative and thus not recoverable.

## THIRTY-SECOND AFFIRMATIVE DEFENSE

This action is barred, in whole or in part, because Plaintiff and the class members Plaintiff represents are not entitled to the compensatory damages requested in the Amended Complaint.

## THIRTY-THIRD AFFIRMATIVE DEFENSE

This action is barred, in whole or in part, because Plaintiff and the class members Plaintiff represents are not entitled to recovery of attorneys' fees or any other costs and expenses requested in the Amended Complaint.

## THIRTY-FOURTH AFFIRMATIVE DEFENSE

This action is barred, in whole or in part, because, and to the extent that, any relief or recovery would unjustly enrich or constitute a windfall to Plaintiff and the class members Plaintiff represents. Any damages that may be awarded in connection with the claims asserted in the Amended Complaint are offset and/or must be reduced by the amount of the tax benefits accruing to Plaintiff and the class members Plaintiff represents, by virtue of their deductions of capital loss, in order to prevent unjust enrichment of Plaintiff and the class members Plaintiff represents.

## THIRTY-FIFTH AFFIRMATIVE DEFENSE

This action is barred, in whole or in part, by the doctrines of estoppel, unclean hands, fraud, *in pari delicto*, waiver, ratification, and/or other related equitable doctrines.

## THIRTY-SIXTH AFFIRMATIVE DEFENSE

This action is barred, in whole or in part, due to Defendants' compliance with all statutes, regulations, or other laws in effect at the time of the conduct alleged in the Amended Complaint.

## THIRTY-SEVENTH AFFIRMATIVE DEFENSE

This action is barred, in whole or in part, to the extent it seeks to impose upon Defendants disclosure obligations that are inconsistent with, or in excess of, those imposed pursuant to the federal securities laws, including the Exchange Act and the rules and regulations promulgated thereunder by the SEC.

## THIRTY-EIGHTH AFFIRMATIVE DEFENSE

This action is barred, in whole or in part, because Plaintiff cannot establish the primary liability necessary to assert a control person liability claim under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a). The Individual Defendants are not subject to control person liability, as they and their subordinates acted in good faith and did not directly or indirectly induce any act alleged to constitute a violation of Section 10(b) of the Exchange Act.

## THIRTY-NINTH AFFIRMATIVE DEFENSE

This action is barred, in whole or in part, by SEC Rule 10b5-l.

## FORTIETH AFFIRMATIVE DEFENSE

This action is barred, in whole or in part, by virtue of statutory defenses, including, but not limited to, 15 U.S.C. § 78t(a), or the governing local laws of this jurisdiction.

## FORTY-FIRST AFFIRMATIVE DEFENSE

This action is barred, in whole or in part, because other parties not named in the Amended Complaint may be indispensable parties to this Action.

WHEREFORE, Defendants respectfully request that a final judgment be entered in their

favor dismissing the Amended Complaint with prejudice; awarding Defendants the reasonable costs of this action, including reasonable attorneys' fees; and granting Defendants such other and further relief as the Court deems just and proper.

## **<u>JURY DEMAND</u>**

Defendants demand a trial by jury of all issues so triable.

Dated: October 30, 2025

Respectfully submitted,

<u>/s/ *Caroline Bullerjahn*</u>
Caroline Bullerjahn (BBO# 657241)
GOODWIN PROCTER LLP
100 Northern Avenue
Boston, MA 02210
Tel.: (617) 570-1000
Fax: (617) 523-1231
cbullerjahn@goodwinlaw.com

*Attorney for Defendants*

86

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document was filed through the Court's CM/ECF system on

October 30, 2025 and will be sent electronically to registered participants as identified on the

Notice of Electronic Filing.


Dated: October 30, 2025

<u>*/s/ Caroline H. Bullerjahn*</u>
Caroline H. Bullerjahn
